1

2

3

UNITED STATES DISTRICT COURT

4

CENTRAL DISTRICT OF CALIFORNIA

5

WESTERN DIVISION

6

7

UNITED STATES OF AMERICA,          )
                                   )
8                                  )
                                   )
9          PLAINTIFF,              )
                                   )
10             V.                  )
                                   ) 20-MJ-4508
11                                 ) LOS ANGELES, CALIFORNIA
    BENJAMIN JONG REN HUNG,        )
12                                 ) SEPTEMBER 28, 2020
                                   ) (8:38 A.M. TO 10:24 A.M.)
13                                 )
          DEFENDANT.               )
14  _____)

15

TELEPHONIC DETENTION HEARING

16

BEFORE THE HONORABLE PATRICIA DONAHUE

17                  UNITED STATES MAGISTRATE JUDGE

18

APPEARANCES:            SEE NEXT PAGE

19

COURT REPORTER:         RECORDED; COURTSMART

20

COURTROOM DEPUTY:       ISABEL MARTINEZ

21

TRANSCRIBER:            DOROTHY BABYKIN

22                          COURTHOUSE SERVICES
                            1218 VALEBROOK PLACE
23                          GLENDORA, CALIFORNIA  91740
                            (626) 963-0566

24

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

2

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF UNITED STATES OF AMERICA:

 3              NICOLA T. HANNA
               UNITED STATES ATTORNEY
 4              BRANDON FOX
               CHIEF, CRIMINAL DIVISION
 5              ASSISTANT UNITED STATES ATTORNEY
               BY:  FRANCES LEWIS
 6                  DAVID RYAN
               ASSISTANT UNITED STATES ATTORNEYS
 7              312 NORTH SPRING STREET
               LOS ANGELES, CALIFORNIA  90012
 8              (APPEARING VIA VIDEO CONFERENCE)

 9   FOR THE DEFENDANT BENJAMIN JONG REN HUNG:

10              AMY KARLIN, ACTING
11              FEDERAL PUBLIC DEFENDER
               BY:  ERIN MURPHY
12              DEPUTY FEDERAL PUBLIC DEFENDER
               321 EAST 2ND STREET
13              LOS ANGELES, CALIFORNIA  90012
               (APPEARING VIA VIDEO CONFERENCE.)
14
     ALSO PRESENT:
15
               ANHAU EWELL (PHONETIC)
16              U.S. PROBATION AND PRETRIAL SERVICES OFFICER

17              DANIEL NIXON
               STATE COUNSEL FOR MR. HUNG
18

19

20

21

22

23

24

25
```

3

1                           I N D E X

2    20-MJ-4508                          SEPTEMBER 28, 2020

3    PROCEEDINGS:   DETENTION HEARING

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          LOS ANGELES, CALIFORNIA; SEPTEMBER 28, 2020; 8:38 A.M.

2              THE CLERK:  -- PATRICIA DONAHUE PRESIDING.

3              CALLING CASE NUMBER 20-MJ-4508, UNITED STATES VERSUS

4      BENJAMIN JUNG REN HUNG.

5              COUNSEL, PLEASE STATE YOUR APPEARANCES, STARTING WITH

6      PLAINTIFFS FIRST.

7              MS. LEWIS:  GOOD MORNING, YOUR HONOR.

8              FRANCES LEWIS FOR THE UNITED STATES, APPEARING VIA

9      VIDEO ALONG WITH AUSA DAVE RYAN, ALSO ON VIDEO.

10             (PAUSE IN PROCEEDINGS.)

11             THE CLERK:  MS. MURPHY, CAN YOU HEAR US?

12             (PAUSE IN PROCEEDINGS.)

13             THE CLERK:  MS. MURPHY, ARE YOU THERE?

14             MS. MURPHY:  YES.  CAN YOU HEAR ME?

15             THE CLERK:  YES.  THANK YOU.

16             YOU CAN MAKE YOUR APPEARANCE NOW.

17             MS. MURPHY:  OKAY.  THANK YOU SO MUCH.

18             I APOLOGIZE, YOUR HONOR, FOR THE PROBLEM WITH THE

19     TECHNOLOGY.

20             THIS IS ERIN MURPHY FROM THE FEDERAL PUBLIC

21     DEFENDER'S OFFICE APPEARING ON BEHALF OF MR. HUNG, WHO IS IN

22     CUSTODY AND APPEARS TO BE APPEARING THROUGH VIDEO

23     TELECONFERENCE.

24             AND THERE SHOULD BE A WAIVER ON FILE ALREADY FROM OUR

25     LAST --

5

1          THE COURT:  THANK YOU, COUNSEL.

2          GOOD MORNING TO EVERYONE.

3          MS. MURPHY, NO NEED TO APOLOGIZE.  THE TECHNICAL

4   DIFFICULTIES ARE NOT -- ARE NOT UNCOMMON.

5          GOOD MORNING, MR. HUNG.

6          CAN YOU HEAR ME?

7          THE DEFENDANT:  YES, YOUR HONOR, I CAN.  THANK YOU.

8          THE COURT:  ALL RIGHT.

9          THE COURT NOTES THERE IS A CONSENT TO VIDEO

10  TELEPHONIC CONFERENCE ON FILE.  AND ACCORDING TO THIS FORM, MR.

11  HUNG HAS WAIVED HIS RIGHT TO APPEAR IN PERSON AND HAS AGREED TO

12  APPEAR VIA VIDEO OR TELEPHONIC CONFERENCE AT A DETENTION BAIL

13  REVIEW HEARING.

14          IS THAT CORRECT, MR. HUNG?

15          THE DEFENDANT:  YES, YOUR HONOR.

16          THE COURT:  ALL RIGHT.  THEN THAT WAIVER IS ON FILE.

17  AND WE WILL PROCEED THIS MORNING WITH THE DEFENDANT APPEARING

18  BY VIDEO OR TELEPHONIC CONFERENCE.

19          WE ARE HERE FOR THE DETENTION HEARING.  THE COURT HAS

20  RECEIVED AND REVIEWED THE CRIMINAL COMPLAINT AND THE SUPPORTING

21  AFFIDAVIT.

22          THE COURT HAS ALSO RECEIVED AND REVIEWED THE REPORT

23  AND RECOMMENDATION OF THE PRETRIAL SERVICES AGENCY, DATED

24  SEPTEMBER 23RD, 2020 AND THE REPORT AND RECOMMENDATION OF THE

25  PRETRIAL SERVICES AGENCY DATED SEPTEMBER 28, 2020.

1          DOES THE GOVERNMENT HAVE ANYTHING TO PROFFER IN

2    ADDITION TO THE ITEMS THAT I JUST STATED?

3          MS. LEWIS:  NO, YOUR HONOR.  UNLESS THE COURT HAD ANY

4    ADDITIONAL QUESTIONS, WE CERTAINLY WOULD BE GLAD TO HIGHLIGHT

5    SOME OF THE CONCERNING TEXT MESSAGES THAT WERE REFERENCED IN

6    THE COMPLAINT AND THE AFFIDAVIT AS WELL AS ANY OF THE

7    ADDITIONAL MATERIAL THAT WAS FOUND IN THE SEARCH WARRANTS THAT

8    WERE EXECUTED AT THE TIME OF DEFENDANT'S ARREST.

9          I DO JUST WANT TO NOTE FOR THE COURT ONE CORRECTION

10   OR ONE POTENTIALLY CONFUSING STATEMENT BASED ON HOW WE WERE

11   READING PRETRIAL SERVICES REPORT.

12         THERE'S AN INDICATION IN THE NEW -- IN THE NEWEST

13   REPORT FROM FRIDAY THAT WHEN IT REFERS TO THE "FIRST RESIDENCE

14   THAT THE FIREARM HE POSSESSED DURING THE PROTESTS" WAS SEIZED

15   AT THAT RESIDENCE, THAT WAS ACTUALLY -- THE FIREARM WAS LOCATED

16   AT THAT RESIDENCE.

17         WE HAVE EVIDENCE LEADING UP TO THE PROTESTS.  BUT

18   THEN DURING THE PROTESTS WHEN HE WAS ARRESTED, THAT'S WHEN THAT

19   FIREARM WAS SEIZED.

20         SO, WHEN THE SEARCH HAPPENED LAST WEEK THEY DID NOT

21   OBTAIN THAT FIREARM.  IT WAS ALREADY IN --

22         (NOISE INTERRUPTION.)

23         MS. LEWIS:  I DID JUST WANT TO NOTE THAT ONE

24   CORRECTION TO THE INFORMATION IN PRETRIAL SERVICES REPORT.

25         BUT OTHERWISE, WE WOULD BE MOVING FOR DETENTION ON

7

1   THE BASIS OF THE COMPLAINT, THE AFFIDAVIT, PRETRIAL SERVICES

2   REPORT AND ITS RECOMMENDATION OF DETENTION.

3            AND, AGAIN, I'D BE GLAD TO COVER ANY ADDITIONAL

4   MATERIAL THE COURT WOULD LIKE ME TO COVER.

5            THE COURT:  JUST TO BE CERTAIN THAT I UNDERSTAND, I'M

6   LOOKING AT THE PRETRIAL SERVICES REPORT DATED SEPTEMBER 28,

7   2020.  AND ON PAGE 2 THE REPORT EXPLAINS THAT A SEARCH OF THREE

8   RESIDENCES WERE CONDUCTED.

9            AND AS TO THE FIRST RESIDENCE, IT STATES THAT A

10  FIREARM THAT THE DEFENDANT POSSESSED DURING THE MAY 31 INCIDENT

11  ALLEGED IN THE COMPLAINT WAS FOUND.

12           THAT IS INCORRECT.  IN FACT, THAT FIREARM WAS FOUND

13  INSIDE THE TRUCK THAT THE DEFENDANT WAS DRIVING DURING THE MAY

14  31, 2020 INCIDENT DESCRIBED IN THE AFFIDAVIT IN SUPPORT OF THE

15  COMPLAINT.

16           IS THAT CORRECT?

17           MS. LEWIS:  YES, YOUR HONOR.  AND THAT IS EXACTLY

18  CORRECT.

19           THE EVIDENCE WE HAD WAS THAT HE KEPT THE FIREARM AT

20  THAT RESIDENCE LEADING UP TO THE PROTESTS.  AND THAT'S WHERE I

21  THINK SOME OF THE CONFUSION CAME FROM, BUT IT HAD ALREADY BEEN

22  SEIZED AT THE TIME OF HIS ARREST -- BY THE TIME OF HIS FEDERAL

23  ARREST IT HAD ALREADY BEEN SEIZED FROM HIS STATE ARREST.

24           THE COURT:  ALL RIGHT.  THANK YOU, COUNSEL.

25           AND I'LL HEAR ARGUMENT IN A MOMENT.

1            I JUST WANT TO ASK MS. MURPHY, DOES THE DEFENSE HAVE

2    ANYTHING OTHER THAN THE PRETRIAL SERVICES' REPORTS AND THE

3    INFORMATION SET FORTH IN THE COMPLAINT WHICH THE COURT HAS,

4    DOES THE DEFENSE HAVE ANY ADDITIONAL EVIDENCE TO PROFFER AT

5    THIS TIME?

6            MS. MURPHY:  YES, YOUR HONOR.

7            AND I JUST -- BEFORE I MOVE INTO THAT, I WANT TO

8    CLARIFY THAT I HAVE -- I ONLY HAVE A REPORT FROM I BELIEVE IT'S

9    LAST FRIDAY.  I DON'T HAVE A REPORT DATED SEPTEMBER 28TH, WHICH

10   I'M -- WOULD BE TODAY.

11           SO, I DON'T KNOW IF THERE IS A REVISED PRETRIAL

12   SERVICES' REPORT THAT PERHAPS I DIDN'T RECEIVE.  SO, I'M --

13   BEFORE I -- BEFORE I MOVE ON, I JUST WANT TO CLARIFY THAT I

14   HAVE EVERYTHING.

15           U.S. PROBATION OFFICER ANHAU:  THIS IS EWELL ANHAU

16   WITH PROBATION AND PRETRIAL SERVICES.  I APOLOGIZE, YOUR HONOR,

17   FOR NOT MAKING AN INITIAL APPEARANCE.

18           ERIN, THE -- THE OLD BAIL REPORT SHOULD BE ATTACHED

19   TO THE DETENTION HEARING PACKET THAT WAS SENT TO YOU.  IF NOT,

20   WE CAN SEND IT TO YOU.

21           MS. MURPHY:  I THINK I HAVE -- I HAVE THE ONE THAT

22   WAS SENT LAST FRIDAY, BUT I JUST -- MAYBE I MISHEARD FROM HER

23   HONOR A REFERENCE TO A DATE OF A REPORT BEING SEPTEMBER 28TH.

24           AND, SO, I WASN'T SURE IF THERE WAS AN ADDITIONAL

25   REVISED REPORT FROM FRIDAY'S REPORT OR IF MAYBE WE'RE JUST

1    LOOKING AT THE DATE ON THE COVER SHEET OF THE FRIDAY REPORT

2    THAT JUST INDICATES THE DATE OF THE HEARING.

3            THE COURT:  YES.  I'M LOOKING AT THE COVER SHEET.

4    THAT'S HOW IT'S -- I'M REFERRING TO IT.  SO, IT'S THE SECOND

5    REPORT.  THERE ARE TWO PRETRIAL SERVICES' --

6            MS. MURPHY:  UNDERSTOOD.  OKAY.

7            THE COURT:  -- REPORTS.

8            MS. MURPHY:  OKAY.  THANK YOU.  THAT -- THAT

9    CLARIFIES THINGS --

10           THE COURT:  OKAY.

11           MS. MURPHY:  -- VERY MUCH ON MY --

12           SO, YOUR HONOR, THERE -- THERE IS SOME EVIDENCE THAT

13   I WOULD LIKE TO PROFFER.  I THINK PERHAPS IT MAKES SENSE TO GO

14   THROUGH IT AS I -- AS I GO THROUGH, YOU KNOW, MY ARGUMENT FOR

15   BOND.

16           I SUBMITTED TO PRETRIAL SERVICES OVER THE WEEKEND A

17   PROPOSED BOND PACKAGE.  AND I -- I CAN GO INTO THAT RIGHT NOW

18   IF -- IF YOU WOULD LIKE.

19           THE COURT:  YES.  I -- YES.

20           MS. MURPHY:  OKAY.

21           THE COURT:  PLEASE.

22           MS. MURPHY:  SO -- SO, WE WOULD BE PROPOSING A BOND

23   OF -- OF $3.525 MILLION CONSISTING OF 2.8 MILLION SECURED BY

24   EQUITY IN MR. HUNG'S PARENTS' HOME IN SAN MARINO; $400,000

25   SECURED BY EQUITY IN PROPERTY OWNED BY HIS BROTHERS, MYRON AND

1  JOSEPH.

2         AND MY UNDERSTANDING, YOUR HONOR, IS THAT HIS FAMILY

3  IS IN THE COURTROOM THIS MORNING.

4         AN ADDITIONAL $200,000 CASH FROM HIS FATHER ISAAC.

5         $50,000 CASH FROM RICHARD ESTERMAN WHO WORKS FOR THE

6  HUNG FAMILY.  HE IS ALSO AN ELECTED CITY COUNCILMEMBER IN

7  SISTERS, OREGON.  AND HE'S KNOWN THE FAMILY, INCLUDING MR.

8  HUNG, FOR MANY YEARS.

9         AND FINALLY A 75,000-DOLLAR SIGNATURE BOND FROM HIS

10  WIFE EMILY.  SHE WORKS FOR A PHARMACEUTICAL COMPANY AND IS NOW

11  ON LEAVE.  SHE IS DUE WITH THEIR FIRST CHILD IN NOVEMBER.

12         SO, I WOULD PROPOSE THAT MR. HUNG CAN LIVE WITH HIS

13  PARENTS IN THEIR HOME.  OR ALTERNATIVELY, I'VE SPOKEN WITH HIS

14  --

15         (AUDIO SKIPPING.)

16         AND SHE -- SHE ALSO HAS OPENED UP HER HOME AND WOULD

17  BE WILLING TO HAVE HIM LIVE THERE AS WELL.

18         OH, YOUR HONOR, IT LOOKS LIKE MR. HUNG WAS -- WAS

19  BLOGGED OFF.

20         I.T. TECH:  YEAH, I'M CALLING MDC RIGHT NOW.

21         MS. MURPHY:  ALL RIGHT.  THIS -- THANK YOU.

22         THE COURT:  IT DOES TO ME AS WELL.  SO, LET'S JUST

23  STOP UNTIL WE CAN GET HIM BACK ON LINE.

24         (PAUSE IN PROCEEDINGS.)

25         I.T. TECH:  SORRY, YOUR HONOR.  THE VIDEO

11

1  DISCONNECTED.  SO, I HAD IT RECONNECTED.  THANK YOU.

2              THE COURT:  ALL RIGHT.  THANK YOU.

3              AT THE TIME THE VIDEO DISCONNECTED, WHO WAS SPEAKING?

4              MR. RYAN:  I THINK ERIN WAS.

5              THE COURT:  OKAY.

6              MS. MURPHY, YOU WERE JUST DESCRIBING THE PROPOSED

7  BOND.

8              MS. MURPHY:  YES, YOUR HONOR.  THANK YOU.

9              AND I THINK WHERE I LEFT OFF I WAS SAYING THAT I HAD

10 SPOKEN WITH MR. HUNG'S MOTHER-IN-LAW.  AND SHE ALSO WOULD BE

11 WILLING TO, YOU KNOW, HAVE HIM LIVE WITH HER AND WOULD ALSO BE

12 WILLING TO POST SIGNIFICANT EQUITY IN HER HOME AS WELL.

13             I WOULD PROPOSE THAT HE'S ON HOUSE ARREST WITH AN

14 ANKLE MONITOR.  YOUR HONOR CAN PROHIBIT HIM FROM DRIVING ANY

15 VEHICLES.  OBVIOUSLY FROM POSSESSING ANY FIREARMS OR

16 AMMUNITION.

17             AND I ALSO UNDERSTAND THAT HIS FATHER ISAAC HONG AND

18 HIS WIFE EMILY CHEN ARE WILLING TO OBLIGATE THEMSELVES AS

19 THIRD-PARTY CUSTODIANS.

20             THIS IS NOT A TYPICAL CONDITION THAT AT LEAST I OFFER

21 UP IN MOST CASES, BUT I THINK THAT IT COULD REALLY GET US THERE

22 IN ASSURING THE CONDITIONS THAT WOULD MAKE THE COURT

23 COMFORTABLE HERE.

24             THAT WOULD ALLOW -- THAT WOULD REQUIRE THOSE PEOPLE

25 TO ACTIVELY SUPERVISE HIM TO MAKE SURE THAT HE IS FOLLOWING HIS

1  CONDITIONS EASILY.  MAKING SURE THAT HE APPEARS FOR HIS COURT

2  APPEARANCE.  AND THEY WOULD ACTUALLY BE REQUIRED TO REPORT ANY

3  VIOLATIONS TO THE COURT, OR THEY WOULD FACE THEIR OWN CRIMINAL

4  CONTEMPT CHARGES.

5          SO, IN A WAY HE WOULD HAVE, YOU KNOW, ONE OR TWO IF

6  YOUR HONOR FELT IT WAS APPROPRIATE JAILERS OR WARDENS SO TO

7  SPEAK MAKING SURE THAT HE'S FOLLOWING HIS CONDITIONS OF

8  RELEASE.

9          AND I DO BELIEVE HERE THAT THIS IS A SITUATION WHERE

10  HE SHOULD BE RELEASED ON BOND.  I UNDERSTAND THAT THE

11  GOVERNMENT AND THE COURT MAY SEE THESE AS VERY SERIOUS

12  ALLEGATIONS, AND I WILL ADDRESS THE ALLEGATIONS.  BUT AT

13  BOTTOM, I THINK THE QUESTION WE HAVE TO ANSWER UNDER THE BAIL

14  REFORM ACT IS WHAT ARE THE LEAST RESTRICTIVE CONDITIONS THAT

15  CAN REASONABLY ASSURE HIS APPEARANCE AND THE SAFETY OF

16  COMMUNITY.

17          AND WE KNOW THAT THE BAIL REFORM ACT DOES NOT ASK FOR

18  GUARANTEES.  IT DOES NOT ASK US TO SPECULATE OVER, YOU KNOW,

19  WHAT COULD OR WHAT MIGHT HAPPEN.  IT'S SIMPLY WHAT ARE THE

20  LEAST RESTRICTIVE CONDITIONS WE CAN SET HERE TO REASONABLY

21  ASSURE US THAT HE'S GOING TO APPEAR.

22          AND THIS IS NOT A PRESUMPTION CASE.  SO, THE BURDEN

23  HERE IS ON THE GOVERNMENT TO SHOW THAT THERE ARE -- THERE'S

24  ABSOLUTELY NO COMBINATION OF CONDITIONS THAT CAN DO THAT -- OR

25  THAT HE CAN DO THAT.

1          AND, SO -- AND I THINK THAT DESPITE THE ALLEGATIONS

2    AND WHAT'S IN THE PRETRIAL SERVICES REPORT, THE CONDITIONS THAT

3    I LAID OUT CAN GET US THERE.

4          AND, SO, I WOULD -- UNLESS YOUR HONOR HAS QUESTIONS

5    BEFORE I MOVE ON, I WOULD LIKE TO ADDRESS THE ALLEGATIONS.

6          OF COURSE THEY'RE SERIOUS.  I THINK ANYTIME WE'RE --

7    ANYTIME WE'RE DEALING WITH GUNS OR ALLEGATIONS OF HATE CRIMES,

8    OF COURSE WE HAVE TO TAKE PAUSE.  BUT I THINK THAT, AGAIN, NONE

9    OF THE ALLEGED VIOLATIONS HERE ARE PRESUMPTION CASES.  AND

10   THAT'S SIGNIFICANT BECAUSE THAT IS CONGRESS TELLING US THAT

11   THESE ARE SIMPLY NOT THE KINDS OF OFFENSES WHERE EVEN A

12   REBUTTABLE PRESUMPTION OF DETENTION ARISES.

13         AND WE KNOW FROM THE CASE LAW THAT THE WEIGHT OF THE

14   EVIDENCE IS THE LEAST IMPORTANT FACTOR.  BUT I WOULD LIKE TO

15   TALK ABOUT THE EVIDENCE BECAUSE I THINK WHEN WE TAKE A CLOSER

16   LOOK, WE SEE THAT THERE ARE SOME ASSUMPTIONS MADE HERE IN THE

17   AFFIDAVIT THAT JUST ARE NOT CLEARLY SUBSTANTIATED.

18         AND, SO, I'D LIKE TO START WITH -- I'M JUST CALLING

19   IT THE "PASADENA PROTEST INCIDENT."

20         SO, THE AFFIANT DESCRIBES WHAT HE GATHERED FROM

21   REPORTS, FROM WITNESS INTERVIEWS AND FROM VIDEO.  I BELIEVE IT

22   STARTS AROUND PAGE 8 OF THE AFFIDAVIT.  AND WE DON'T KNOW

23   WHETHER THIS INFORMATION FOR THE MOST PART IS SECOND- THIRD- OR

24   FOURTH-HAND INFORMATION.  WE HEAR FROM A SERGEANT -- I'M GOING

25   TO PRONOUNCE THIS INCORRECTLY -- SERGEANT BUTCHELS WHO CLAIMS

14

1   HE SAW THE TRUCK ACCELERATE TOWARD THE CROWD AND PEOPLE MOVE

2   OUT OF THE WAY.

3          BUT WE ALSO SEE IN THE AFFIDAVIT THAT THEY SAY THAT

4   MR. HUNG WAS BLARING HIS HORN AND CAUSING CARS TO MOVE OUT OF

5   THE WAY.  SO, TO ME IT'S JUST AS LIKELY THAT HE WAS USING THE

6   HORN TO ALERT PEOPLE TO MOVE OUT OF THE WAY.

7          AND, YOUR HONOR, I WILL -- I WILL NOTE THAT I ASKED

8   THE GOVERNMENT HERE TO SEND ME THE VIDEOS THAT THE AFFIANT WAS

9   RELYING ON IN DRAFTING THE REPORT.  AND GOVERNMENT COUNSEL TOLD

10  ME WHERE I COULD LOCATE A PARTICULAR ONE ON YOUTUBE.  AND WHEN

11  I WATCH IT -- AND I'M HAPPY TO SEND YOUR HONOR THE LINK TO IT

12  -- IT ACTUALLY DOES SHOW HIM SLOWING DOWN IN THE TRUCK.  IT

13  SHOWS HIM SLOWING DOWN, BRAKING AND BLARING HIS HORN.

14         AND, SO, I THINK THAT WHEN THE AFFIANT SAYS THAT, YOU

15  KNOW, HE HEARD FROM SOMEONE ELSE THAT HE SAW THE TRUCK

16  ACCELERATE TOWARD THE CROWD, IT'S MISSING THIS REALLY IMPORTANT

17  FACT THAT HE ACTUALLY, YOU KNOW, APPEARED TO STOP AND IS

18  BLOWING THE HORN AS A WAY TO ALERT PEOPLE TO MOVE.

19         AND THE AFFIANT ALSO SAYS THAT NONE OF THE FOOTAGE OR

20  WITNESS INTERVIEWS HE HAS SEEN SUGGEST THAT PROTESTERS THREW

21  ITEMS AT HIM OR PROVOKED HIM.  I THINK THIS IS TO SUGGEST

22  SOMEHOW THAT HE WAS JUST CRASHING INTO THIS CROWD UNPROVOKED.

23         BUT WE HAVE JUST ONE IMAGE HERE OF THE WHOLE ALLEGED

24  INCIDENT IN THE AFFIDAVIT AT PAGE 10.  IT SHOWS ONE SIDE OF THE

25  TRUCK AT A VERY OBLIQUE ANGLE.

1          AND I WOULD LIKE TO SAY THAT I DO HAVE A CLIP FROM

2    THE INSIDE OF THE TRUCK THAT DOES, IN FACT, ACTUALLY SHOW

3    SOMEONE THROWING WHAT LOOKS LIKE SOME CONTAINER WITH LIQUID AT

4    THE TRUCK.  I COULD TRY TO FIGURE OUT HOW TO PLAY IT FOR YOUR

5    HONOR -- SHARE MY SCREEN OR SOMEHOW SEND IT TO YOU.

6          BUT, AGAIN, I THINK THAT THIS REALLY REBUTS THIS

7    IMAGE THAT THE AFFIANT IS TRYING TO PAINT BECAUSE IT DOES SHOW

8    THAT HE WAS -- IF YOU WANT TO CALL IT PROVOCATION THAT THERE

9    WAS SOMEBODY, YOU KNOW, THROWING SOMETHING AT THE CAR.  HE HAD

10   HIS PREGNANT WIFE IN THE CAR AT THE TIME.  AND, SO, I THINK

11   IT'S ONLY NATURAL THAT YOU WOULD BLARE THE HORN AND TRY TO GET

12   OUT OF THE SITUATION.

13         AND THE AFFIANT ALSO NOTES AT PAGE 11, PARAGRAPH 22,

14   THAT THE CLIP THAT HE DOES -- THAT HE HAS DOES NOT HAVE AUDIO.

15   BUT I WILL SAY THAT THE YOUTUBE CLIP THAT I WAS DIRECTED TO

16   DOES HAVE AUDIO.  AND IT DOES SHOW THAT THE CAR HORN IS BLARING

17   AS -- AS THE TRUCK IS LEADING UP TO THE TURN INTO THE

18   INTERSECTION.  AND YOU CAN HEAR PEOPLE SCREAMING.

19         OF COURSE, IT'S A PROTEST SO MAYBE THE SCREAMING WAS

20   HAPPENING ALREADY.  BUT IT'S ALSO JUST AS CONSISTENT THAT

21   PEOPLE WERE SCREAMING AT THE TRUCK.

22         AND, SO, IT'S JUST NOT TRUE AS THE AFFIANT SAYS THAT

23   YOU CAN'T TELL FROM THE VIDEO WHAT WAS GOING ON IN THAT REGARD.

24         AND TURNING TO THE REST OF THE AFFIDAVIT ON THIS --

25   ON THIS ISSUE, IT MAKES MUCH OF THE FLAGS THAT ARE IN THE BACK

1    OF THE TRUCK.  AND IT SEEMS TO SUGGEST THAT BECAUSE EXTREMISTS

2    AND MILITIA GROUPS HAVE USED THOSE FLAGS THAT MR. HUNG MUST

3    ALSO BE, YOU KNOW, SIMILARLY ALIGNED WITH THOSE GROUPS.

4           BUT I'LL NOTE THAT EACH ONE OF THOSE FLAGS EXIST

5    OUTSIDE OF THOSE GROUPS.  THE THIN BLUE LINE FLAG I IMAGINE

6    THAT THAT ADORNS THE HALLS OF MANY LAW ENFORCEMENT AGENCIES

7    ACROSS THE COUNTRY.

8           THE GASDEN FLAG THAT DATES ALL THE WAY BACK TO THE

9    AMERICAN REVOLUTIONARY WAR AS DOES THE BETSY ROSS FLAG.

10          AND THERE REALLY IS NO EVIDENCE BESIDES A SINGLE

11   PICTURE OF MR. HUNG ALLEGEDLY WEARING A SHIRT CONNECTED WITH

12   THIS GROUP CALLED "THE 3 PERCENTERS."  THERE'S NOTHING

13   WHATSOEVER TO SUGGEST, AT LEAST IN THIS AFFIDAVIT, THAT HE WAS

14   ACTIVELY A MEMBER OF ANY OF THESE GROUPS.

15          AND, YOU KNOW, WAVING THESE FLAGS REGARDLESS WHAT ONE

16   MIGHT THINK THEY COULD SIGNIFY IS CLEARLY PROTECTED SPEECH.

17          AND TURNING FROM THAT, I THINK IT'S ALSO REALLY

18   IMPORTANT TO CONSIDER THE STATUS OF THAT CASE.  IN SPEAKING

19   WITH HIS STATE COUNSEL MR. NIXON, WHO I ALSO UNDERSTAND IS IN

20   THE COURT TODAY, THE ASSAULT WITH A DEADLY WEAPON CHARGE WAS

21   DECLINED BY THE D.A.  AND HE'S NOW CHARGED WITH MISDEMEANOR

22   POSSESSION OF A FIREARM IN A VEHICLE.

23          NOW, TO ME THIS INDICATES THAT THE D.A. REVIEWED THE

24   EVIDENCE AND THEN DECIDED AGAINST PURSUING THE MORE SERIOUS

25   CHARGES THAT ARE MORE AKIN TO WHAT THE GOVERNMENT IS

1  CONTEMPLATING CHARGING HERE.

2           AND THERE HIS BROTHER POSTED BOND, ONE OF THE SAME

3  BROTHERS WHO'S WILLING TO NOW POST AN EVEN MORE SIGNIFICANT

4  BOND.  AND THAT WAS BACK IN MAY.  AND THAT WAS -- SO THAT WAS

5  ALMOST FOUR MONTHS AGO.  AND IN THIS TIME THERE HAVE BEEN NO

6  ALLEGATIONS OF ANY ISSUES WHILE HE'S BEEN ON BOND.  AND, MORE

7  IMPORTANTLY, AS FAR AS I CAN TELL IN THE AFFIDAVIT THERE HAS

8  BEEN NOTHING -- NO ALLEGATIONS OF ANYTHING MORE SERIOUS OR LESS

9  SERIOUS OR EQUALLY SERIOUS HAPPENING SINCE THE DATE OF HIS

10  ARREST.

11           AND I THINK THAT TELLS US SOMETHING REALLY

12  SIGNIFICANT FOR BOND PURPOSES.  IT TELLS US THAT BOND WORKS FOR

13  MR. HUNG, THAT HE'S PAYING ATTENTION TO THE RULES.  AND THAT'S

14  EXACTLY WHAT WE NEED TO KNOW TO SET BOND HERE.

15           I'D LIKE ALSO TO TURN TO THE OTHER SORT OF I GUESS

16  I'D CALL THEM "PROTESTER-RELATED INCIDENTS" IN THE AFFIDAVIT.

17  BECAUSE, AGAIN, I THINK THAT THE AFFIANT SORT OF COMES TO

18  CERTAIN CONCLUSIONS.  BUT WHEN YOU REALLY LOOK AT WHAT'S LAID

19  OUT, IT JUST DOESN'T PAN OUT.

20           SO, FOR EXAMPLE, ON PAGE 14 AT SUBHEADING 3, IT SAYS

21  THAT MR. HUNG, QUOTE, SURVEILLED THE AREA BEFORE MAY 31ST.  AND

22  THEN IN AN APPARENT EFFORT TO LOCATE THE PROTESTERS.

23           BUT WHEN YOU ACTUALLY READ WHAT FOLLOWS, THAT'S JUST

24  NOT SO CLEAR.  IT GOES ON TO STATE AT PARAGRAPH 29 THAT ON MAY

25  30TH THE WITNESSES SAW WHAT THEY THOUGHT WAS HUNG'S TRUCK DO

1  SOMETHING CALLED "COAL ROLLING."  BUT NO ONE IDENTIFIED HIM AS

2  THE DRIVER.

3       INSTEAD THE AFFIANT RELIES ON AN ALLEGED SIX-MONTH

4  OLD VIEWING OF SOMETHING CALLED "COAL ROLLING" ON YOUTUBE,

5  WHICH IS PROBABLY THE WORLD'S MOST POPULAR OPEN SOURCE, YOU

6  KNOW, VIDEO REPOSITORY THAT ANYONE COULD LOOK AT.

7       AND THEN ALSO CELL TOWER RECORDS THAT PURPORT TO SHOW

8  HIS CELL PHONE WAS IN JUST GENERALLY THE OLD TOWN PASADENA AREA

9  THAT NIGHT.  BUT OLD TOWN PASADENA IS ACTUALLY A RELATIVELY

10  LARGE AREA.  IT'S NOT JUST, YOU KNOW, THE AREA AROUND LIKE FAIR

11  OAKS AND COLORADO.  IT ALSO ABUTS TWO MAJOR FREEWAYS, THE 134

12  AND THE 210.  AND THAT'S ONLY A FEW MILES AWAY FROM SAN MARINO

13  WHERE THE AFFIANT CLAIMS MR. HUNG HAD A RESIDENCE.

14       SO, TO ME IT'S NOT AT ALL SURPRISING THAT HIS PHONE

15  MIGHT BE PICKED UP IN THAT AREA.

16       AND, ALSO, THE FBI SPOKE TO A WITNESS -- I THINK THIS

17  IS SO IMPORTANT.  THE FBI SPOKE TO A WITNESS WHO SAID THEY SAW

18  A TRUCK RESEMBLING MR. HUNG'S ON MAY 29TH AND MAY 30TH.  AND ON

19  MAY 29TH THE TRUCK PASSENGER ASKED HIM, QUOTE, WHERE TO FIND

20  PROTESTS IN PASADENA AND HOW TO ACCESS THE CROWD.

21       BUT THAT PERSON AND THE DRIVER OF THE TRUCK WERE

22  IDENTIFIED AS CAUCASIAN.  AND MR. HUNG IS ASIAN.  AND, SO, I

23  THINK THAT TELLS US SOMETHING REALLY IMPORTANT ABOUT THAT, YOU

24  KNOW, MAY 30TH STATEMENT FROM THIS WITNESS.  WE JUST CAN'T

25  ASSUME THAT EVERYTIME SOMEONE SAW A TRUCK THAT LOOKED LIKE MR.

1    HUNG THAT HE WAS THE ONE ACTUALLY DRIVING IT.  OR THAT IT WAS

2    EVEN HIS TRUCK.

3           AND THEN WE TURN ON TO I THINK ANOTHER, YOU KNOW,

4    UNFAIR ASSUMPTION HERE IS WHEN THE AFFIANT DESCRIBES MR. HUNG

5    AND HIS WIFE, QUOTE, BRAGGING ABOUT THEIR EFFORTS TO ASSAULT

6    PROTESTERS.  BUT, AGAIN, WHEN YOU ACTUALLY READ WHAT THE

7    AFFIDAVIT SAYS, IT DOESN'T GO THAT FAR.  AT PAGE 17, THIS IS

8    PARAGRAPH 33(A), MAY 28TH SOMEONE ELSE TEXTED MR. HUNG AND HIS

9    WIFE AND OTHERS ABOUT, QUOTE, THEY.  WE DON'T KNOW WHO THEY IS

10   IN REFERENCE TO.  IT COULD BE PERHAPS THE REFERENCE TO

11   PROTESTERS.  WE DON'T KNOW WHICH ONES.  WE DON'T KNOW WHERE.  I

12   NOTE THAT THIS WAS A TIME IN THE COUNTRY WHERE PROTESTS WERE

13   ERUPTING ALL ACROSS, YOU KNOW, THE NATION.  SO, WE DON'T REALLY

14   KNOW WHAT THAT'S IN REFERENCE TO.

15          BUT HERE, QUOTE, THIS OTHER PERSON AGAIN, NOT MR.

16   HUNG, SAYING "ANTIFA LIGHTING THE WINDOWS AND BURNING STUFF."

17   AND THEN AGAIN SOMEONE ELSE SAYING, "BLACK LIVES MATTER AT IT

18   AGAIN."

19          THERE IS NOTHING THERE REALLY ABOUT ANYONE BRAGGING

20   ABOUT EFFORTS TO ASSAULT PROTESTERS LET ALONE MR. HUNG DOING

21   THAT.

22          AND THEN WE GO ON TO THE NEXT PARAGRAPH, 33(B), MAY

23   29TH AN AFFIANT -- THE AFFIANT CLAIMS THAT MR. HUNG TEXTED

24   PEOPLE TO SAY THAT ANTIFA HAS BEEN AVOIDING ME OR SOMETHING.  I

25   CAN NEVER -- I CAN NEVER SEEM TO FIND THEM WHEN I'M OUT WAR

1   RIGGING.

2           AND FROM THERE THE AFFIANT CONCLUDES, OH, HE MUST

3   HAVE MEANT USING HIS TRUCK TO ASSAULT DEMONSTRATORS.  THAT'S ON

4   -- THAT STARTS ON PAGE 17 AND GOES OVER TO PAGE 18.

5           I THINK THAT'S A PRETTY FAR LEAP BECAUSE WE HAVE --

6   HIS TRUCK LICENSE PLATE WAS WAR RIG.  SO, I THINK MORE

7   NATURALLY READ WAR RIGGING IS REFERRING TO THE FACT THAT HE'S

8   DRIVING A TRUCK, YOU KNOW, OSTENSIBLY CALLED "WAR RIG."  IT'S

9   NOT A REFERENCE TO WANTING TO HURT PEOPLE.  I THINK THAT THAT'S

10  MORE CONSISTENT WITH COUNTER PROTESTING, WHICH IS NOT ILLEGAL.

11  THERE'S NO EVIDENCE OF HIM SAYING I'M GOING TO GO OUT AND TRY

12  TO ASSAULT OR HURT DEMONSTRATORS.

13          AND REALLY WHAT I THINK (AUDIO OUT) GOING ON IN THE

14  LAST SEVERAL MONTHS IS THE SAME THING THAT WE'VE SEEN LITERAL

15  CARAVANS OF PEOPLE IN TRUCKS OR -- AND I DON'T --

16          THE COURT:  MS. MURPHY --

17          MS. MURPHY:  AND I DON'T SEE THIS DEPARTMENT OF

18  JUSTICE --

19          THE COURT:  MS. MURPHY, MS. MURPHY, YOU'RE BREAKING

20  UP.

21          MS. MURPHY:  -- ARRESTING ALL THOSE PEOPLE FOR --

22          THE COURT:  MS. MURPHY, YOU'RE BREAKING UP.  I'M

23  HAVING A BIT OF A DIFFICULT TIME HEARING YOU.

24          (PAUSE IN PROCEEDINGS.)

25          MS. MURPHY:  OH, I'M SORRY.

1              THE COURT:  CAN YOU HEAR ME?

2              MS. MURPHY:  IS THAT BETTER?

3              I.T. PERSON:  THIS IS I.T.  NO, IT'S COMING IN QUITE

4       -- QUITE CHOPPY.  CAN YOU TRY CALLING IN WITH YOUR PHONE ONE

5       MORE TIME.

6              MS. MURPHY:  SHOULD I TRY CALLING IN AGAIN?

7              I.T. PERSON:  TRY CALLING IN ON YOUR CELL PHONE ONE

8       MORE TIME.

9              MS. MURPHY:  YEAH, I'M HAVING TROUBLE HEARING YOU

10      NOW.

11             I.T. PERSON:  CAN YOU TRY --

12             MS. MURPHY:  SORRY.  DO YOU WANT ME TO CALL IN?

13             I.T. PERSON:  YEAH, TRY CALLING IN ON YOUR CELL PHONE

14      ONCE MORE.

15             (PAUSE IN PROCEEDINGS.)

16             MS. MURPHY:  HOLD UP --

17             (PAUSE IN PROCEEDINGS.)

18             MS. MURPHY:  HI.  CAN YOU HEAR ME?

19             THE COURT:  YES.

20             MS. MURPHY:  OKAY.  ALL RIGHT.  THANK YOU.

21             THE COURT:  ALL RIGHT.  YOU CAN PROCEED.  THAT'S

22      BETTER.

23             MS. MURPHY:  OKAY.  GOOD.  THANK YOU.

24             SO, YOU KNOW, AS I WAS SAYING, YOU KNOW, I'M LOOKING

25      -- I'M FOCUSING HERE ON THE AFFIDAVIT.  AND I'M JUST SEEING A

1   LOT OF ISSUES WITH THESE CLAIMS THAT THEY WERE BRAGGING ABOUT

2   EFFORTS TO ASSAULT PROTESTERS.

3          AND I HAD TURNED AGAIN TO PAGE 18, PARAGRAPH 33(C).

4   THIS IS A TEXT FROM SOMEONE CALLED -- CALLED "EMILY."

5   OSTENSIBLY MR. HUNG'S WIFE SAYING, "IN RESPONSE TO A PHOTO

6   SENT" -- AGAIN BY SOMEONE OTHER THAN MR. HUNG -- DEPICTING

7   PEOPLE BLOCKING TRAFFIC ON A HIGHWAY.  WE KNOW NOTHING ELSE

8   ABOUT THAT IMAGE BESIDES WHAT THE AFFIANT IS STATING.

9          AND THERE IT SAYS THAT SHE ALLEGED THAT SHE, BEING

10  EMILY, ALLEGEDLY STATED, "THAT'S WHY YOU DON'T STOP ON THE

11  FREEWAY FOR THOSE PEOPLE AND HAVE A GUN."  AND --"AND IF THEY

12  TRY TO STOP MY CAR, I'M RUNNING THEM OVER."

13         AGAIN, THAT'S -- THAT IS NOT HER OR MR. HUNG BRAGGING

14  ABOUT EFFORTS TO ASSAULT PRISONERS.  THAT TO ME SOUNDS LIKE

15  SOMEONE SAYING, HEY, IF -- IF ONE OF THESE PEOPLE DOES

16  SOMETHING TO MY CAR WHILE I'M INSIDE OF IT, I'M GOING TO DEFEND

17  MYSELF.

18         AND -- AND PEOPLE MAY DISAGREE OVER, YOU KNOW, OVER

19  WHAT -- YOU KNOW, WHAT EFFORTS SOMEONE MIGHT TAKE TO DEFEND

20  THEMSELVES, BUT THIS IS CLEARLY TALKING ABOUT PROTECTION -- NOT

21  PROVOCATION.

22         AND -- AND AT BOTTOM THERE IS NOT EVIDENCE OF MR.

23  HUNG BRAGGING ABOUT ASSAULTING PROTESTORS.  YOU HAVE THE

24  CONDUCT OF OTHER PEOPLE.  YOU HAVE MR. HUNG TALKING ABOUT

25  DRIVING A TRUCK AROUND.  AND SOMEONE ELSE TALKING ABOUT WHAT

1   THEY WOULD DO TO DEFEND HERSELF.

2          AND I THINK WHEN WE LOOK AT THE FIREARM ALLEGATIONS

3   WE SEE SORT OF A SIMILAR THEME.  YOU KNOW, WE LOOK AT THE

4   DECEMBER 2017 ALLEGATIONS -- THAT'S IN REFERENCE TO TWO -- TWO

5   GLOCKS.  THOSE -- THOSE SPAN PAGES 19 THROUGH 24 OF THE

6   AFFIDAVIT.

7          THERE ARE NO ALLEGATIONS SHOWING THAT MR. HUNG TOLD

8   MR. -- I'M GOING TO MESS THIS PERSON'S NAME UP.  I APOLOGIZE --

9   MR. HOOEYMEYANO TO BUY WEAPONS IN OREGON FOR HIM.  THERE'S NO

10  ALL- -- THERE ARE NO FACTS ALLEGED IN THERE THAT SHOW THAT HE

11  MADE ANY REQUEST FOR THAT.  ONLY THAT THE TWO OF THEM WERE

12  TEXTING ABOUT HIM BEING AT THE GUN SHOP.  AND HOOEYMEYANO

13  SAYING THAT HE WAS GOING TO CHECK OUT THE PISTOLS.

14          AND THERE'S SUPPOSEDLY SIX MESSAGES ABOUT HIM

15  DROPPING PISTOLS OFF AT THE LODI RESIDENCE -- WHICH I KNOW.

16  IT'S -- IT'S UNUSUAL I THINK JUST TO REFER TO GLOCKS AS

17  PISTOLS.  GLOCKS ARE HANDGUNS.  BUT REGARDLESS, I DON'T KNOW --

18  IT'S NOT CLEAR FROM THE AFFIDAVIT THAT THEY WERE NECESSARILY

19  THE SAME ONE.

20          AND THEN WE TURN TO THE MARCH 2020, THE THREE RIFLES

21  THERE.

22          THE GOVERNMENT I UNDERSTAND NOW PROFFERS THAT TWO OF

23  THEM ARE MISSING FROM WHEN THEY CONDUCTED ONE OF THE SEARCHES.

24  IT'S IN THE PRETRIAL SERVICES REPORT FROM FRIDAY.

25          BUT I THINK THIS RELIES ON ANOTHER ASSUMPTION THAT

24

1   THE AFFIANT MADE -- WHICH IS THAT ALL THREE WEAPONS ALLEGEDLY

2   PURCHASED IN OREGON NECESSARILY MADE THEIR WAY DOWN TO

3   CALIFORNIA.  I DON'T THINK THAT THERE'S CLEAR ENOUGH EVIDENCE

4   OF THAT.

5            WE ONLY HAVE AN UNDATED PHOTO THAT THE AFFIANT THINKS

6   WAS TAKEN IN CALIFORNIA.  THAT'S AT PAGE 25.  WE DON'T REALLY

7   KNOW ANYTHING ABOUT THAT PHOTO.

8            SO, WHERE IT WAS TAKEN, WE DON'T KNOW --

9            OH, I CAN'T SEE ANYONE NOW.

10           CAN YOU STILL -- CAN YOU HEAR ME?

11           I.T. PERSON:  WE CAN STILL HEAR YOU. YOUR VIDEO MAY

12   HAVE DROPPED OFF.

13           IT WAS -- THE VIDEO WAS DROPPING OFF.

14           I APOLOGIZE, YOUR HONOR.  WE MIGHT NEED TO WAIT FOR

15   THEM TO CALL BACK IN.

16           THE COURT:  OKAY.

17           I.T. PERSON:  IT COULD JUST BE A BANDWIDTH --

18           THE COURT:  WE ALSO LOST GOVERNMENT COUNSEL, RIGHT?

19           I.T. PERSON:  IT SOUNDS LIKE IT, YEAH.

20           THE BEST THING WE COULD DO IN THIS SITUATION USUALLY

21   IS JUST THEY WILL USUALLY CONNECT.  AND THEN THEY'LL NOTICE IT.

22   AND THEN COME BACK ON AND RECONNECT.

23           THE COURT:  OKAY.

24           I.T. PERSON:  OH, WHO IS THAT THAT JUST JOINED ON?

25           MS. LEWIS:  HI.  IT'S AUSA LEWIS.  I GOT KICKED OUT

1  OF THE VIDEO.  SO, I THOUGHT I WOULD TRY DIALING IN.

2           I.T. PERSON:  THANK YOU.

3           MS. MURPHY:  I JUST GOT KICKED OUT OF THE VIDEO AS

4  WELL.  SO, I'M GOING TO TRY  -- I'LL STAY DIALED IN.  AND I'LL

5  TRY LOGGING BACK IN TO THE VIDEO.

6           I.T. PERSON:  YEAH.  IT MIGHT BE BEST IF --

7           WELL, YOUR HONOR, IF IT'S OKAY IF THEY CALL IN.  IT

8  WOULD JUST EAT UP LESS BANDWIDTH AND PREVENT THEM FROM FALLING

9  OFF.

10          THE COURT:  YES.  IT'S FINE WITH THE COURT IF -- IF

11   -- IF THE ATTORNEYS APPEAR ONLY BY PHONE.

12          HOWEVER, IF YOU ARE APPEARING ONLY BY PHONE, PLEASE

13  IDENTIFY YOURSELF BEFORE YOU START SPEAKING SO THAT THE RECORD

14  IS CLEAR WHO THE SPEAKER IS.

15          (PAUSE IN PROCEEDINGS.)

16          MS. MURPHY:  THIS IS ERIN MURPHY, YOUR HONOR.

17          IS THERE A WAY TO MAKE SURE THAT MR. HUNG STILL IS

18  ABLE TO PARTICIPATE IN THESE PROCEEDINGS?

19          I.T. PERSON:  MR. HUNG, CAN YOU STILL HEAR -- SEE AND

20  HEAR US?

21          THE DEFENDANT:  YES, I CAN STILL HEAR YOU GUYS.

22          THANK YOU.

23          MS. MURPHY:  OKAY.  OKAY.  THANK YOU.

24          THE COURT:  MS. MURPHY, THIS IS --

25          MS. MURPHY:  ALL RIGHT.  THEN I DON'T HAVE TO --

1          THE COURT:  THIS IS THE COURT.

2          MS. MURPHY:  OF COURSE --

3          THE COURT:  AND I'M JUST LETTING YOU KNOW MR. HUNG IS

4   APPEARING STILL ON THE VIDEO ON THE SCREEN HERE IN THE

5   COURTROOM.  SO, WE CAN STILL SEE HIM.  ALTHOUGH, WE CANNOT SEE

6   YOU.

7          MS. MURPHY:  UNDERSTOOD.  ALL RIGHT.

8          I THINK IT'S NOT IMPORTANT FOR ANYONE TO SEE ME.  SO,

9   I'M HAPPY TO PROCEED LIKE THIS IF YOUR HONOR IS OKAY WITH THAT.

10         THE COURT:  ALL RIGHT.

11         CAN WE JUST FOR CLARITY HAVE THE ATTORNEYS JUST

12   IDENTIFY YOURSELVES RIGHT NOW SO -- SO THE RECORD IS CLEAR WHO

13   IS PARTICIPATING.

14         (PAUSE IN PROCEEDINGS.)

15         MS. LEWIS:  YES, YOUR HONOR.  IF THIS IS HELPFUL,

16   I'LL GO FIRST.

17         FRANCES LEWIS FOR THE UNITED STATES.

18         AND I BELIEVE AUSA DAVE RYAN IS EITHER ON VIDEO OR ON

19   THE PHONE AS WELL.

20         THE COURT:  WE DO NOT HAVE MR. RYAN ON THE VIDEO.

21         MS. LEWIS:  OKAY.  THEN I WILL WAIT FOR HIM TO SEE IF

22   HE APPEARS BY PHONE.

23         (PAUSE IN PROCEEDINGS.)

24         THE COURT:  ALL RIGHT.  AND WE HAVE MS. MURPHY BY

25   PHONE, CORRECT?

1                    MS. MURPHY:  YES.  THANK YOU.

2                    THE COURT:  HOW ABOUT PRETRIAL SERVICES?

3                    U.S. PRETRIAL SERVICES OFFICER HANOV:  YES.  THIS IS

4     UREL HANOV.  I'M ON THE PHONE.

5                    THE COURT:  ALL RIGHT.

6                    ALL RIGHT.  MS. MURPHY, THEN, YOU MAY PROCEED.

7                    MS. MURPHY:  THANK YOU, YOUR HONOR.

8                    SO, I'LL SORT --

9                    GO AHEAD.  SORRY.

10                    WAS -- MS. LEWIS, DID YOU -- WERE YOU TRYING TO SAY

11    SOMETHING?

12                    MS. LEWIS:  NO, I WAS NOT.

13                    MS. MURPHY:  OKAY.  SORRY.  I JUST WANT TO MAKE SURE

14    I WASN'T TALKING OVER ANYONE.

15                    SO, I'LL BACKTRACK JUST LIGHTLY TO THE MARCH 2020

16    ALLEGATIONS REGARDING THESE THREE RIFLES.

17                    NOW, THE AFFIANT IS CONCLUDING THAT THESE RIFLES MUST

18    HAVE MADE THEIR WAY DOWN TO CALIFORNIA, BUT WE REALLY HAVE NO

19    -- NO REALLY GOOD EVIDENCE OF THAT.  WE HAVE ONLY THIS UNDATED

20    PHOTO THAT THE AFFIANT THINKS WAS TAKEN IN CALIFORNIA THAT'S

21    LOCATED AT PAGE 25 OF THE AFFIDAVIT.

22                    WE REALLY DON'T KNOW ANYTHING ABOUT THIS PHOTO --

23    (AUDIO BLIP.)  CAN -- CAN RELIABLY LEAD US TO THAT CONCLUSION.

24                    WE DON'T KNOW WHERE IT WAS TAKEN.  WE DON'T KNOW WHEN

25    IT WAS TAKEN.  WE DON'T KNOW WHO TOOK IT.  WE DON'T EVEN KNOW

1   IF IT WAS TAKEN BY MR. HUNG OR IF IT WAS SIMPLY AN IMAGE

2   DOWNLOADED FROM THE INTERNET.

3          AND -- BUT FROM -- WITHOUT THOSE FACTS, THE AFFIANT

4   IS STILL CONCLUDING THAT HE THINKS IT CONTAINS ONE OF THE

5   FIREARMS.  BUT WE STILL DON'T KNOW NECESSARILY IF THAT'S THE

6   SAME FIREARM.  AND THE AFFIANT THINKS THAT IT WAS TAKEN --

7          (AUDIO BEGINS SKIPPING AT 9:11 A.M.)

8          INVOLVED -- BECAUSE THE IMAGE CONTAINED ITEMS THAT

9   WERE ALLEGEDLY PURCHASED AFTER THE FIREARMS WERE PURCHASED.

10         BUT WE DON'T NECESSARILY KNOW WHETHER THOSE ITEMS

11   WERE SHIPPED.  AND EVEN IF THEY WERE -- TO CALIFORNIA, WE DON'T

12   NECESSARILY KNOW THAT THEY STAYED THERE.

13         -- ACCEPT WHAT THE AFFIANT IS SAYING IS TRUE, WE

14   STILL HAVE TO TAKE A STEP -- RECOGNIZE THAT THE WEAPONS -- ARE

15   FOR INTERSTATE TRANSFER OF FIREARMS AND -- ACQUISITION OF

16   FIREARMS.

17         I'M NOT TRYING -- TRULY I'M NOT TRYING TO MINIMIZE

18   THESE CHARGES, BUT THEY DO NOT INVOLVE NECESSARILY THE

19   POSSESSION OF ILLEGAL FIREARMS OR THE USE OF ILLEGAL FIREARMS

20   OR ANY OTHER ASSET OF VIOLENCE OR -- OR USING THEM IN ANY SORT

21   OF -- TRAFFICKING OR --

22         THE AFFIANT DESCRIBES A LOT OF ACTIVITIES TO DO WITH

23   THE GUNS, CLAIMING THAT MR. HUNG WAS AMASSING THEM -- AND USING

24   THE FAMILY VINEYARD AS A SHOOTING RANGE TO, QUOTE --

25         THIS IS ALL -- NONE OF THOSE ACTS ARE IN AND OF

1   THEMSELVES ILLEGAL.

2           AND NONE OF THE MESSAGES IN THE AFFIDAVIT DESCRIBES

3   -- GUNS.  IT'S REALLY -- THE ONES THAT I'VE IDENTIFIED -- I

4   CAN POINT YOUR HONOR TO A FEW OF THEM ARE REALLY ABOUT BEING --

5   YOU KNOW, WHAT TO DO -- I'M TALKING TO REACTING TO SOMETHING

6   THAT'S NOT -- GO OUT AND PROVOKE -- OR TO HARM PEOPLE FOR NO

7   REASON.

8           THESE -- TALKING ABOUT BEING PREPARED TO DEFEND

9   HIMSELF.

10          (AUDIO SKIPPING STOPS AT 9:13:45 A.M.)

11          MS. MURPHY:  PAGE -- I BELIEVE IT'S ON PAGE 29,

12  PARAGRAPH 54.

13          AGAIN, THIS IS ANOTHER TEXT FROM SOMEONE ON TALKING

14  ABOUT, YOU KNOW, WHAT TO DO IF THINGS REALLY GO DOWN.

15          SO, THESE ARE ABOUT BEING PREPARED AND BEING READY TO

16  DEFEND THEMSELVES.

17          AND WE CAN DISAGREE OVER WHAT KIND OF PREPARATION IS

18  NECESSARY, BUT IT'S NOT ILLEGAL.  AND IT FALLS I THINK WELL

19  WITHIN WHAT OUR COURTS SAY IS PROTECTED BY THE SECOND

20  AMENDMENT.

21          AND, YOU KNOW, AT BOTTOM, WHEN IT COMES TO THE

22  ALLEGATIONS, I THINK THIS IS WHAT WE HAVE.  WE HAVE ALLEGATIONS

23  THAT HE DROVE INTO A GROUP OF PROTESTORS.  BUT WHEN WE LOOK AT

24  THE VIDEO EVIDENCE, IT SHOWS A MUCH MORE COMPLICATED PICTURE

25  THAN THAT.  BUT WE ALSO HAVE A DECLINATION OF THAT CHARGE FROM

1   THE D.A.  WE HAVE ALLEGATIONS THAT SOMEONE ELSE PURCHASED

2   WEAPONS IN OREGON.  BUT NO EVIDENCE THAT -- THAT MR. HUNG

3   ACTUALLY ASKED HIM TO DO THAT.

4        WE HAVE ALLEGATIONS THAT HE DROVE TO OREGON AND

5   PURCHASED WEAPONS, BUT REALLY NOTHING BEYOND THOSE SEVERAL

6   STEPS OF SPECULATION TO SAY THAT THEY MADE IT BACK TO

7   CALIFORNIA OR THAT HE WAS NECESSARILY THE ONE TO DO THAT.

8        BUT EVEN SO -- EVEN ACCEPTING THAT THEY -- YOU KNOW

9   -- ACCEPTING THE AFFIDAVIT -- AFFIANT'S ALLEGATION THAT THOSE

10  WEAPONS ARE NOW IN CALIFORNIA, THE ALLEGATIONS THAT HE AND

11  OTHERS WERE TRYING TO PREPARE IN CASE THERE WAS SOME SORT OF

12  ARMED CONFLICT, THAT'S NOT ILLEGAL.  THERE IS NO EVIDENCE THAT

13  HE EVER SHOT SOMEONE, THAT HE WAS PLANNING TO SHOOT SOMEONE.

14       AND I'LL NOTE THAT HE HAS NO CRIMINAL HISTORY BESIDES

15  THE INSTANT ALLEGATIONS.

16       AND WHEN IT COMES TO THE DANGER-TO-COMMUNITY PRONG OF

17  THE BAIL REFORM ACT, WE'RE CONCERNED WITH THE DANGER TO THE

18  COMMUNITY NOW LOOKING FORWARD.  WE'RE NOT JUST CONCERNED WITH

19  WHAT THEY WERE ALLEGED TO HAVE DONE IN THE PAST.

20       AND, YOU KNOW -- AND FOR GOOD REASON, OF COURSE.

21  THERE'S THE PRESUMPTION OF INNOCENCE.  AND WE'RE SUPPOSED TO BE

22  LOOKING FORWARD TO -- TO SEE WHAT WE CAN DO TO REASONABLY

23  ASSURE THE SAFETY OF THE COMMUNITY.

24       AND WE KNOW THAT HE HAS BEEN ON BOND SINCE MAY OF

25  THIS YEAR.  NO PROBLEMS.  NO EVIDENCE OF ANY MISCONDUCT SINCE

1    THEN.  IT'S CLEAR THAT HE WOULD UNDERSTAND HIS RESPONSIBILITY.

2            THE WEAPONS HERE HAVE BEEN SEIZED.  SO, THAT

3    MITIGATES ANY RISK OF HIM USING THEM AGAIN.

4            I UNDERSTAND THAT THE GOVERNMENT BELIEVES THAT TWO OF

5    THE WEAPONS ARE MISSING.  BUT, AGAIN, THAT ASSUMES THAT THEY

6    EVER GOT DOWN HERE TO BEGIN WITH.  AND I THINK THAT THERE CAN

7    BE BOND CONDITIONS AGAINST ACQUIRING ANY NEW WEAPONS.  THE

8    COURT CAN PROHIBIT HIM FROM DRIVING A CAR.  THE COURT CAN KEEP

9    HIM ON HOUSE ARREST WITH AN ANKLE MONITOR.  HE WOULD BE LIVING

10   WITH HIS SURETIES.  AND THESE ARE SUBSTANTIAL LIKE BOND

11   CONDITIONS.  THE THREE AND A HALF MILLION DOLLARS IS MORE THAN

12   YOU WOULD HAVE TO PAY IN STATE COURT IF YOU WERE CHARGED WITH

13   MURDER.

14           AND I THINK IT'S REALLY SIGNIFICANT THAT IT'S NOT --

15   IT'S SPREAD ACROSS MULTIPLE PEOPLE.  IT'S SPREAD ACROSS HIS

16   PARENTS, HIS BROTHERS, A GOOD FAMILY FRIEND AND EMPLOYEE AND

17   HIS OWN WIFE.

18           AND WE ALSO WOULD HAVE -- WE HAVE TWO PEOPLE

19   VOLUNTEERING TO BE THIRD-PARTY CUSTODIANS.

20           AND I KNOW HIS WIFE SHE IS DUE IN NOVEMBER WITH THEIR

21   FIRST CHILD.  I REALLY JUST CAN'T IMAGINE HE WOULD DO ANYTHING

22   TO JEOPARDIZE HER, ESPECIALLY THIS CLOSE TO THE -- TO THE BIRTH

23   OF THEIR CHILD OR ANY OF THE OTHER PEOPLE VOUCHING FOR HIM.

24           AND SPEAKING OF VOUCHING FOR HIM, I WANT TO TELL THE

25   COURT THAT DOZENS OF PEOPLE FROM MR. HUNG'S COMMUNITY WERE

1    WILLING TO COME TO COURT THIS MORNING TO SHOW THEIR SUPPORT FOR

2    HIM.  THE ONLY REASON THEY'RE NOT THERE STACKED IN THE

3    COURTROOM RIGHT NOW WAS BECAUSE I ADVISED THEM NOT TO COME

4    BECAUSE OF COVID-19.  AND I DID NOT WANT TO OVERWHELM THE COURT

5    WITH THAT MANY VISITORS.  BUT THESE ARE STAKEHOLDERS IN HIS

6    COMMUNITY.  YOU KNOW, THEY INCLUDE TEACHERS, BUSINESS OWNERS,

7    DOCTORS, A FORMER MAYOR OF SAN MARINO.  AND CLEARLY FROM THE

8    WIDE NEWS COVERAGE OF THIS CASE WE KNOW THAT THE WHOLE WORLD

9    KNOWS ABOUT THESE ALLEGATIONS.

10            AND THESE COMMUNITY MEMBERS -- THESE ARE THE SAME --

11   THIS IS THE SAME COMMUNITY, THE SAFETY WE'RE CONCERNED WITH,

12   THEY'RE SAYING WE STILL BELIEVE IN MR. HUNG.  AND THEY WOULD

13   NOT BE VOUCHING FOR HIM LIKE THAT IF THEY THOUGHT HE WAS A

14   MENACE TO THEIR COMMUNITY.

15            AND I THINK THAT WE SHOULD LISTEN TO THAT.  AND I

16   THINK WITH THE CONDITIONS THAT WE'VE OFFERED UP HERE WE CAN

17   REASONABLY ASSURE HIS SAFETY IN THE COMMUNITY -- OR I'M SORRY,

18   THE SAFETY OF THE COMMUNITY AND ALSO HIS APPEARANCE IN COURT.

19            SO, I WILL -- I WILL LEAVE IT AT THAT.  BUT, ALSO,

20   MORE THAN HAPPY TO ANSWER QUESTIONS FROM YOUR HONOR.

21            THE COURT:  YES.  THANK YOU.

22            MS. MURPHY, I DO HAVE A QUESTION.  YOU STATED THAT HE

23   IS RELEASED ON BOND IN -- THAT WAS SET BY THE STATE COURT.

24            WHAT ARE THE CONDITIONS OF THAT RELEASE?

25            MS. MURPHY:  YOUR HONOR, ALL I -- I SPOKE WITH MR.

33

1    NIXON ABOUT THIS.  HE MAY BE IN A BETTER POSITION TO GO INTO

2    THE DETAILS BECAUSE I UNDERSTAND HE -- HE REPRESENTS HIM IN

3    THAT MATTER.  I'LL TELL YOU WHAT I DO KNOW.

4              AS I UNDERSTAND THAT IT WAS A 50,000-DOLLAR BOND.

5    AND THAT HIS BROTHER JOSEPH TOOK ON THAT OBLIGATION.

6              I DON'T KNOW ANYTHING MORE ABOUT THE -- THE SPECIFICS

7    OF THAT BOND.

8              I MEAN, MY -- MY EXPERIENCE WITH STATE COURT, YOU

9    KNOW, BOND IS THAT IT'S -- THE SUPERVISION MAY NOT BE AS -- AS

10   INTENSIVE AS FEDERAL SUPERVISION.  BUT YOU STILL HAVE, YOU

11   KNOW, THE BASIC CONDITIONS.  YOU CAN'T BE COMMITTING NEW

12   OFFENSES.  YOU HAVE TO SHOW UP TO COURT.

13             I UNDERSTAND THAT HIS -- HE HAS AN APPEARANCE

14   TOMORROW IN FACT.

15             AS FAR AS ANY PARTICULAR OTHER CONDITIONS, I WOULD

16   NEED TO SPEAK WITH -- WITH MR. NIXON TO FIGURE -- TO FIGURE

17   THAT OUT UNLESS HE IS ABLE TO MAKE A PROFFER IN COURT.

18             (PAUSE IN PROCEEDINGS.)

19             THE COURT:  ALL RIGHT.

20             IS MR. NIXON HERE?

21             MR. NIXON:  YES, YOUR HONOR.

22             GOOD MORNING.

23             THE COURT:  GOOD MORNING.

24             WHY DON'T YOU GO AHEAD AND STATE YOUR APPEARANCE FOR

25   THE RECORD.

1          MR. NIXON:  SHOULD I --

2          THE COURT:  YES.

3          I.T. PERSON:  YOU WANT TO MAKE SURE YOU SPEAK INTO

4     ONE OF THESE MICS.  BUT YOU CAN SIT THERE IF YOU LIKE AND MAKE

5     SURE YOU SPEAK INTO THE MIC SO WE CAN HEAR YOU.

6          MR. NIXON:  YES, SIR.

7          GOOD MORNING, YOUR HONOR.  DANIEL NIXON APPEARING IN

8     A LIMITED CAPACITY AS MR. HUNG'S STATE COURT COUNSEL IN THE

9     CASE ENTITLED, PEOPLE OF STATE OF CALIFORNIA VERSUS BENJAMIN

10    HUNG.

11         MR. HUNG HAS BEEN CHARGED IN A ONE COUNT MISDEMEANOR

12    COMPLAINT BY THE PASADENA CITY PROSECUTOR'S OFFICE WITH

13    POSSESSION OF A LOADED GUN IN A CAR ESSENTIALLY.

14         HE WAS -- WHEN HE WAS ARRESTED HE WAS ARRESTED ON

15    FELONY ASSAULT WITH A DEADLY WEAPON CHARGES, ESSENTIALLY

16    ASSAULT WITH A MOTOR VEHICLE.

17         THE BOND WAS SET AT $50,000 WHICH IS I THINK WHAT THE

18    BAIL SCHEDULE CALLS FOR IN THE CONTEXT OF A STANDARD FELONY

19    ARREST INVOLVING PENAL CODE SECTION 245.

20         I WAS NOT HIS COUNSEL AT THE TIME THE BOND WAS

21    POSTED.  SO, MY UNDERSTANDING IS IS THAT A BAIL BOND WAS SIMPLY

22    PROCURED FROM A BAIL BONDSMAN, AND THAT THAT HAS BEEN LODGED

23    WITH THE -- LODGED WITH THE COURT.

24         WE HAVE HAD ONE -- DUE TO THE DIFFICULTIES IN STATE

25    COURT WITH COVID RIGHT NOW, WE HAVE HAD ONE APPEARANCE ON THAT

1    MATTER.  AND IT WAS -- I'M TRYING TO -- I'M TRYING TO -- IT WAS

2    LAST -- AT THE END OF AUGUST.

3              AND I APPEARED ON MR. -- STATE COURT ALLOWS ON A

4    MISDEMEANOR PROSECUTION FOR A LAWYER TO APPEAR WITHOUT THE

5    PRESENCE OF A CLIENT.  IT'S PENAL CODE SECTION 977(A).

6              I APPEARED ON THE MATTER.  AND WITHOUT MR. HUNG BEING

7    IN ATTENDANCE THE ARRAIGNMENT ON THE MATTER WAS CONTINUED.

8              IN TERMS OF THE CONDITIONS, STATE COURT BOND -- I'M

9    SURE THE COURT IS AWARE IS NOT QUITE LIKE FEDERAL COURT BOND.

10   YOU JUST DON'T HAVE A HEARING LIKE THIS.  YOU POST A BAIL BOND.

11   YOU'RE RELEASED.

12             THERE ARE CONDITIONS THAT ARE IMPOSED BY THE BONDING

13   COMPANY TYPICALLY BECAUSE THEY'RE SORT OF UNDERWRITING THIS

14   RISK.  TYPICALLY, IT'S DON'T LEAVE THE STATE WITHOUT NOTIFYING

15   US.  MAKE ALL YOUR COURT APPEARANCES.  THE BOND HAS A --

16   TYPICALLY HAS A ONE-YEAR PERIOD.  AND THEN IT EXPIRES OR AT

17   LEAST CAN BE PUT OVER.

18             BUT IN TERMS OF THE -- THE RESTRICTIONS THAT THE

19   COURT POSES, I MEAN, THE COURT BASICALLY JUST SETS BAIL.  AND

20   IN THIS CASE IT DID SET BAIL I BELIEVE AT -- AT THE

21   50,000-DOLLAR MARK EVEN THOUGH I WOULD IMAGINE THE BAIL IS LESS

22   FOR A MISDEMEANOR.  BUT I THINK THE COURT JUST HANDLED IT THAT

23   WAY.

24             AND, SO, WHEN WE APPEARED IN LATE AUGUST WE PUT OVER

25   THE ARRAIGNMENT UNTIL TOMORROW ACTUALLY.  AND THE BOND WAS TO

1   STAND AS I DESCRIBED.

2           SO, IF THAT ADDRESSES THE COURT'S QUESTION.

3           THE COURT:  THANK -- YEAH, IT DOES.  THANK YOU VERY

4   MUCH.

5           MR. NIXON:  JUST -- IF I MIGHT JUST ADD, THOUGH, YOUR

6   HONOR, I WILL SAY THAT MR. HUNG IS -- TO MY -- IN MY DEALINGS

7   WITH HIM HAS BEEN RESPONSIVE.  AND I -- AND THERE HAVE BEEN NO

8   NEW ISSUES OR ALLEGATIONS RAISED OUTSIDE OF THIS OF COURSE WITH

9   RESPECT TO HIS -- HIS BEHAVIOR SINCE HE WAS ARRESTED AS IT

10  RELATES TO THE STATE MATTER.

11          THE COURT:  ALL RIGHT.

12          THANK YOU VERY MUCH.

13          MR. NIXON:  THANK YOU, YOUR HONOR.

14          (PAUSE IN PROCEEDINGS.)

15          THE COURT:  ALL RIGHT.  I'LL HEAR FROM THE

16  GOVERNMENT.

17          MS. LEWIS:  YES, YOUR HONOR.  THIS IS FRANCES LEWIS

18  FOR THE GOVERNMENT.

19          I WANT TO RESPOND BOTH TO THE -- THE ARGUMENTS WITH

20  REGARD TO THE ALLEGATIONS IN THE COMPLAINT.  AND I ALSO WANT TO

21  RESPOND TO THE BOND PACKAGE THAT WAS PROFFERED THAT -- THAT

22  COULD -- NO CONDITION TO SECURE HIS APPEARANCE AND TO PROTECT

23  THE COMMUNITY.

24          AND I WILL START WITH THE ALLEGATIONS OF THE

25  COMPLAINT.

1    COUNSEL PAINTS A VERY DIFFERENT PICTURE THAN THE ONE

2    THAT I THINK THE COMPLAINT DESCRIBES.  AND I THINK IT'S EASY TO

3    GO THROUGH EACH PIECE OF EVIDENCE ONE BY ONE AND TRY TO MAKE A

4    SUGGESTION THAT A SINGLE PIECE OF EVIDENCE ON ITS OWN DOESN'T

5    MEAN ANYTHING, BUT THAT'S NOT, OF COURSE, HOW WE LOOK AT THE

6    ALLEGATIONS AS A WHOLE.

7    AND I THINK THE ALLEGATIONS AS A WHOLE ARE EXTREMELY

8    TROUBLING OF AN INDIVIDUAL WHO HAS A STRONG VIOLENT IDEOLOGY

9    AND WHO TOOK IT UPON HIMSELF TO ENGAGE IN VIOLENT ACTIVITY

10   DURING A WEEKEND OF PROTESTS.

11   I DON'T THINK THAT IT'S FAIR TO CHARACTERIZE HIS

12   ACTIONS ON MAY 31ST AS THOSE OF A COUNTER-PROTESTER OR AS

13   MERELY SOMEONE ACTING IN SELF-DEFENSE.

14   HE -- ON THE WEEKEND OF MAY 31ST AS THE COURT OF

15   COURSE KNOWS HE DROVE A VERY LARGE TRUCK.  IT'S NOT JUST A

16   TYPICAL TRUCK.  IT'S GOT ELEVATED SUSPENSION.  IT'S GOT A

17   MODIFIED EXHAUST PIPE.  AND HE DROVE THAT INTO A CROWD OF

18   AROUND A HUNDRED PEOPLE INCLUDING TWO PLAINCLOTHES POLICE

19   OFFICERS.  AND HAD THEY NOT JUMPED OUT OF THE WAY SOMEONE

20   EASILY COULD HAVE BEEN KILLED.

21   AND I THINK IT'S CLEAR FROM THE DESCRIPTIONS IN THE

22   COMPLAINT THAT THIS WAS NOT AN ACCIDENT, AND THAT THIS WAS ALSO

23   NOT SOMEONE STUCK IN A CROWD OF PROTESTERS WHO WAS TRYING TO

24   GET OUT, OR THAT THIS WAS SOMEONE ACTING IN SELF-DEFENSE

25   BECAUSE OF THE SWARM OF PROTESTERS ATTACKING THE TRUCK.

1    AS OUTLINED IN THE COMPLAINT, THE DEFENDANT SPENT THE

2   WEEKEND TARGETING PROTESTERS IN HIS TRUCK FOR THIS PURPOSE.

3    JUST TWO NIGHTS BEFORE HE TEXTED HIS FRIEND -- AND

4   COUNSEL MENTIONED THIS ONE -- BUT HAS A VERY DIFFERENT

5   INTERPRETATION OF I THINK ITS PLAIN MEANING -- HE TEXTED HIS

6   FRIEND, QUOTE -- AVOIDING ME OR SOMETHING.  I CAN NEVER SEEM TO

7   FIND THEM WHEN I'M OUT WAR RIGGING.

8    SO, IT'S CLEAR HE DIDN'T JUST ACCIDENTALLY FIND

9   HIMSELF IN THE CROWD IN PASADENA ON MAY 31ST.  IT'S CLEAR HE

10   WAS TRYING TO FIND THEM AND THAT HE HAD A VERY STRONG

11   IDEOLOGICAL BELIEF THAT THE BLACK LIVES MATTER PROTESTERS WERE

12   AFFILIATED WITH ANTIFA.

13    AGAIN, THE TEXT MESSAGES BELIE THAT INTERPRETATION.

14    AND I DO WANT TO COME BACK TO SOME OF THE MORE RECENT

15   TEXT MESSAGES THAT WE FOUND ON HIS PHONE SUBSEQUENT TO THE

16   SEIZURE LAST WEEK.

17    CELL SITE DATA PLACES HIM IN THE VICINITY OF VARIOUS

18   PROTESTS IN DOWNTOWN L.A.  AND CELL SITE DATA IS IN MUCH MORE

19   SPECIFIC THAN JUST SOUTHERN CALIFORNIA.  IT CAN SHOW THE

20   DIFFERENCE BETWEEN HIS -- WHERE HIS HOME IS IN SAN MARINO AND

21   WHERE THE PROTESTERS ARE IN OLD PASADENA.

22    AND IT'S CLEAR THAT THE CELL SITE DATA PLACES HIM IN

23   THE VICINITY OF PROTESTS IN OLD TOWN PASADENA THE DAY BEFORE

24   WHEN INDIVIDUALS IDENTIFIED A TRUCK MATCHING HIS IDENTICALLY

25   WITH THE SAME THREE DISTINCT FLAGS AT THE BACK ATTEMPTING TO

1    MAKE A U-TURN AND TERRIFYING THEM SO MUCH THAT THEY HAD TO

2    LEAVE THE SCENE BECAUSE THEY WERE WORRIED FOR THEIR OWN SAFETY.

3            THE FACT THAT THE DAY BEFORE THERE WAS YET ANOTHER

4    DESCRIPTION BY A WITNESS WHO SAW THE SAME TRUCK CIRCLING AND

5    DESCRIBED IT AS TWO CAUCASIAN MALES -- AND THAT CELL SITE DATA

6    PLACES MR. HUNG ELSEWHERE -- DOESN'T REALLY GIVE US MUCH

7    CONFIDENCE THAT HE'S NOT TRYING TO ENGAGE IN THIS ACTIVITY.  IT

8    SHOWS US THAT HE PROBABLY HAD COCONSPIRATORS.

9            WE KNOW AT LEAST ON MAY 31ST HE WAS WITH HIS WIFE IN

10   THE TRUCK.  AND THE DESCRIPTION FROM THE WITNESSES THE NIGHT

11   BEFORE INDICATE THAT THERE WAS ANOTHER INDIVIDUAL IN THE TRUCK

12   WITH HIM WHEN HE WAS CIRCLING OLD TOWN AND COMING BACK TO

13   ENGAGE WITH THE PROTESTERS THEN.

14           AND IT'S POSSIBLE THERE WERE YET MORE COCONSPIRATORS

15   WHO WERE USING HIS TRUCK THE PREVIOUS NIGHT BEFORE THAT.

16           AGAIN, THE PICTURE OF A COUNTER-PROTESTOR IS NOT

17   REALLY CONSISTENT WITH THE OTHER ACTIONS HE HAD ON -- ON THE

18   DAY OF MAY 31ST ITSELF.

19           DURING THE ASSAULT HE WAS CARRYING A LOADED HANDGUN

20   WITH A HIGH-CAPACITY MAGAZINE.  THAT'S THE SUBJECT OF THE

21   INSTANT CHARGES.  AND THIS IS THE SAME GUN.

22           IT IS -- I CAN'T TELL IF I JUST MISHEARD COUNSEL IF

23   SHE WAS SAYING IT'S UNCLEAR THAT'S THE SAME GUN THAT WAS

24   ACQUIRED FROM OUT OF STATE.

25           I THINK IT'S MENTIONED IN THE AFFIDAVIT.  IT IS THE

1   SAME GUN -- THE SERIAL NUMBERS MATCH, THE SAME GUN HE HAD A

2   FRIEND ACQUIRE FOR HIM OUT OF STATE IN SOMEONE ELSE'S NAME SO

3   THAT IT WOULD NOT BE TRACEABLE TO HIM.

4            HE ALSO HAD IN HIS TRUCK A MACHETE, AN 18-INCH LONG

5   PIPE AND A BULLHORN.

6            SO, AGAIN, THESE ARE NOT THE ACTIONS OF SOMEONE

7   ACTING IN SELF-DEFENSE OR MERE COUNTER-PROTESTORS.  THESE ARE

8   SOMEONE WHO IS -- WHO IS SEEKING OUT THE CROWD.

9            I ALSO WANT TO ADDRESS THE VIDEO.  WE HAVE NOW ALSO

10  SEEN I THINK THE SAME VIDEO THAT COUNSEL WAS REFERRING TO FROM

11  INSIDE THE TRUCK.  THE COURTS HAVE ADDITIONAL VIDEO, THE

12  YOUTUBE VIDEO THAT SHE REFERENCED.  THEN THERE'S SOME

13  ADDITIONAL VIDEO AS WELL AS SURVEILLANCE FROM A NEARBY STORE.

14           THE SURVEILLANCE FROM A NEARBY STORE STARTS WELL

15  BEFORE THE VIDEO THAT COUNSEL IS REFERRING TO TAKEN FROM INSIDE

16  THE TRUCK WE BELIEVE BY MR. HUNG'S WIFE, EMILY CHEN.

17           THE SURVEILLANCE VIDEO IS CONSISTENT WITH THE POLICE

18  REPORTS WHICH DESCRIBE SEVERAL CARS APPROACHING A CROWD OF

19  PEACEFUL PROTESTERS BLOCKING AN INTERSECTION.  THOSE CARS ALL

20  MAKE U-TURNS.  AND IT'S CLEAR ON THE SURVEILLANCE VIDEO THAT

21  THE U-TURNS ARE VERY EASILY MADE.  THE PROTESTERS AREN'T COMING

22  AT ANY OF THE CARS.

23           AND MR. HUNG INSTEAD IS TAKING A U-TURN AND DRIVING

24  AWAY FROM THE PROTESTORS, ACCELERATES INTO THE CROWD.

25           AND THE VIDEO THAT'S FROM INSIDE THE TRUCK STARTS AS

1   HE'S ALREADY MAKING HIS APPROACH INTO THE CROWD.  SO, THAT

2   VIDEO, OF COURSE, DOESN'T SHOW THE SORT OF LEAD-UP TO HIS

3   APPROACH TOWARDS THE PROTESTORS.

4           I DO ACKNOWLEDGE IT DOES SHOW FROM THE PASSENGER SIDE

5   SORT OF A STYROFOAM BEVERAGE CUP GETTING THROWN AT THE WINDOW.

6   I DON'T THINK ANYONE WITHIN THE TRUCK HAS ANY REACTION TO IT OR

7   LOOKS OR SOUNDS SCARED IN ANY WAY.  INSTEAD, HIS WIFE YELLS THE

8   PHRASE,"HORN THEIR ASSES."

9           AND THEN MR. HUNG WHO HAS HIS WINDOW DOWN PROCEEDS TO

10  BLARE NOT JUST A NORMAL CAR HORN, YOUR HONOR.  IT'S A MODIFIED

11  HORN TO SOUND LIKE A TRAIN HORN.  HE BLARES HIS HORN AS HE'S

12  DRIVING INTO THE CROWD AND YELLS, "FUCK YOU" OUT HIS WINDOW.

13          SO, AGAIN, THESE ARE NOT THE ACTIONS OF A

14  COUNTER-PROTESTOR.  THEY'RE NOT THE ACTIONS OF SOMEONE ACTING

15  IN SELF-DEFENSE.  THEY'RE THE ACTIONS OF SOMEONE WHO

16  INTENTIONALLY WENT OUT THERE SEEKING TO DRIVE INTO THE CROWD OF

17  PROTESTORS.  AND HE'S EXTREMELY FORTUNATE THAT NO ONE GOT HURT.

18          YOU KNOW, I THINK PARTICULARLY FOR SOMEONE WITH A

19  THIN BLUE LINE FLAG -- IT'S SOMETHING HE MAYBE SHOULD HAVE

20  CONSIDERED THAT THERE WERE ACTUALLY LAW ENFORCEMENT OFFICERS IN

21  THAT CROWD THAT HE EASILY COULD HAVE KILLED HAD THEY NOT JUMPED

22  OUT OF THE WAY.

23          AND I DO WANT TO TOUCH ON THE FIREARM FROM OUT OF

24  STATE BECAUSE I THINK AGAIN THERE WERE SOME EFFORTS BY COUNSEL

25  TO SUMMARIZE THE AFFIDAVIT IN A WAY THAT I DON'T THINK IS

1   CONSISTENT WITH THE ACTUAL ALLEGATIONS IN THE AFFIDAVIT OR

2   CONSISTENT WITH WHAT WE FOUND IN --

3            (AUDIO SKIPPING AT 9:29 A.M.)

4            MS. LEWIS: -- FIREARM -- OF COURSE IT WAS ACQUIRED

5   FROM OUT OF STATE WHICH MEANS IT'S NOT NECESSARILY EASY TO

6   TRACE.  YOU ACTUALLY HAVE TO FIND -- THE SOURCE --

7            I.T. PERSON:  I'M SORRY.  YOU'RE BREAKING UP THERE.

8   AND --

9            MS. LEWIS:  -- WHERE IT WAS PURCHASED --

10           I.T. PERSON:  COUNSEL, YOU'RE BREAKING UP.

11           MS. LEWIS: -- ACQUIRED IT BECAUSE SOME -- IN

12  CALIFORNIA.

13           THE COURT:  MS. LEWIS, YOU ARE BREAKING UP.  WE'RE

14  HAVING A DIFFICULT TIME.

15           MS. LEWIS:  I'M SORRY.  CAN YOU HEAR ME?

16           THE COURT:  WE'RE HAVING A DIFFICULT TIME HEARING

17  YOU.

18           MS. LEWIS:  YES.

19           I.T. PERSON:  YOU CAN TRY GOING TO PLACE IN YOUR HOME

20  THAT MIGHT HAVE BETTER RECEPTION OR YOU CAN TRY DIALING BACK

21  IN.

22           MS. LEWIS:  OKAY.

23           (PAUSE IN PROCEEDINGS.)

24           MS. LEWIS:  I'M HAVING A DIFFICULT TIME HEARING YOU.

25           I APOLOGIZE.

1              WHAT WAS THAT?

2              I.T. PERSON:  YOU CAN TRY DIALING BACK IN OR YOU CAN

3    TRY MAYBE GOING TO YOUR HOME --

4              MS. LEWIS:  ALL RIGHT.

5              I.T. PERSON:  -- WITH A PLACE THAT MIGHT HAVE BETTER

6    RECEPTION.

7              (PAUSE IN PROCEEDINGS.)

8              MS. LEWIS:  OKAY.  LET ME TRY -- DIALING BACK IN.

9              I.T. PERSON:  THANK YOU.

10             (PAUSE IN PROCEEDINGS.)

11             MS. LEWIS:  HELLO.  THIS IS --

12             (AUDIO SKIPPING.)

13             I.T. PERSON:  YEAH.  YOU'RE STILL COMING IN KIND OF

14   GARBLED.

15             MS. LEWIS:  DOES --

16             I.T. PERSON:  WELL, YES.  YOU'RE STILL COMING IN

17   CHOPPY.

18             (AUDIO SKIPPING.)

19             MS. LEWIS:  -- HE'S INDICATED HE CAN HEAR ME AS WELL.

20             SO, I'M WONDERING IF THE COURT IS HAVING THE

21   TECHNOLOGY ISSUE.

22             I.T. PERSON:  YVETTE, I CAN HEAR YOU AGAIN.  YOU

23   SOUND GOOD.

24             CAN SOMEONE ELSE TRY  --

25             MS. LEWIS:  SO, I WANT ERIN AND DAVE --

1            MS. MURPHY:  I CAN HEAR -- SORRY.  I CAN HEAR MS.

2    LEWIS.  I'M HAVING TROUBLE HEARING THE COURT THOUGH.

3            MR. RYAN:  THIS IS DAVID RYAN.  SAME FOR ME.  I CAN

4    HEAR MS. LEWIS AND MS. MURPHY, BUT I'M HAVING TROUBLE HEARING

5    THE COURT.

6            I.T. PERSON:  OKAY.  WE'RE COMING IN CHOPPY?

7            WE CAN TRY RECONNECTING FROM YOUR BENCH IF YOU'D

8    LIKE.

9            THE COURT:  OKAY. YES.

10           (PAUSE IN PROCEEDINGS.)

11           I.T. PERSON:  ARE WE COMING IN NOW?  CAN YOU SEE AND

12   HEAR THE COURT?

13           (PAUSE IN PROCEEDINGS.)

14           (UNIDENTIFIED SPEAKER)  TRYING TO WORK OUT SOME

15   TECHNICAL DIFFICULTIES.

16           MS. LEWIS:  HELLO.  YES.

17           I.T. PERSON:  OKAY.  WE'RE COMING IN BETTER NOW?

18           MS. LEWIS:  YEAH.

19           (PAUSE IN PROCEEDINGS.)

20           I.T. PERSON:  OKAY.  THANK YOU.

21           THE COURT:  THANK YOU VERY MUCH.

22           MS. LEWIS:  YOUR HONOR, THIS IS FRANCES LEWIS.

23           I'D BE GLAD TO CONTINUE.  I DON'T KNOW WHERE YOU GUYS

24   STARTED TO LOSE ME IN TERMS OF THE ARGUMENT, IF YOU HAD HEARD

25   MY DISCUSSION OF THE VIDEO FROM INSIDE THE TRUCK OR IF I SHOULD

1    CONTINUE WITH THAT.

2            THE COURT:  YES.  I HEARD YOUR DISCUSSION OF THE

3    VIDEO FROM INSIDE THE TRUCK.  BUT THAT IS THE POINT AT WHICH

4    YOU STARTED TO BECOME INCREASINGLY DIFFICULT TO UNDERSTAND.

5            MS. LEWIS:  OKAY.

6            SO, I WILL THEN -- AFTER THE VIDEO OF THE TRUCK I WAS

7    TURNING TO SOME OF THE FIREARM ALLEGATIONS.  AND THAT'S WHERE I

8    WILL PICK UP.

9            THE FIREARM THAT DEFENDANT HAD IN HIS POSSESSION ON

10   MAY 31ST, I MAY HAVE MISHEARD COUNSEL.  I THINK SHE MENTIONED

11   THERE'S NOT NECESSARILY A LINK BETWEEN THAT AND THE ONE THAT

12   WAS ACQUIRED FROM OUT OF STATE.

13           I THINK THE AFFIDAVIT IS CLEAR THAT THE SERIAL

14   NUMBERS MATCHED.  IT WAS, IN FACT, A GUN THAT WAS ACQUIRED IN

15   OREGON.  AND, YOU KNOW, BUT/FOR SOME DILIGENT WORK ON THE

16   AGENTS, THERE'S NO WAY WE WOULD NECESSARILY HAVE KNOWN THAT

17   BECAUSE THE SERIAL NUMBERS -- OF COURSE, IN CALIFORNIA YOU CAN

18   TRACE TO A PURCHASER IN CALIFORNIA.

19           THE DEFENDANT AS A RESIDENT OF CALIFORNIA WHO

20   PURCHASES GUNS IN CALIFORNIA WOULD HAVE GUNS TRACED BACK TO

21   HIM.  BUT HE DOES ACTUALLY HAVE NO GUN REGISTERED TO HIM IN

22   CALIFORNIA -- WOULD SUGGEST THAT HE ACQUIRES ALL OF HIS

23   FIREARMS FROM ELSEWHERE, AND THAT THEY ARE MUCH MORE DIFFICULT

24   TO TRACE AS A RESULT.

25           THROUGH THE WORK OF THE AGENTS THEY FOUND THE NEAREST

1   -- GUN STORE NEXT TO HIS FAMILY'S RV PARK IN OREGON, WENT TO

2   THAT GUN STORE AND FOUND THAT YES, IN FACT, THERE WERE FIREARMS

3   THAT HE HAD PURCHASED HIMSELF IN MARCH.  AND THE FIREARM THAT

4   WAS ON HIS PERSON IN MAY OF THIS YEAR WAS ACQUIRED BY A SORT OF

5   LONG-TIME ASSOCIATE OF HIS IN HIS FAMILY BACK IN DECEMBER OF

6   2017.  AND THEN CONSISTENT WITH THE TEXT MESSAGES BROUGHT INTO

7   CALIFORNIA FOR MR. HUNG AND TRANSFERRED TO MR. HUNG.

8        SO, THE -- IT'S CLEAR THAT HE'S ACQUIRING WEAPONS

9   FROM OTHER SOURCES.  AND I'LL GET INTO SOME OF THE WEAPONS THAT

10  WERE FOUND.  BUT I THINK IT'S TELLING THAT IF SOMEONE WHO LIVES

11  IN CALIFORNIA, HE MAKES AN ARGUMENT OF HIS STRONG COMMUNITY

12  TIES, IT'S CLEARLY AN AVID GUN POSSESSOR.  HE DOESN'T HAVE ANY

13  GUNS REGISTERED TO HIM IN THE STATE OF CALIFORNIA.  HE'S

14  CLEARLY TRYING TO CIRCUMVENT THE CALIFORNIA GUN RESTRICTIONS.

15  AND THERE ARE AMPLE TEXT MESSAGES TO SUPPORT THAT AS WELL.

16       THE GUNS THAT HE HIMSELF ACQUIRED IN MARCH OF THIS

17  YEAR -- THE SORT OF IDEOLOGICAL TEXT MESSAGES REALLY START TO

18  INCREASE IN MARCH OF THIS YEAR WITH THE ONSET OF COVID

19  CONSISTENT WITH SEVERAL CONSPIRACY THEORIES THAT ARE TOSSED

20  AROUND AMONG HIS FRIEND GROUP ABOUT COVID AND SORT OF

21  CONSPIRACY THEORIES THAT COVID WAS SORT OF AN INVENTION AND NOT

22  ACTUALLY SOMETHING REAL, AND THAT IT WAS THE ONSET OF A

23  POTENTIAL MILITARY OPERATION WITHIN THE UNITED STATES AND

24  POTENTIAL CIVIL WAR.

25       AND HE WENT TO OREGON IN RESPONSE TO THIS INCREASE OF

1  CONCERN AND PURCHASED THREE ADDITIONAL FIREARMS THAT HE THEN

2  IMMEDIATELY BROUGHT BACK TO CALIFORNIA.

3          AND THE REASON WHY WE AT LEAST KNOW ONE OF THEM WAS

4  BROUGHT BACK TO CALIFORNIA IS BECAUSE ONE OF THEM WAS NOT ONLY

5  PICTURED IN THE PHOTOGRAPH THAT WE PUT IN THE AFFIDAVIT --

6  VAGARO HUNTER BOLDDASH RIFLE.  AND IT'S PICTURED WITH

7  ADDITIONAL GEAR, TACTICAL GEAR, THAT WE KNOW HE PURCHASED

8  AROUND THE SAME TIME AND HAD SHIPPED TO LODI.  IT'S CONSISTENT

9  WITH THAT LOCATION.

10          BUT IT WAS ACTUALLY FOUND LAST WEEK SORT OF

11  ELIMINATING ANY POTENTIAL FOR DOUBT ON THAT ONE.  IT WAS

12  ACTUALLY FOUND LAST WEEK, THE VAGARO HUNTER BOLDDASH RIFLE,

13  SAME SERIAL NUMBER, FOUND AT THE LODI VINEYARD WHERE -- WHERE

14  WE UNDERSTOOD HIM TO HAVE BROUGHT IT ALONG WITH THE OTHER

15  WEAPONS THAT HE HAD.

16          AND AS WE NOTED, AND AS PRETRIAL SERVICES NOTED, HE

17  BROUGHT THREE FIREARMS IN MARCH.  AND TWO OF THOSE WE HAVE NOT

18  LOCATED.  WE SEARCHED THREE PREMISES THAT WE KNOW ARE

19  ASSOCIATED WITH HIM AND HIS WEAPONS ACTIVITIES.  WE DIDN'T FIND

20  TWO OF THOSE RIFLES.  AND THAT'S EXTREMELY CONCERNING TO THE

21  GOVERNMENT BECAUSE IT MEANS THEY'RE EITHER SOMEWHERE ELSE,

22  RIGHT -- THEY'RE EITHER AT HIS PARENTS' RESIDENCE HERE LOCALLY.

23  THEY'RE AT HIS FAMILY'S RV PARK IN OREGON.  THEY'RE IN A

24  VEHICLE THAT WE HAVEN'T SEARCHED.  OR HE'S TRANSFERRED THEM TO

25  SOMEONE ELSE.  AND WE -- AND WE CAN'T TRACE THAT ACTIVITY

1  BECAUSE OF THE NATURE OF THE TRANSACTIONS HE'S ENGAGED IN.

2        HE ALSO SPENT THE LAST FEW MONTHS ACCUMULATING

3  ADDITIONAL TACTICAL GEAR.

4        AND I THINK I'LL SORT OF START, THE TACTICAL GEAR

5  ACCUMULATION STARTS IN SORT OF MARCH OF -- YOU KNOW, THERE'S

6  PLENTY ACTUALLY DATING BACK TO BEFORE THAT.  BUT THE SORT OF

7  ESCALATION OF IT, AGAIN, COINCIDES WITH HIS TRIP TO OREGON IN

8  MARCH OF 2020.  AND HE INCREASES HIS ACCUMULATION OF TACTICAL

9  GEAR.

10        AND, YOU KNOW, OF THE DOLLARS HE HAS SPENT IN 2020 ON

11  TACTICAL GEAR, I THINK HALF OF IT OR SO --

12        (AUDIO SKIPPING.)

13        MS. LEWIS:  -- AFTER HIS ARREST -- 2020 --

14        (AUDIO SKIPPING.)

15        THE COURT:  MS. LEWIS --

16        MS. LEWIS:  AND WHILE I ACKNOWLEDGE HE'S NOT BEEN --

17        (AUDIO SKIPPING.)

18        THE COURT:  MS .LEWIS --

19        MS. LEWIS:  -- TESTED --

20        (AUDIO SKIPPING.)

21        THE COURT:  MS. LEWIS, YOU'RE BREAKING UP AGAIN.

22        I.T. PERSON:  YEAH.  MS. LEWIS, CAN YOU HEAR US?

23        (AUDIO SKIPPING.)

24        MS. LEWIS:  -- THAT HE HAS NOT MATURED IN ANY WAY --

25        THE COURT:  MS. LEWIS, CAN YOU HEAR US?  YOU'RE

1    BREAKING UP AGAIN.

2              MS. LEWIS:  YEAH.  I'M HAVING A HARD TIME HEARING THE

3    COURT.

4              I WONDER AGAIN -- MR. RYAN --

5              (AUDIO SKIPPING.)

6              MS. MURPHY:  YOU KNOW, I CAN HEAR MS. LEWIS, BUT --

7    THE COURT THERE'S A LITTLE WOBBLE.

8              (AUDIO SKIPPING.)

9              MR. RYAN: -- THE --

10             I.T. PERSON:  YEAH.  IT MIGHT BE A --

11             WE CAN TRY CONNECTING ONE MORE TIME.

12             (THE COURT AND I.T. TECH CONFERRING.)

13             (PAUSE IN PROCEEDINGS.)

14             THE COURT:  COUNSEL, WE ARE GOING TO DISCONNECT AND

15   RECONNECT AGAIN TO SEE.  BECAUSE THAT -- THAT DID HELP FOR A

16   WHILE.

17             (PAUSE IN PROCEEDINGS.)

18             MS. LEWIS:  OKAY.  WE'LL STAND BY.

19             (PAUSE IN PROCEEDINGS.)

20             I.T. PERSON:  HELLO.  CAN YOU SEE AND HEAR THE COURT

21   BETTER?

22             MS. LEWIS:  I CAN HEAR YOU JUST FINE.  I'M NOT ON

23   VIDEO.  SO, I -- I'M SORRY.  THIS IS FRANCES LEWIS.  I CAN --

24   I CAN SAY THAT I HEAR YOU.

25             (PAUSE IN PROCEEDINGS.)

1              MS. MURPHY:  THIS IS ERIN MURPHY.

2              I CAN HEAR YOU.  I -- I TOO AM NOT ON VIDEO.  SO, I

3      -- I CAN'T SAY WHETHER THE VIDEO IS COMING IN CLEAR.

4              THE COURT:  ALL RIGHT.  WELL, WE CAN HEAR YOU BOTH

5      CLEARLY NOW.

6              MS. LEWIS:  OH, GREAT.

7              SO -- SO, I WILL -- I WILL SORT OF -- AND I'LL DO MY

8      BEST TO WRAP UP BECAUSE I REALIZE THE TECHNOLOGICAL ISSUES MAKE

9      THIS DIFFICULT.

10             BUT I'VE BEEN TALKING ABOUT THE GUNS THAT WERE

11     ACQUIRED IN OREGON IN MARCH OF THIS YEAR THAT WE -- ONE OF

12     WHICH WE LINKED TO THE HOUSE AS WELL AS THIS TACTICAL GEAR THAT

13     HE SPENT THE LAST FEW MONTHS ACCUMULATING AND THE FACT THAT THE

14     EVIDENCE AS SET FORTH IN THE AFFIDAVIT IS CLEAR THAT HE'S

15     CONTINUING TO PURCHASE LARGE QUANTITIES OF THESE TACTICAL GEAR.

16             AND SOMETHING THAT I THINK IS WORTH NOTING IS THAT A

17     LOT OF THIS TACTICAL GEAR -- I KNOW THERE'S AN ARGUMENT THAT

18     THIS IS ALL FOR SELF-DEFENSE.  ONE OF THE CONVERSATIONS HE HAD

19     WITH AN ASSOCIATE THAT'S MENTIONED IN THE AFFIDAVIT IS ABOUT

20     ACQUIRING SOMETHING CALLED A "SHOOT HOUSE."  THAT'S NOT

21     SOMETHING THAT'S USED IN SELF-DEFENSE.  IT'S A STRUCTURE THAT

22     ALLOWS SHOOTERS TO STIMULATE URBAN COMBAT AND PRACTICE CLEARING

23     BUILDINGS.  AGAIN, THAT'S NOT SOMETHING THAT YOU WOULD NEED IF

24     ALL YOU WERE MERELY DOING IS PREPARING TO ENGAGE IN

25     SELF-DEFENSE.

1          AND, AGAIN, I THINK THE ARGUMENT THAT HE WAS SIMPLY

2    SOMEONE OUT THERE TRYING TO ENGAGE IN SELF-DEFENSE IS -- IS

3    REALLY UNDERMINED BY THE FACT THAT HE AFFIRMATIVELY WENT TO THE

4    PROTEST -- WHICH HE HAS THE RIGHT TO DO TO COUNTER-PROTEST.

5    BUT YOU DON'T HAVE THE RIGHT TO SHOW UP TO A FIGHT, START A

6    FIGHT AND THEN CLAIM SELF-DEFENSE WHEN YOU RESPOND.

7          SO, I THINK IT'S PARTICULARLY CONCERNING TO THE

8    GOVERNMENT THAT THESE EFFORTS HAVE BEEN CONTINUED.  AND WHILE

9    HE HASN'T BEEN ARRESTED, HE HAS CERTAINLY NOT BEEN DETERRED.

10         AND I THINK THE EVIDENCE OF WHAT WAS FOUND LAST WEEK

11   IS CONSISTENT WITH THIS AS WELL.

12         UP AT THE LODI RESIDENCE THERE WERE TWO PISTOLS AND

13   SEVEN RIFLES AND THOUSANDS OF ROUNDS OF AMMO AT THE FAMILY

14   VINEYARD WHICH I THINK IS AGAIN REFERRED TO AS HIS PARENTS'

15   VINEYARD.  WE'RE NOT DISPUTING THAT IT'S A WORKING VINEYARD.

16   BUT IT'S CLEAR FROM THE TEXT MESSAGES AND THE CELL SITE DATA HE

17   SPENT A SIGNIFICANT AMOUNT OF TIME THERE.  AND THEY FOUND OVER

18   20 FIREARMS -- OR SORRY -- THEY FOUND 20 FIREARMS AT THE

19   VINEYARD, 10 RIFLES INCLUDING THE VAGARO HUNTER ACTION RIFLE

20   PURCHASED IN MARCH, 10 PISTOLS AND 60,000 ROUNDS OF AMMUNITION.

21         AND, SO, WE HAVE CLEAR USE OF HIS EVIDENCE -- SORRY,

22   CLEAR EVIDENCE OF HIS USE OF THE VINEYARD AS A TACTICAL

23   TRAINING GROUND, INCLUDING COMMUNICATIONS WITH ASSOCIATES ABOUT

24   DOING JUST THAT.

25         AND I THINK THOSE -- SOME OF THE MORE RECENT TEXT

1    MESSAGES ARE PARTICULARLY CONCERNING AND RELATE TO THAT AS

2    WELL.

3                THE ONE PARTICULAR TEXT MESSAGE FROM HIS PHONE LAST

4    WEEK THAT STOOD OUT TO US, THERE ARE PICTURES OF -- THAT MR.

5    HUNG HIMSELF TAKES THAT HE IS SENDING TO A TEXT GROUP.  AND THE

6    TEXT GROUP IS CALLED "SHOOTERS OF THE NEST."  AND IT SHOWS HIM

7    OUTFITTING A HELMET WITH NIGHTVISION GOGGLES.  AND HE THEN

8    SHOWS A PHOTO OF THE -- THIS HELMET OUTFITTED WITH NIGHTVISION

9    GOGGLES PICTURED NEXT TO TWO AR-15'S.  AND HE SENDS THAT ON

10   SEPTEMBER 11TH, 2020 -- SO, WELL AFTER HIS ARREST IN MAY.

11               HIS ASSOCIATE RESPONDS TO THESE PHOTOS BY SAYING,

12   QUOTE, ANTIFA WORST NIGHTMARE.  CAN YOU IMAGINE BEING ANTIFA

13   ROLLING UP IN LODI THINKING IT'S SWEET.  AND THE KING BERNARDO

14   HUNTS YOU DOWN.

15               AND WE UNDERSTAND THE REFERENCE TO "KING BERNARDO"

16   BEING TO BENJAMIN HUNG.

17               AND HUNG RESPONDS TO THIS TEXT MESSAGE BY SAYING,

18   QUOTE, "NO FLY ZONE WHERE THINGS MAGICALLY DISAPPEAR OR BECOME

19   GRAPE FERTILIZER -- GRAPE, G-R-A-P-E- -- OF COURSE REFERENCING

20   THE VINEGARD, THE GRAPE FERTILIZER -- AGAIN, AN EXTREMELY

21   TROUBLING TEXT MESSAGE ABOUT WHAT HE WOULD POTENTIALLY DO WITH

22   THESE AR-15'S AND THE NIGHTVISION GOGGLES AND THE HELMET THAT

23   HE HAD PICTURED THERE.

24               THERE'S ANOTHER TEXT MESSAGE FROM SEPTEMBER 10TH,

25   2020 TO THE SHOOTERS OF THE NEST TEXT GROUP WHERE THEY ARE

1  DISCUSSING A CONSPIRACY THEORY THAT THE WILDFIRES IN OREGON

2  WERE STARTED BY ANTIFA.

3         AND MR. HUNG TEXTS, "ANTIFA TERRORISTS CAUGHT SETTING

4  FIRES" TO WHICH HIS ASSOCIATE REPLIES -- AND PARDON MY LANGUAGE

5  -- "FUCKERS NEED TO BE BURNED AT STAKE."

6         AND THEN MR. HUNG USES THE IPHONE FEATURE TO

7  EMPHASIZE THAT COMMENT ABOUT BURNING PEOPLE AT THE STAKE --

8  THUS SIGNALING HIS AGREEMENT WITH IT.

9         HE TALKS ABOUT THE FACT THAT -- YOU KNOW, AGAIN,

10  THERE'S THESE ARGUMENTS -- AND I'LL GET TO THE BOND PACKAGE

11  HERE IN A MOMENT -- ARGUMENTS OF SORT OF SUPPORT FROM THE

12  COMMUNITY.

13         I DON'T KNOW HOW MUCH THE COMMUNITY KNOWS OF HIS

14  IDEOLOGY -- HIS VIOLENT IDEOLOGY OR THE ACTIONS HE TOOK ON MAY

15  31ST.  AND SO -- I DON'T DOUBT THAT HE HAS SUPPORT FROM FRIENDS

16  AND FAMILY.  THAT IS COMMON.

17         BUT ONE OF THE SORT OF MORE TROUBLING TEXT MESSAGES

18  AS WELL ON AUGUST 25TH, 2020 IN CONVERSATIONS ABOUT HIS TRUCK

19   -- AND, AGAIN, HE REFERS TO IT AS THE WAR RIG WITH ALL FLAGS

20  WITH HIM.  HE -- HE THEN -- MR. HUNG NOTES THAT THE WAR RIG IS

21  NOW A NATIONAL ICON, AND THAT HE'S HAD NEIGHBORS APPROACH HIM,

22  "LIKE I WAS SOME KIND OF GREEK GOD OF A PATRIOT AND THAT THEY

23  WANTED TO, QUOTE, SHAKE MY HAND AND PAT MY TRUCK, AND THAT THEY

24  ARE, QUOTE, READY TO FIGHT THE FULL CIVIL WAR IF NEED BE.

25         SO, AGAIN, WE'RE IN AUGUST OF 2020.  WE ARE WELL

1  AFTER HIS ARREST ON MAY 31ST.  AND HE'S STILL MAKING REFERENCES

2  TO A CIVIL WAR.  AND HE'S STILL MAKING REFERENCES TO SORT OF --

3  SORT OF PROUD REFERENCES WITH RESPECT TO HIS TRUCK AND HIS

4  ACTIVITY THE WEEKEND OF THE PROTESTS.

5          AND THEN I'LL SORT OF END WITH THE TEXT MESSAGES.

6  THE SORT OF MOST TROUBLING ONE IS A SERIES THAT HE SENT TO

7  HIMSELF -- SORT OF PERSONAL NOTES OR A DIARY ON AUGUST 22ND,

8  2020.

9          HE MAKES A LOT OF COMMENTS ABOUT SORT OF A MOB COMING

10  THROUGH YOUR NEIGHBORHOOD, AND THAT IF ANYBODY COMES TO HARM

11  HIM THEY BETTER BE READY FOR THE SEVENTH LEVEL OF HELL.  HE

12  SAYS, QUOTE, "I WILL OPERATING A 10,000-DOLLAR NIGHTVISION

13  SETUP AND A 5,000-DOLLAR NK-18 RIFLE BEHIND A PILE OF FULLY

14  LOADED HUNDRED ROUND DRUM MAG.

15          "COME TO OUR NEIGHBORHOOD AND THREATEN OUR BABIES?

16          "THESE SCUM WILL PRAY FOR A QUICK DEATH AND HOPE WE

17  DON'T BRING THEM BACK TO OUR SUBTERRANEAN INTERROGATION CHAMBER

18  WHERE THE FUN REALLY BEGINS.  AND I MAKE THEM TELL ME WHERE

19  THEIR FAMILIES LIVE.

20          "THESE SCUM ARE LETHAL DISEASE TO THE FUTURE

21  PROSPERITY AND WELL-BEING OF OUR CHILDREN.  WE WILL ERADICATE

22  THEM ACCORDINGLY."

23          AND, AGAIN, THIS IS AUGUST 22ND, 2020.  THESE ARE

24  TEXT MESSAGES WE JUST FOUND ON HIS PHONE LAST FRIDAY AFTER IT

25  WAS SEIZED PURSUANT TO THE SEARCH WARRANTS FROM LAST WEEK.

1          THEY ARE EXTREMELY TROUBLING.  THEY -- THEY GO WELL

2   BEYOND STATEMENTS OF A COUNTER-PROTESTOR OR STATEMENTS OF

3   SOMEONE ACTING IN SELF-DEFENSE.

4          AND THEY ARE VERY MUCH CONSISTENT WITH THE VIOLENT

5   IDEALOGY AND SOMEONE WHO IS A DANGER TO THE COMMUNITY.

6          AND NO CONDITIONS OF BOND WOULD BE ABLE TO ALLEVIATE

7   THAT.

8          (AUDIO SKIPPING.)

9          MS. LEWIS:  AND THEN I WILL JUST BRIEFLY TOUCH ON

10  SORT OF THE BOND PACKAGE.

11         AGAIN, I THINK ALL THE ARGUMENTS I MAKE JUST -- WHY

12  HE'S A DANGER TO THE COMMUNITY.  AND, YOU KNOW, DIFFERENT

13  DEFENDANTS -- TO THE COURT WITH DIFFERENT -- SUPPORT FROM THEIR

14  FAMILY -- MOST OF THEM ARE LOVED BY THEIR FAMILY.  MOST OF THE

15  FAMILIES SHOW UP -- WILLING TO PUT UP BAIL RESOURCES --

16  AVAILABLE --

17         (AUDIO SKIPPING.)

18         I.T. PERSON:  I'M SORRY, MS.  YOU'RE BREAKING UP

19  REALLY BAD AGAIN.

20         WE MAY NEED TO RECONNECT.

21         (AUDIO SKIPPING.)

22         THE COURT:  MS. LEWIS --

23         (AUDIO SKIPPING.)

24         THE COURT:  MS. LEWIS, YOU'RE BREAKING UP AGAIN.

25         MS. LEWIS:  -- CLEARLY IS A FAMILY --

```
 1              (AUDIO SKIPPING.)

 2              MS. LEWIS:  -- THAT HAS AMPLE RESOURCES.

 3              AND THEY SEEM WILLING TO PUT UP --

 4              THE COURT:  SHE CAN'T HEAR --

 5              (AUDIO SKIPPING.)

 6              THE COURT:  MS. LEWIS, CAN YOU HEAR THE COURT?

 7              MS. LEWIS:  OH, CAN YOU STILL HEAR ME, YOUR HONOR?

 8              THE COURT:  NO.  YOU -- YOU WERE COMING IN CLEARLY.

 9   AND THEN --

10              (AUDIO SKIPPING.)

11              MS. LEWIS:  SO -- IT'S A LITTLE HARD, BUT I CAN --

12   SORT OF HEAR THE COURT --

13              (AUDIO SKIPPING.)

14              THE COURT:  ALL RIGHT.

15              WHEN YOU STARTED TO ADDRESS THE BOND PACKAGE --

16              MR. RYAN:  THIS IS DAVE RYAN.  I CAN HEAR MS. LEWIS

17   BUT I'M NOT HEARING THE COURT.

18              (AUDIO INTERRUPTION.)

19              THE COURT:  -- WE COULD NO LONGER HEAR YOU.  WE'RE

20   GOING TO TRY TO RECONNECT.

21              (PAUSE IN PROCEEDINGS.)

22              MS. LEWIS:  OKAY.  THANK YOU.

23              (PAUSE IN PROCEEDINGS.)

24              THE OPERATOR:  HELLO.  WELCOME TO THE CONFERENCE --

25              (PAUSE IN PROCEEDINGS.)
```

```
 1              THE OPERATOR:  I'LL CONNECT YOU TO YOUR CONFERENCE
 2   NOW.
 3              (PAUSE IN PROCEEDINGS.)
 4              THE COURT:  ALL RIGHT.  MS. LEWIS, CAN YOU HEAR THE
 5   COURT --
 6              MS. LEWIS:  YES.  MUCH BETTER.
 7              THANK YOU, YOUR HONOR.
 8              THE COURT:  MS. MURPHY, CAN YOU HEAR THE COURT?
 9              MS. MURPHY:  YES, I CAN.
10              AND CAN I JUST CONFIRM THAT MR. HUNG CAN STILL HEAR
11   AND SEE WHAT'S GOING ON.
12              THE DEFENDANT:  YES, I CAN.
13              THANK YOU.
14              MS. MURPHY:  THANK YOU.
15              THE COURT:  AND I CAN TELL YOU THROUGHOUT THIS
16   ARGUMENT MR. HUNG HAS BEEN ON THE UNINTERRUPTED VIDEO.  SO,
17   THAT IS THE ONE CONNECTION THAT SEEMS TO WORK VERY WELL THIS
18   MORNING.
19              MS. MURPHY:  OKAY.  SO, THANK YOU.
20              THE COURT:  ALL RIGHT.
21              MS. LEWIS:  SO, THEN I WILL CONTINUE --
22              YOUR HONOR, IT SOUNDS LIKE YOU HEARD MY REFERENCE TO
23   THE TEXT MESSAGES THAT WE FOUND ON HIS PHONE LAST WEEK.  AND IT
24   WAS WHEN I GOT TO THE --
25              (AUDIO SKIPPING.)
```

1          MS. LEWIS:  -- WE STARTED TO LOSE YOU.

2          IS THAT RIGHT?

3          THE COURT:  YES.  I HEARD YOUR ARGUMENT REGARDING THE

4   TEXT MESSAGES FOUND ON HIS PHONE LAST WEEK.

5          YOU THEN TURNED TO ADDRESS THE BOND PACKAGE.  AND AT

6   THAT POINT THE CONNECTION -- YOUR WORDS BROKE UP.  AND WE DID

7   NOT UNDERSTAND WHAT YOU SAID AT ALL REGARDING THE BOND PACKAGE.

8          (PAUSE IN PROCEEDINGS.)

9          THE COURT:  CAN YOU HEAR --

10          MS. LEWIS:  AND ARE YOU -- I'M HAVING A LITTLE

11   TROUBLE HEARING THE COURT.

12          ARE YOU ABLE TO HEAR ME CLEARLY?

13          (AUDIO SKIPPING.)

14          I.T. PERSON:  WE ARE UNABLE TO HEAR YOU --

15          MS. MURPHY:  THIS IS -- THIS IS ERIN MURPHY.  I'M

16   ALSO HAVING TROUBLE HEARING THE COURT.

17          I.T. PERSON:  OKAY. STAND BY, PLEASE.

18          (THE COURT AND I.T. TECH CONFERRING.)

19          (PAUSE IN PROCEEDINGS.)

20          THE COURT:  COUNSEL, CAN YOU HEAR ME?  THIS IS THE

21   COURT.

22          (PAUSE IN PROCEEDINGS.)

23          MS. LEWIS:  YES. I CAN HEAR YOU BETTER NOW, YOUR

24   HONOR.

25          THIS IS --

1          MS. MURPHY:  THIS IS ERIN MURPHY.

2          YES, I CAN HEAR YOU BETTER.

3          THE COURT:  SO, I.T. IS TELLING ME THAT THIS PATTERN

4   WILL CONTINUE WHERE IT CLEARS FOR A WHILE.  AND THEN IT BECOMES

5   GARBLED FOR A WHILE.

6          WE CAN CONTINUE LIKE THIS WHERE I WILL NOTIFY YOU

7   WHEN I CANNOT UNDERSTAND WHAT YOU'RE SAYING.

8          A SECOND OPTION IS I.T. CAN EXPLORE PERHAPS OTHER

9   WAYS TO CONNECT.

10          A THIRD OPTION IS THAT WE CAN RECONVENE LATER,

11   PERHAPS AT A TIME WHEN THE ATTORNEYS COULD BOTH BE IN THE

12   COURTROOM.

13          AND IF COUNSEL HAVE OTHER -- OR I.T. HAVE OTHER

14   SUGGESTIONS, THE COURT IS HAPPY TO LISTEN TO THOSE.

15          MS. MURPHY:  YOUR HONOR, THIS IS ERIN MURPHY.

16          I'M FINE WITH ANY OF THOSE OPTIONS.  I DO WONDER IF

17   MAYBE THE MOST EFFICIENT THING IS TO TRY TO APPEAR IN PERSON.

18   I'M HAPPY TO DO THAT.  I -- I LIVE IN THE VALLEY.  SO, IT WILL

19   TAKE ME PROBABLY AN HOUR TO GET TO COURT, BUT I'M HAPPY TO DO

20   THAT IF GOVERNMENT COUNSEL IS ABLE TO DO THAT OR MAYBE EVEN

21   JUST HAVING ONE LESS PERSON TRYING TO CONNECT WILL MAKE IT

22   EASIER.  I DON'T KNOW.

23          MS. LEWIS:  AND I -- THIS IS FRANCES LEWIS.

24          I GUESS WE HAVE NO OBJECTION TO EITHER OF THOSE

25   OUTCOMES.  I DO THINK WE'RE PROBABLY -- AT LEAST I KNOW I'M

1    WRAPPING UP WITH REGARD TO ARGUMENT.  I THINK WE'RE CLOSE TO

2    FINISHING.  BUT I WOULD IN SOME WAYS DEFER TO MS. MURPHY ON

3    WHAT HER PREFERENCE IS HERE BECAUSE IT'S HER CLIENT'S DETENTION

4    HEARING.

5              SO, WE ARE COMFORTABLE CONTINUING AS IS WITH THE

6    COURT LETTING US KNOW WHEN THE CONNECTION DROPS.

7              I CAN ALSO BE IN COURT -- IT'S SORT OF THE SAME --

8    I'M ACTUALLY QUITE CLOSE TO DOWNTOWN.  I COULD BE THERE IN 30

9    MINUTES IF NEED BE.

10             (PAUSE IN PROCEEDINGS.)

11             (THE COURT AND I.T. TECH CONFERRING.)

12             THE COURT:  ALL RIGHT.

13             WELL, COUNSEL, I WAS ABLE TO HEAR

14   YOU BOTH CLEARLY -- (LAUGHTER.) -- NOW THAT WE'VE -- WE'VE

15   RAISED THIS.

16             I.T. HAS ALSO TOLD ME ONE WAY TO FREE BANDWIDTH IS TO

17   ELIMINATE MR. HUNG'S VIDEO CONNECTION WITH THE COURT.

18             RIGHT NOW HE HAS A CONNECTION SO THAT HE CAN SEE THE

19   COURT.  HE CAN SEE ME SITTING HERE AT THE BENCH.

20             IF THE VIDEO CONNECTION IS CUT, HE WILL STILL BE ABLE

21   TO HEAR EVERYTHING THAT IS HAPPENING.  BUT HE WOULD NOT BE ABLE

22   TO SEE IT.

23             AND, I.T. HAS INFORMED THE COURT THAT MIGHT FREE UP

24   SOME BANDWIDTH AND CAUSE FEWER OF THESE DISRUPTIONS.

25             BUT I WOULD ASK, MS. MURPHY, THAT IS A DECISION FOR

1    YOU AND YOUR CLIENT.

2              MS. MURPHY:  THANK YOU, YOUR HONOR.

3              YOU KNOW, I -- BECAUSE I -- I'M NOT REALLY IN A

4    POSITION WHERE I CAN SPEAK WITH HIM FREELY TO MAKE SURE THAT

5    HE'S COMFORTABLE WITH THAT, I WOULD PREFER THAT HE STILL HAS A

6    FEED SO THAT HE CAN SEE THE COURT AND SEE WHAT'S GOING ON.  I

7    THINK THAT THAT'S IMPORTANT.

8              THE COURT:  OKAY.  YES.

9              MS. MURPHY:  SO, I MEAN, IF -- IF THIS IS GOING TO

10   CONTINUE TO BE AN ISSUE, YOU KNOW, I -- I WONDER IF MAYBE AT

11   THIS POINT IT'S BETTER FOR ME TO JUST DRIVE DOWN THERE.  AND I

12   CAN -- I CAN APPEAR IN PERSON.  I'M HAPPY TO DO THAT.  I JUST

13   NEED PROBABLY -- I LIVE IN NORTHRIDGE.  SO, I PROBABLY NEED

14   LIKE AN HOUR TO GET DOWN THERE.

15             (PAUSE IN PROCEEDINGS.)

16             THE COURT:  OF COURSE NOW YOU ARE BOTH COMING IN

17   CRYSTAL CLEAR.

18             (LAUGHTER.)

19             THE COURT:  HOW ABOUT WE -- LET'S PROCEED BECAUSE

20   YOU'RE BOTH COMING IN VERY CLEARLY.

21             MS. MURPHY:  GREAT.  OKAY.

22             THE COURT:  AND IF WE HAVE ONE MORE GARBLE FAILURE,

23   THEN, I THINK WE WILL RECESS UNTIL WE CAN HAVE COUNSEL HERE IN

24   PERSON.

25             IS THAT AGREEABLE TO YOU BOTH?

1              MS. MURPHY:  THIS IS ERIN MURPHY.

2              YES, YOUR HONOR.

3              MS. LEWIS:  AND THIS IS FRANCES LEWIS.

4              YES, YOUR HONOR.

5              THE COURT:  ALL RIGHT.

6              SO, MS. LEWIS, YOU MAY THEN PROCEED WHERE YOU LEFT

7    OFF.

8              MS. LEWIS:  SURE.

9              SO, WITH REGARD TO THE BOND PACKAGE, YOUR HONOR, I

10   FULLY ACKNOWLEDGE IT'S SIZABLE.  IT REFLECTS A LARGE AMOUNT OF

11   RESOURCES AND SUPPORT FROM HIS FAMILY.

12             THAT'S OFTEN COMMON.  THE NUMBERS ARE OFTEN NOT THAT

13   HIGH.  BUT DIFFERENT DEFENDANTS COME FROM DIFFERENT

14   RESOURCES.   AND SOME DEFENDANTS WHEN THEY PRESENT A

15   50,000-DOLLAR BOND PACKAGE, IT'S BECAUSE THAT'S THE ONLY

16   RESOURCES THAT THEY AND THEIR FAMILY HAVE.

17             SO, I THINK THAT THE NUMBERS ARE NOT THE ISSUE HERE

18   BECAUSE OF COURSE THERE'S -- THE GOVERNMENT'S POSITION IS THAT

19   THERE'S NO AMOUNT OF BOND THAT IS GOING TO SECURE HIS

20   APPEARANCE OF FUTURE COURT DATES AND IS GOING TO PROTECT THE

21   COMMUNITY FROM THE DANGERS THAT I JUST WALKED THROUGH.

22             I ALSO JUST WANT TO NOTE, YOUR HONOR, THAT SOME OF

23   THE INDIVIDUALS WHO ARE PARTICIPATING IN THAT BOND PACKAGE,

24   SPECIFICALLY HIS WIFE, ARE IMPLICATED IN THESE ACTIVITIES.

25             MS. CHEN IS THE INDIVIDUAL WHO IN RESPONSE TO TEXT

1   MESSAGES ABOUT A MILITARY OPERATION COMING WITHIN THE UNITED

2   STATES HAD HER OWN RESPONSE THAT SAID ON STANDBY, THE SHEEP

3   HAVE NO IDEA WHAT'S COMING.

4        SHE, OF COURSE, WAS IN THE TRUCK WITH MR. HUNG ON MAY

5   31ST, 2020.  SHE'S THE ONE ON THE VIDEO THAT COUNSEL REFERRED

6   TO FROM INSIDE THE TRUCK YELLING, HORN THEM.

7        AND SHE'S ALSO AN INDIVIDUAL WHEN LAW ENFORCEMENT

8   SPOKE TO HER LAST WEEK ABOUT HER HUSBAND'S FIREARMS ACQUISITION

9   -- INITIALLY DENIED THAT HE HAD ANY FIREARMS WHATSOEVER BEFORE

10  ULTIMATELY ADMITTING THAT HE DID, IN FACT, OWN FIREARMS.

11       SO, I DON'T THINK SHE'S A PARTICULAR INDIVIDUAL WHO

12  SHOULD BE SERVING AS A SURETY IN THIS CASE.

13       I'M NOT ATTEMPTING TO IMPLICATE THE PARENTS IN THIS

14  IN ANY WAY.  BUT I WILL NOTE THAT THEIR SON HAS USED SEVERAL OF

15  THEIR PROPERTIES FOR THE LAST TWO YEARS TO ACCUMULATE HIS --

16  THEIR ARSENAL OF WEAPONS.  AND HE'S USED THEIR VINEYARD TO

17  CREATE A TACTICAL TRAINING GROUND.

18       I'M NOT SUGGESTING THEY KNEW THAT HE WAS OUT THERE

19  ENGAGING IN THE TYPE OF BEHAVIOR HE WAS ENGAGED IN ON MAY 31ST.

20  BUT IT -- IT IMPLICATES HIS PROPERTY IN A WAY THAT MAKES IT

21  DIFFICULT TO LOOK TO THOSE RESOURCES AS SOURCES OF BOND IN THIS

22  CASE.

23       SO, AGAIN, I THINK THE BOND PACKAGE IS CERTAINLY

24  SUBSTANTIAL.  WE LEARNED ABOUT IT FOR THE FIRST TIME ON THE

25  CALL TODAY, BUT EVEN HEARING IT AND KNOWING OF ITS -- OF ITS

1  SIZE, IT'S CLEAR TO US THAT THERE IS NO AMOUNT OF BOND THAT'S

2  GOING TO PROTECT THE COMMUNITY FROM THIS INDIVIDUAL.

3       SO, UNLESS THE COURT HAS ANY FURTHER QUESTIONS, I

4  WILL END THERE.

5       THE COURT:  ALL RIGHT.

6       THANK YOU, COUNSEL.

7       MS. MURPHY, WOULD YOU LIKE TO RESPOND.

8       MS. MURPHY:  YES, YOUR HONOR, TO -- TO A FEW POINTS.

9       YOU KNOW, I UNDERSTAND THE GOVERNMENT'S PERSPECTIVE

10  AND THEIR VIEW OF THINGS HERE.

11       AND -- AND I UNDERSTAND THEIR POSITION THAT YOU'D

12  HAVE TO TAKE THE WHOLE AFFIDAVIT TOGETHER.  BUT I DO THINK YOU

13  STILL NEED TO BREAK IT DOWN INTO COMPONENTS TO ACTUALLY SEE

14  WHAT IS THE EVIDENCE HERE.

15       AND, AGAIN, I -- I DO -- I MENTION THIS TO SORT OF

16  COUNTER WHAT THEY'RE SAYING.  BUT I DO WANT US ALL TO KEEP IN

17  MIND THAT THE WEIGHT OF THE EVIDENCE AND THE CHARGES THEMSELVES

18  ARE REALLY JUST ONE FACTOR.  AND THE WEIGHT OF THE EVIDENCE IS

19  AFFORDED THE LEAST AMOUNT OF WEIGHT HERE.

20       AND -- BUT TURNING -- TURNING BACK TO WHAT I WAS

21  SAYING, YOU KNOW, THE GOVERNMENT USES THIS PHRASE, STRONG

22  VIOLENT IDEOLOGY TO DESCRIBE MR. HUNG.  BUT I DON'T -- I STILL

23  HAVE NOT HEARD ANYTHING ABOUT HIM HATCHING PLANS TO GO OUT AND

24  HURT PEOPLE WITHOUT PROVOCATION.

25       I THINK THE CLOSEST THING WE GET THERE IS THIS --

1   THIS TEXT MESSAGE EXCHANGE ABOUT -- ABOUT WAR RIGGING -- WHICH,

2   AGAIN, I THINK IF SOMEONE WERE TO -- WERE INTENDING TO SAY

3   LET'S GO OUT AND HURT PEOPLE, THEY WOULD USE DIFFERENT

4   TERMINOLOGY.

5          BUT EVEN THEN THE REST OF THE EVIDENCE THAT WE'VE

6   HEARD AND THAT'S BEEN PROFFERED HERE, I DON'T HAVE THESE TEXT

7   MESSAGES.  I THINK THAT TO THE EXTENT THAT THE COURT RELIES ON

8   THEM IN DETAINING -- ORDERING MR. HUNG DETAINED, I THINK -- I

9   THINK I SHOULD HAVE A COPY OF THEM.

10         BUT EVEN ACCEPTING MS. LEWIS'S REPRESENTATIONS, THEY

11  DESCRIBE PEOPLE WHO ARE TALKING ABOUT PREPARATION.

12         AND WE MAY -- PEOPLE MAY NOT LIKE WHAT THEY'RE --

13  WHAT THEY'RE TALKING ABOUT.  THEY MAY NOT -- THEY MAY FIND IT

14  UNSAVORY.  THEY MAY FIND IT -- YOU KNOW, THEY MAY HAVE

15  DIFFERENT VIEWS ON -- ON WHAT -- ON HOW APPROPRIATE THAT IS.

16  BUT THAT IS ALL PROTECTED SPEECH BECAUSE NONE OF IT IS -- IS

17  ABOUT ACTUALLY GOING OUT AND HURTING PEOPLE WITHOUT

18  PROVOCATION.  IT SOUNDS LIKE IT'S ALL ABOUT BEING PREPARED IN

19  CASE SOMETHING DOES HAPPEN.

20         AND THE SAME GOES FOR THE REFERENCES TO THIS -- THIS

21  SHOOT HOUSE.

22         YOU KNOW, I -- AGAIN, YOU COULD HAVE AN ISSUE WITH

23  THAT.  YOU COULD -- YOU COULD THINK THAT YOU WOULD NEVER WANT

24  TO -- WANT TO HAVE THAT AT YOUR HOUSE.  BUT THERE IS NOTHING

25  ILLEGAL ABOUT THAT.  THAT TO ME SOUNDS LIKE SOMEONE WHO, YOU

1    KNOW, COULD PERHAPS BE A HOBBYIST -- OR EVEN ACCEPTING THE

2    GOVERNMENT'S REPRESENTATIONS THAT THEY THINK THEY'RE -- THEY'RE

3    PREPPING FOR SOME SORT OF DOOMSDAY SCENARIO -- AGAIN, THERE'S

4    NOTHING ILLEGAL ABOUT THAT.

5              AND THE GOVERNMENT IS -- IS CITING THINGS THAT

6    HE'S -- THAT HE'S BEEN UNDETERRED.  BUT THE THING THAT THEY'RE

7    CITING ARE THINGS LIKE BUYING TACTICAL GEAR.

8              AGAIN, THERE'S NOTHING ILLEGAL ABOUT BUYING TACTICAL

9    GEAR.

10             AND THESE TEXT MESSAGES ABOUT ANTIFA -- AGAIN, I

11   DON'T HAVE THOSE.  BUT I  -- I THINK THAT IT'S CLEAR WE'RE --

12   WE'RE LIVING IN A TIME IN OUR COUNTRY WHERE THERE IS A LOT OF

13   DIVISION.  AND SOME OF THE THINGS THAT THE GOVERNMENT HAS

14   DESCRIBED ABOUT, YOU KNOW, ANTIFA SETTING FIRES IN OREGON,

15   THOSE ARE REACTIONS TO -- TO NEWS REPORTS THAT WERE BEING

16   SPREAD AROUND.

17             AND YOU CAN HAVE DIFFERENT VIEWS ON -- ON, YOU KNOW,

18   WHETHER THINGS ARE PURE OR NOT.  BUT, YOU KNOW, I DON'T SEE

19   ANYTHING SUGGESTING THAT HE AND HIS -- HIS FRIENDS OR ANYONE

20   ELSE WERE HATCHING A PLAN TO GO OUT AND HURT PEOPLE WITHOUT

21   PROVOCATION.

22             AND WHEN IT COMES TO THE DESCRIPTION OF WHAT HAPPENS

23   -- WHATEVER HAPPENED BACK ON MAY 31ST, YOU KNOW, I REALLY -- I

24   URGE THE COURT TO WATCH THIS VIDEO BECAUSE IT ACTUALLY DOESN'T

25   SHOW THAT HE DROVE, YOU KNOW, DIRECTLY INTO THIS CROWD.  IT

1  SHOWS THAT HE STOPPED.  AND IT SHOWS THAT THE CROWD DISPERSED.

2  AND THEN -- AND THEN HE'S TURNING.

3          AND IT DOES SHOW PEOPLE, YOU KNOW, GETTING NEAR THE

4  TRUCK.  AND -- AND YOU CAN SEE A PERSON AT THE -- AT THE BACK

5  END OF THE TRUCK WHO CONTINUES TO CHASE IT AS THE CAR IS

6  TURNING.  AND I BELIEVE THAT'S THE SAME PERSON WHO THREW

7  SOMETHING AT THE TRUCK WITH THEM INSIDE OF IT.

8          AND -- AND, SO, I -- AND AT THE END OF THE DAY WHAT

9  WE'RE TALKING ABOUT HERE IS BOND.  AND WE'RE TALKING ABOUT CAN

10  WE SET CONDITIONS THAT ARE GOING TO REASONABLY ASSURE THAT HE

11  IS NOT A DANGER TO THE COMMUNITY AND THAT HE'S NOT A FLIGHT

12  RISK.

13          I HAVEN'T HEARD ANY EVIDENCE WHATSOEVER THAT HE'S A

14  FLIGHT RISK BECAUSE HE'S NOT.

15          YOU KNOW, HE HAS EVERY REASON TO STAY HERE.  THIS IS

16  WHERE HIS FAMILY IS.  THIS IS WHERE HIS -- HIS COMMUNITY IS.

17  THIS IS WHERE HIS WIFE AND SOON TO BE CHILD ARE GOING TO BE.

18          HE CAN SURRENDER HIS PASSPORT.

19          AND I THINK THAT THE CONDITIONS THAT WE'VE LAID OUT

20  REALLY DO GET US THERE.

21          AND, YOU KNOW, I'VE OFFERED UP TWO PEOPLE WHO ARE

22  WILLING TO POSE AS THIRD-PARTY SURETIES -- AN EXTREMELY ROBUST

23  PACKAGE THAT'S SPREAD ACROSS MANY PEOPLE WHO WOULD HAVE EVERY

24  REASON TO MAKE SURE THAT HE'S FOLLOWING THE CONDITIONS.

25          HE CAN BE ON HOUSE ARREST AND HAVE AN ANKLE MONITOR.

1          HE CAN BE RESTRICTED FROM -- FROM DRIVING A CAR.

2          AND, OF COURSE, IF HE'S -- WHEREVER HE ENDS UP

3     STAYING, MY UNDERSTANDING IS THAT PRETRIAL SERVICES GOES TO THE

4     LOCATION AND SEARCHES IT TO MAKE SURE THAT THERE ARE NO RISKS

5     OF SAFETY OR ANYTHING.

6          AND I -- AND I CAN IMAGINE THAT ANYONE WHO IS WILLING

7     TO LET HIM LIVE IN THEIR HOME, IF THEY HAVE WEAPONS THAT THEY

8     OWN LEGALLY, THEY -- THEY WOULD SURELY SURRENDER THEM.

9          AND I ALSO THINK THAT IF THE COURT IS CONCERNED, YOU

10    KNOW, BY ANY OF THESE RECENT TEXT MESSAGES -- WHICH, AGAIN, I

11    DON'T HAVE COPIES OF -- THE COURT CAN ALSO PUT LIMITS ON HIS

12    USE OF CELL PHONES AND HIS USE OF THE INTERNET.

13         AND, SO, I DISAGREE THAT -- THAT NO AMOUNT OF BOND OR

14    ANY CONDITION CAN PREVENT HIM FROM BEING A RISK TO -- A RISK OF

15    DANGER BECAUSE I THINK THAT SO MUCH OF WHAT THE GOVERNMENT

16    SORT OF DANGER CALCULATION HERE IS BASED ON IS SIMPLY A -- A

17    DISTASTE OF WHAT HIS BELIEFS ARE.  AND THAT'S JUST NOT ENOUGH.

18         AND I THINK THAT WHEN WE LOOK AT THE BALANCE OF THE

19    BOND PACKAGE THAT WE CAN PRESENT COMPARED TO THE -- THE

20    ALLEGATIONS HERE -- COMPARED TO HIS -- HIS TOTAL LACK OF ANY

21    CRIMINAL HISTORY AND THE AMOUNT OF SUPPORT THAT HE HAS IN THE

22    VERY COMMUNITY THAT WE'RE CONCERNED WITH, I THINK IT SHOWS THAT

23    HE'S -- HE'S CERTAINLY -- WE CAN SET BOND CONDITIONS HERE THAT

24    ARE GOING TO ASSURE THE -- REASONABLY ASSURE THE SAFETY OF THE

25    COMMUNITY AND HIS APPEARANCE.

1          SO -- BUT, OF COURSE, IF YOUR HONOR HAS OTHER

2     QUESTIONS FOR ME, I'M HAPPY TO ANSWER THEM.

3          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

4          DOES EITHER -- EITHER SIDE HAVE ANY ADDITIONAL

5     ARGUMENT THAT YOU WOULD LIKE TO PRESENT?

6          MS. LEWIS:  NO, YOUR HONOR.

7          THIS IS FRANCES LEWIS.

8          (PAUSE IN PROCEEDINGS.)

9          THE COURT:  AND -- AND YOU HAVE NO FURTHER ARGUMENT,

10    CORRECT, MS. MURPHY?

11         MS. MURPHY:  UNLESS YOUR HONOR HAS QUESTIONS FOR ME.

12         THE COURT:  ALL RIGHT.  NO.

13         ALL RIGHT.  THANK YOU.

14         THANK YOU, BOTH.

15         THE COURT HAS CONSIDERED THE TWO REPORTS OF PRETRIAL

16    SERVICES.

17         AND MS. MURPHY WAS CORRECT.  THE PRETRIAL SERVICES

18    REPORT HAD THE DATE OF TODAY'S HEARING ON IT.  THERE ARE --

19    THERE ARE TWO REPORTS, THE INITIAL ONE THAT WAS PREPARED THE

20    DATE OF MR. HUNG'S INITIAL APPEARANCE AND THEN THERE WAS ONE

21    PREPARED ON THIS PAST FRIDAY.  SO, THE COURT HAS REVIEWED BOTH

22    OF THOSE AND THE AFFIDAVIT IN SUPPORT OF THE COMPLAINT AND HAS

23    LISTENED CAREFULLY TO THE VERY FINE ARGUMENTS OF BOTH COUNSEL

24    THIS MORNING.

25         THE COURT AGREES THAT THE BOND PACKAGE ADDRESSES THE

1  RISK OF NON-APPEARANCE.

2          MS. MURPHY NOTED THAT IN LIGHT OF THAT BOND PACKAGE

3  HER CLIENT DOES NOT PRESENT A RISK OF FLIGHT.  AND THE COURT

4  AGREES WITH THAT ARGUMENT FOR ALL OF THE REASONS SET FORTH IN

5  THE ARGUMENT AS WELL AS THE INFORMATION SET FORTH IN THE TWO

6  PRETRIAL SERVICES REPORTS.

7          HOWEVER, THE COURT DOES NOT BELIEVE THAT THE BOND

8  PACKAGE ADDRESSES OR CAN ADDRESS THE RISK OF DANGER TO THE

9  COMMUNITY.

10          LOOKING AT THE TOTALITY OF THESE ALLEGATIONS, THE

11  COURT IS CONCERNED -- VERY CONCERNED THAT THE DEFENDANT

12  PRESENTS A DANGER TO OTHERS AND TO THE COMMUNITY.

13          AND THE BOND CONDITIONS DO NOT ALLEVIATE THAT

14  POTENTIAL DANGER.

15          IN PARTICULAR, I INQUIRED ABOUT THE STATE CASE

16  BECAUSE THE DEFENDANT WAS ARRESTED BY THE LOCAL AUTHORITIES

17  FOLLOWING THE MAY 31, 2020 INCIDENT.  AND A -- HE WAS RELEASED

18  ON BOND.  AND ACCORDING TO THE AFFIDAVIT IN SUPPORT OF THE

19  COMPLAINT, AT PARAGRAPH 69, IT STATES THAT HUNG CONTINUED TO

20  SHIP FIREARMS' COMPONENTS TO THE LODI RESIDENCE AFTER THE MAY

21  31, 2020 INCIDENT.

22          AND IT NOTES -- IT CITES TO PAYPAL RECORDS SHOWING

23  THAT HE PURCHASED ANOTHER SHOOTING TARGET IN THE SHAPE OF A

24  MALE TORSO ON AUGUST 3RD OF 2020, A COMPONENT PART FOR BUILDING

25  A GLOCK 19 HANDGUN ON AUGUST 26, 2020 AND ANOTHER SHOOTING

1   TARGET IN THE SHAPE OF A MALE TORSO ON AUGUST 22ND OF 2020.

2          AND, AGAIN, THAT'S PARAGRAPH 69 OF THE AFFIDAVIT IN

3   SUPPORT OF THE COMPLAINT.

4          AND THIS INDICATES THAT AFTER THE EVENTS OF MAY 31,

5   AFTER THE ARREST, AFTER HIS RELEASE ON BOND, THE DEFENDANT HAS

6   CONTINUED TO AMASS ITEMS THAT RENDER HIM A DANGER TO THE

7   COMMUNITY.  AND HE APPEARS IN NO WAY TO HAVE BEEN DETERRED OR

8   TO HAVE PAUSED IN HIS ACTIVITIES AS A RESULT OF AN ENCOUNTER

9   WITH LAW ENFORCEMENT ON MAY 31 OF 2020.

10         HIS ACTIVITIES APPEAR TO HAVE CONTINUED.

11         AND THE COURT FULLY RECOGNIZES AS -- AS WAS -- MR.

12  NIXON NOTED, THAT ACQUISITION OF MATERIALS DOES NOT NECESSARILY

13  VIOLATE ANY RELEASE CONDITIONS THAT WERE SET BY THE COURT.

14         BUT WHAT THEY DO SHOW IS THAT THE -- MR. HUNG DID NOT

15  IN ANY WAY ALTER HIS BEHAVIOR IN AMASSING THIS ARSENAL

16  FOLLOWING HIS ARREST ON -- AND THE INCIDENT OF MAY 31.

17         AND THAT GIVES THE COURT CONCERN THAT REGARDLESS OF

18  THE BOND AMOUNT, THAT HE WOULD CONTINUE TO AMASS MATERIALS OR

19  ENGAGE IN BEHAVIOR THAT COULD POTENTIALLY PRESENT A DANGER TO

20  THE COMMUNITY.

21         THE COURT NOTES AS THE GOVERNMENT POINTS OUT THAT THE

22  DEFENDANT ACQUIRED GUN -- THE GUNS ACQUIRED IN OREGON, TWO OF

23  WHICH HAVE NOT BEEN LOCATED, BASED ON THE ALLEGATIONS SET FORTH

24  IN -- IN THE COMPLAINT, THAT IS --

25         MS. MURPHY:  YOUR HONOR, I APOLOGIZE.  THIS IS ERIN

1    MURPHY.

2              (AUDIO SKIPPING.)

3              MS. MURPHY:  YOU'RE -- I'M HAVING A LITTLE TROUBLE

4    HEARING YOU.

5              THE COURT:  AHH, ALL RIGHT.  WE ARE GOING TO --

6              MS. LEWIS:  AND THIS IS AUSA LEWIS.

7              I HEARD YOU VERY CLEARING UP UNTIL --

8              (AUDIO SKIPPING.)

9              MS. LEWIS:  -- REFERRING TO THE MARCH FIREARMS.

10             THE COURT:  ALL RIGHT.  WE'RE GOING TO RECONNECT.

11             (PAUSE IN PROCEEDINGS.)

12             THE OPERATOR:  HELLO.  WELCOME TO THE --

13             I'LL CONNECT YOU TO YOUR CONFERENCE NOW.

14             I.T. PERSON:  DO WE SOUND BETTER?

15             MS. LEWIS:  YES.  THIS IS AUSA LEWIS.

16             YOU'RE MUCH CLEARER NOW.  AND WE WERE -- IT WAS CLEAR

17   FROM THE COURT UP UNTIL SHE -- HER LAST SENTENCE ABOUT THE

18   MARCH FIREARM.

19             (PAUSE IN PROCEEDINGS.)

20             THE COURT:  ALL RIGHT.

21             AND, MS. MURPHY, CAN YOU HEAR ME?

22             MS. MURPHY:  YES, I CAN, YOUR HONOR.

23             THANK YOU.

24             THE COURT:  ALL RIGHT.  THANK YOU.

25             AND THANK YOU, BOTH, FOR POINTING OUT WHEN YOU COULD

1 NOT.

2 THAT TWO OF THOSE FIREARMS HAVE NOT BEEN LOCATED IS

3 OF CONCERN TO THE COURT.

4 ALSO, THE COURT NOTES THAT THE DEFENDANT CLEARLY HAS

5 CONSIDERABLE FAMILY SUPPORT AND APPRECIATES THE FAMILY WHO HAVE

6 -- AND FRIENDS WHO HAVE SHOWN UP HERE TODAY IN COURT AND WHO

7 HAVE OFFERED TO POST BOND.

8 BUT THE -- THE DEFENDANT -- BASED ON THE ALLEGATIONS

9 IN THE AFFIDAVIT HAS ACQUIRED FIREARMS OUTSIDE THE STATE OF

10 CALIFORNIA.  ONE INFERENCE TO BE DRAWN FROM THAT IS THAT HE IS

11 ATTEMPTING TO AVOID CALIFORNIA'S FIREARMS LAWS.

12 AND THE COURT CAN DRAW A NEGATIVE INFERENCE FROM THAT

13 AS WELL.

14 AND THE COURT NOTES THAT THE -- THE DEFENDANT AMASSED

15 THIS ARSENAL OF WEAPONS ON THE PROPERTY THAT APPEARS TO BE

16 OWNED BY HIS PARENTS.

17 IN ADDITION TO THE FIREARMS, THE COURT REFERS TO THE

18 AFFIDAVIT AT PAGES 9 AND 10 WHICH TALKS ABOUT WHAT HAPPENED ON

19 MAY 31ST.

20 AND AT PARAGRAPH 20 IT STATES THAT ACCORDING TO THE

21 PASADENA POLICE DEPARTMENT REPORTS, WITNESS INTERVIEWS AND

22 VIDEO OF THE INCIDENT TAKEN BY BYSTANDERS, HUNG'S TRUCK CAME TO

23 A STOP BEHIND THREE TO FOUR OTHER CARS EACH WAITING TO SLOWLY

24 MAKE U-TURNS BECAUSE IT WAS CLEAR THAT THE INTERSECTION WAS

25 BLOCKED BY PROTESTORS.

1          INSTEAD OF TURNING AROUND, HOWEVER, HUNG BLARED A

2          LOUD TRAIN-LIKE HORN CAUSING THE CARS IN FRONT OF HIS

3          TRUCK TO MOVE OUT OF THE WAY.

4           A SERGEANT BUTCHELS THEN SAW THE TRUCK

5          ACCELERATE RAPIDLY AS IT DROVE TOWARD THE CROWD.

6          AND HE SAW THE PROTESTORS, INCLUDING TWO PLAINCLOTHES

7          PASADENA POLICE DEPARTMENT DETECTIVES, SPRINT OUT THE

8          TRUCK'S WAY TO AVOID BEING RUN OVER.

9          AND THE NEXT PARAGRAPH NOTES BASED ON THE EVIDENCE

10    AVAILABLE THAT THIS WAS DONE WITHOUT PROVOCATION.

11          SO, IT -- IT APPEARS THAT HIS ACTIONS ON MAY 31ST

12    WERE INTENTIONAL.

13          AND HAD THE PROTESTORS, INCLUDING THE TWO

14    PLAINCLOTHES DETECTIVES NOT SPRINTED OUT OF THE WAY, THEY COULD

15    HAVE BEEN HIT BY THIS VERY LARGE TRUCK.

16          THE OTHER REASON THE COURT NOTES THAT IT IS CONCERNED

17    THAT THE DEFENDANT IS A DANGER TO THE COMMUNITY IS IN ADDITION

18    TO THE FIREARMS, IN THE TRUCK THAT HE DROVE INTO THIS CROWD,

19    OFFICERS FOUND AN 18-INCH MACHETE AND AN 18-INCH LONG METAL

20    PIPE.

21          THE COURT CAN INFER FROM THAT EVIDENCE COMBINED WITH

22    ALL OF THE TEXT MESSAGES, THE ONES THAT ARE REFERENCED IN THE

23    AFFIDAVIT IN SUPPORT OF THE COMPLAINT, AS WELL AS THE

24    ADDITIONAL ONES NOTED BY THE GOVERNMENT COUNSEL THIS MORNING

25    THAT THE DEFENDANT -- THERE'S A RISK THAT THE DEFENDANT WILL

1   USE THOSE ITEMS TO HARM OTHER PEOPLE.

2           SO, THE COURT CONCLUDES THAT ALTHOUGH THE RISK OF

3   NON-APPEARANCE CAN BE MITIGATED BY THE BOND THAT WAS PROFFERED

4   THIS MORNING, THE RISK OF DANGER TO THE COMMUNITY CANNOT BE

5   MITIGATED.

6           AND, THEREFORE, THE COURT ORDERS DETENTION PENDING

7   TRIAL IN THIS MATTER.

8           I WILL ALSO NOTE THAT IT'S THE -- AS THE TRANSCRIPT

9   MAKES CLEAR, WE HAD DIFFICULTY HEARING COUNSEL THIS MORNING.

10          AT EACH POINT WHEN THE COURT WAS UNABLE TO HEAR

11  COUNSEL CLEARLY, WE STOPPED THE PROCEEDING AND RECONNECTED

12  SOMEONE.

13          SO, THE COURT BELIEVES THAT IT IS -- HAD THE

14  OPPORTUNITY TO COMPLETELY -- TO HEAR -- TO HEAR THE COMPLETE

15  PRESENTATION MADE BOTH BY COUNSEL FOR MR. HUNG AND BY COUNSEL

16  FOR THE GOVERNMENT THIS MORNING.

17          AND FINALLY, I'LL NOTE THAT THE COURT WILL ISSUE A

18  WRITTEN ORDER ON THIS MATTER FURTHER DESCRIBING ITS FINDINGS.

19          OF COURSE, THE COURT HAS CONSIDERED THE NATURE AND

20  CIRCUMSTANCES OF THE OFFENSE CHARGED, THE WEIGHT OF THE

21  EVIDENCE AGAINST THE DEFENDANT, THE DEFENDANT'S HISTORY AND

22  CHARACTERISTICS AND THE NATURE AND SERIOUSNESS OF THE DANGER TO

23  ANY PERSON OR THE COMMUNITY THAT WOULD BE POSED BY THE

24  DEFENDANT'S RELEASE.

25          IS THERE ANYTHING FURTHER FROM THE GOVERNMENT?

1          MS. LEWIS:  YOUR HONOR, THIS IS AUSA LEWIS.

2          NOTHING FURTHER ON DETENTION.  I HATE TO KEEP US ANY

3    LONGER.  THERE WAS JUST ONE BRIEF CORRECTION I WANTED TO MAKE

4    TO THE RECORD ON SEALING THE COMPLAINT THAT WE HAD DISCUSSED

5    LAST WEEK.

6          THE COURT:  ALL RIGHT.  WELL, HOLD -- HOLD A MOMENT.

7          MS. LEWIS:  BUT I CAN --

8          THE COURT:  I WANT TO ASK --

9          MS. LEWIS:  YEAH.

10         THE COURT: -- MS. MURPHY WITH REGARD TO THIS, THE

11   DETENTION, IS THERE ANYTHING FURTHER?

12         MS. MURPHY:  YOUR HONOR, I -- I DO HAVE SOME CONCERNS

13   WITH MR. HUNG'S DETENTION.

14         I UNDERSTAND THAT MANY PEOPLE ARE NOW STARTING TO BE

15   TRANSPORTED FROM MDC TO A FACILITY IN ARIZONA.  AND I DON'T

16   HAVE ANY -- PERSONALLY I DON'T HAVE ANY CLIENTS WHO HAVE BEEN

17   IN THAT POSITION, BUT I DO HAVE COLLEAGUES WHO ARE DEALING WITH

18   THAT.

19         AND I UNDERSTAND THAT IT'S MADE IT EXTRAORDINARILY

20   DIFFICULT TO COMMUNICATE WITH CLIENTS.

21         I UNDERSTAND THAT YOUR HONOR MAY BE LIMITED IN WHAT

22   YOU CAN ASK THE BUREAU OF PRISONS TO DO.

23         BUT TO THE EXTENT THAT YOUR HONOR CAN REQUEST THAT HE

24   STAY LOCALLY AT MDC, I WOULD  -- I WOULD REQUEST THAT.

25         THE COURT:  MS. MURPHY, I CAN CERTAINLY CONVEY THAT

1   INFORMATION TO THE MARSHALS AND TO THE BUREAU OF PRISONS.  AND

2   I -- AND I WILL CONVEY THAT.

3          BUT THE COURT HAS NO AUTHORITY WHATSOEVER OVER THE

4   PLACEMENT OF PRETRIAL DETAINEES.  THERE ARE MANY, MANY FACTORS

5   OBVIOUSLY THAT GO INTO THAT DECISION.  AND THAT IS A DECISION

6   THAT IS NOT MADE BY THE COURT, BUT I CERTAINLY WILL PASS ALONG

7   THE REQUEST.

8          (PAUSE IN PROCEEDINGS.)

9          THE COURT:  IS THERE ANYTHING FURTHER, MS. MURPHY, ON

10  THE DETENTION ISSUE?

11         MS. MURPHY:  NO, YOUR HONOR.

12         THANK YOU.

13         THE COURT:  ALL RIGHT.

14         AND, MS. LEWIS, YOU HAD SOMETHING TO SAY WITH REGARD

15  TO THE SEALED AND UNSEALED COMPLAINT AND AFFIDAVIT?

16         MS. LEWIS:  YES, YOUR HONOR.

17         I JUST WANTED TO CORRECT SOMETHING.  I HAD

18  REPRESENTED TO THE COURT WHEN WE LAST APPEARED BEFORE YOU THAT

19  THE ORIGINAL COMPLAINT HAD BEEN FILED UNDER SEAL.  AND THAT WE

20  WERE SEEKING TO FILE SORT OF A REDACTED VERSION PUBLICLY.

21         WHEN WE WENT BACK AFTER THE HEARING AND LOOKED AT THE

22  RECORD AND SPOKE TO CRIMINAL INTAKE, WE LEARNED THAT THE -- OUR

23  APPLICATION TO SEAL THE COMPLAINT HAD NEVER ACTUALLY MADE IT TO

24  THE MAGISTRATE JUDGE.

25         WE WERE -- WE HAD MADE THE CONFUSION ON OUR END

1   BECAUSE WE HAD FILED THE APPLICATION TO SEAL THE SEARCH

2   WARRANT.  AND THAT WAS GRANTED.  AND THAT WAS TRULY JUST A

3   MISTAKE ON OUR PART.  WE HAD AN APPLICATION PREPARED.  WE HAD

4   INTENDED TO FILE IT.  AND WE JUST -- IT NEVER MADE IT TO THE

5   COURT.

6            AND SO THE -- WHEN I REPRESENTED TO THE COURT THAT

7   THE ORIGINAL COMPLAINT WAS UNDER SEAL, IT TURNED OUT THAT THAT

8   WAS NOT CORRECT.

9            I DON'T THINK ANYTHING CHANGES WITH REGARD TO THE

10  SUBSEQUENT REQUESTS WHICH WAS THAT FOR THE REASONS WE EXPLAINED

11  TO THE COURT, WE WOULD LIKE THE ORIGINAL COMPLAINT TO STAY

12  SEALED AND FOR THE REDACTED VERSION TO BE PUBLIC.

13           AND I BELIEVE THE COURT'S MINUTE ORDER ACCOUNTS FOR

14  THAT AND IS SUFFICIENT FOR THAT.  BUT IF THE COURT WANTED US TO

15  FILE A SEPARATE -- MORE FULSOME APPLICATION EXPLAINING IT, WE'D

16  BE GLAD TO.

17           AND I JUST WANTED TO MAKE SURE THE COURT KNEW THAT I

18  HAD MADE A MISTAKE WHEN I MADE THAT REPRESENTATION.

19           THE COURT:  SO, AS IT STANDS RIGHT NOW, THE ORIGINAL

20  COMPLAINT IS SEALED.  AND THE REDACTED COMPLAINT IS NOT SEALED.

21           IS THAT CORRECT?

22           MS. LEWIS:  CORRECT, YOUR HONOR.

23           THE COURT:  ALL RIGHT.

24           DOES THE DEFENSE HAVE A -- HAVE ANY POSITION ON THIS?

25           DO YOU WANT FURTHER EXPLANATION ON THE RECORD?

1          MS. MURPHY:  I GUESS I JUST WANT TO UNDERSTAND SOME

2     THINGS.

3          MY -- YOU KNOW, I WAS SOMEWHAT CONCERNED THAT I SAW A

4     FAIR AMOUNT OF PRESS COVERAGE THAT WAS TAKEN FROM THE COMPLAINT

5     AFFIDAVIT.  IT'S SPECIFIC -- SOME -- I THINK I SAW AN ARTICLE

6     THAT SPECIFICALLY REFERENCED THE AFFIDAVIT.

7          AND -- BUT BY THAT POINT, I -- I HAD UNDERSTOOD THAT

8     IT WAS -- THAT IT WAS STILL UNDER SEAL.  SO, I'M NOT SURE IF

9     THERE WAS A PERIOD OF TIME WHERE PERHAPS IT WASN'T UNDER SEAL.

10         WHEN I TRIED TO ACCESS THE COMPLAINT THROUGH ECF, I'M

11    NOT EVEN ABLE TO -- TO DOWNLOAD IT, AT LEAST THE ORIGINAL ONE

12    NOT THE -- ONE.

13         SO, I'M -- I'M NOT SURE WHAT HAPPENED THERE.  BUT AS

14    IT STANDS NOW, IF THE  -- IF THE ORIGINAL COMPLAINT WITH ALL OF

15    THE P.I.I. IS UNDER -- IS STILL UNDER SEAL, AND THE REDACTED

16    ONE IS VIEWABLE.  ASSUMING THAT YOUR HONOR -- I'M TRYING TO

17    REMEMBER IF YOUR HONOR DID ORDER THAT VERSION TO BE UNSEALED

18    DURING THE LAST APPEARANCE.  BUT ASSUMING THAT THAT IS THE

19    CASE, THEN -- THEN I DON'T HAVE ANYTHING TO ADD -- JUST CONCERN

20    THAT THERE WAS APPARENTLY FOR A PERIOD OF TIME SOME VERSION OF

21    THE AFFIDAVIT AVAILABLE TO THE PUBLIC THAT, YOU KNOW, IT'S HARD

22    TO -- IT'S HARD TO SAY WHICH -- WHICH VERSION WAS REVEALED.

23         THAT'S JUST A CONCERN I'M EXPRESSING -- NOT

24    NECESSARILY SOMETHING THAT I THINK, YOU KNOW, NEEDS TO BE

25    ADDRESSED BY FURTHER ORDER OF THE COURT.

1        MS. LEWIS:  AND THIS IS AUSA LEWIS.

2        I CAN HOPEFULLY ALLEVIATE SOME OF THAT.

3        THE OFFICE'S PRESS RELEASE DID NOT GO OUT UNTIL AFTER

4    WE HAD CONFIRMED THAT THE ORIGINAL COMPLAINT WAS NO LONGER

5    PUBLICLY AVAILABLE, AND THAT ONLY THE REDACTED COMPLAINT WAS

6    AVAILABLE.  AND THE REDACTED COMPLAINT WAS WHAT OUR

7    UNDERSTANDING IS THE PRESS GOT.

8        SO, I CANNOT SPEAK TO IF SOMEONE INDEPENDENTLY WENT

9    TO PACER BEFORE MR. HUNG'S ARREST AND SORT OF WAS HUNTING

10   THROUGH POTENTIAL CASES, WHETHER THEY WOULD HAVE BEEN ABLE TO

11   FIND IT OR NOT, BUT AGAIN SORT OF SUBSEQUENT TO HIS ARREST WE

12   WERE ABLE TO GET THIS CORRECTED.  AND THE ORIGINAL COMPLAINT

13   WAS NO LONGER PUBLICLY AVAILABLE BEFORE THE PRESS WAS NOTIFIED

14   OF HIS ARREST AND ONLY GOT A COPY OF THE REDACTED COMPLAINT --

15   WHICH SHOULD BE AVAILABLE ON THE DOCKET.

16       SO, IF MS. MURPHY IS HAVING TROUBLE ACCESSING THE

17   REDACTED COMPLAINT, WE CAN CERTAINLY GET HER THAT.  AND IF SHE

18   NEEDS THE ORIGINAL UNREDACTED COMPLAINT, WE'D ALSO BE GLAD TO

19   PROVIDE HER THAT AGAIN.

20       THE COURT:  ALL RIGHT.  YES, THE GOVERNMENT SHOULD

21   PROVIDE MS. MURPHY WITH -- WITH BOTH THE INITIAL COMPLAINT AND

22   THE REDACTED COMPLAINT.

23       AND JUST SO THE RECORD IS VERY CLEAR, THE COURT

24   ORDERS THAT THE INITIAL COMPLAINT REMAINS SEALED, AND THAT THE

25   UN- -- AND THAT THE REDACTED COMPLAINT IS NOT SEALED AND IS

81

1   PUBLICLY AVAILABLE ON THE DOCKET.

2            MS. LEWIS:  THANK YOU, YOUR HONOR.

3            THE COURT:  ALL RIGHT.

4            IS THERE ANYTHING FURTHER?

5            MS. LEWIS:  NOT FROM THE GOVERNMENT, YOUR HONOR.

6            MS. MURPHY:  NOT FROM DEFENSE COUNSEL, YOUR HONOR.

7            THANK YOU.

8            THE COURT:  ALL RIGHT.

9            THANK YOU, BOTH.

10            THE CLERK:  COURT IS ADJOURNED.

11            (PROCEEDINGS ADJOURNED AT 10:24 A.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

82

1

2

3

4

5                          C E R T I F I C A T E

6

7

8          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
   FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE
   ABOVE-ENTITLED MATTER.

9

10

    /S/ DOROTHY BABYKIN                     10/9/20
11  _____     _____
    FEDERALLY CERTIFIED TRANSCRIBER        DATED
12  DOROTHY BABYKIN

13

14

15

16

17

18

19

20

21

22

23

24

25