1   Stephen G. Larson (SBN 145225)
    *slarson@larsonllp.com*
2   Hilary L. Potashner (SBN 167060)
    *hpotashner@larsonllp.com*
3   Jerry A. Behnke (SBN 180462)
    *jbehnke@larsonllp.com*
4   **LARSON O'BRIEN LLP**
    555 South Flower Street, Suite 4400
5   Los Angeles, California 90071
    Telephone:(213) 436-4888
6   Facsimile: (213) 623-2000

7   Attorneys for Benjamin Jong Ren Hung

8   UNITED STATES DISTRICT COURT

9   CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

| 11 | United States of America, | Case No. 2:20-CR-00452-SJW |
|----|---------------------------|----------------------------|
| 12 | Plaintiff, | **DEFENDANT BENJAMIN HUNG'S APPLICATION FOR REVIEW OF DETENTION ORDER AND REQUEST FOR HEARING** |
| 13 | vs. | |
| 14 | Benjamin Jong Ren Hung, | |
| 15 | Defendant. | Judge:   Hon. Stephen V. Wilson |

16
17
18
19
20
21
22
23
24
25
26
27
28

I.      **INTRODUCTION**

Benjamin Hung is not a flight risk—as the Magistrate Judge properly found—and the concern that he is a "danger to the community" is based on a misunderstanding of Mr. Hung's character and a mischaracterization of the events that transpired during a protest in the streets of Pasadena on May 31, 2020. Regrettably, in its quest to detain and prosecute Mr. Hung, the government appears to have been swept up in the political moment.  The complaint affidavit and the government's argument during Mr. Hung's detention hearing contain repeated reference to the government's misinterpretation of Mr. Hung's alleged political views, which itself is an improper basis for detention and charging decisions. Rather, as the law clearly establishes, the decision whether to detain Mr. Hung pending trial must be based on Mr. Hung's conduct, the nature and circumstances of the charged offense, and his background and characteristics.  Here, each of those factors supports releasing Mr. Hung on the sizeable bond and intensive supervision proposed in this case.

II.     **BACKGROUND**

Benjamin Hung is 28 years old.  He grew up in San Marino, California.  Mr. Hung has no criminal history and no prior record of violence.  Mr. Hung is married and his wife, Emily, who works for a pharmaceutical company, is now 36 weeks pregnant with their first child and is due to give birth next month.  Mr. Hung's close-knit family include his parents who own successful businesses, including an RV resort in Oregon and a working vineyard in Lodi, California.  For his part Mr. Hung manages family-related properties around Los Angeles and assists in running the family businesses.

As described in a letter of support from community volunteers and families, attached as **Exhibit 1**, Mr. Hung and his family have a strong reputation for community service.  The twelve individuals who submitted the attached letter have known Mr. Hung—whom they refer to as "Benny"—for 15 years.  **Exhibit 1**.  They

write:

> During our relationship with Benny for many volunteer projects, we have experienced that he always shows up on time, works hard, and carries his family's important values in serving the community in a polite, respectable manner. Benny grew up in San Marino in a very reputable family committed to serving the San Marino Unified School District and the Greater San Gabriel Valley communities. During high school, Benny was a hardworking student and an outstanding football player who helped the team and lifted the families in the community of San Marino.

> By knowing Benny's wonderful attitude, character, and his genuine heart for serving others, it is our hope that you take note of this letter of recommendation for Benny's case, as we truly believe Benny is not and has never been a threat to our community.

Mr. Hung's involvement in the community is further evidenced by his and his wife's participation in the San Marino Rotary Club Fourth of July parade. A photograph from that event is attached as **Exhibit 2**; see also **Exhibit 3**, D. Magrdichian Letter in Support.

Mr. Hung was arrested pursuant to a warrant on a complaint filed September 21, 2020, and was charged in a two-count indictment on October 7, 2020 with two related charges: Conspiracy to transport a firearm interstate and make a false statement in the acquisition of that firearm in violation of 18 U.S.C. § 371; and unlawfully possessing the same firearm in violation of 18 U.S.C. § 922. The indictment also contains forfeiture allegations related to the same firearm, which has been seized and is in the possession of the government. Nearly three years after the conduct alleged in the Indictment, Mr. Hung was arrested and ordered detained. He has been quarantined at the Metropolitan Detention Center since his arrest.

## III.   PROCEEDINGS BEFORE THE MAGISTRATE JUDGE

At Mr. Hung's initial appearance the government moved for detention under 18 U.S.C. § 3142(f) on the grounds that the offense "involves . . . the possession or

1  use of a firearm" and there is a serious risk that the defendant will flee.  Dkt. No. 3.

2  The Magistrate Judge conducted a detention hearing on September 28, 2020.  The

3  transcript of the hearing is attached hereto as **Exhibit 4**.

4        At the hearing, Mr. Hung offered a substantial bond—in the amount of

5  $3,525,000—to be fully secured by property and cash from multiple sources,

6  including several members of Mr. Hung's immediate family.  Specifically, the

7  proposed bond consisted of $2.8 million secured by equity in Mr. Hung's parents'

8  home in San Marino; $400,000 secured by equity in property owned by his brothers;

9  $200,000 cash from his father; $50,000 cash from Richard Esterman, who works for

10  the Hung family and is also an elected city councilmember in Sisters, Oregon; and a

11  $75,000 signature bond from his wife.  Mr. Hung also agreed to submit to intensive

12  pretrial supervision and a lengthy list of restrictive conditions, including, of course,

13  the requirement that he not possess any firearms or ammunition.

14        While the Magistrate Judge correctly found that the proffered bond along with

15  other conditions of release mitigated any risk of non-appearance, the Magistrate

16  Judge was convinced by the government's concerns of danger to the community and

17  ordered Mr. Hung detained.  Specifically, the Magistrate Judge accepted the

18  government's claim that Mr. Hung engaged in an "act of violence" against

19  protestors on May 31, 2020, when he allegedly drove a 1997 Dodge Ram pickup

20  truck through a crowd that was blocking the street.  The government further claimed

21  that its subsequent investigation revealed that Mr. Hung harbors a "violent

22  ideology."  The government pointed to text messages from seized electronic devices

23  as well as firearms and other equipment that Mr. Hung allegedly purchased and

24  possessed primarily at the vineyard and a house in Lodi.

25        The Magistrate Judge concluded that the bond package proffered by Mr.

26  Hung combined with strict release conditions could mitigate the risk that Mr. Hung

27  would not appear in court as required, as his family and friends would forfeit

28  significant resources if he fled.  However, the Court found the bond package does

LARSON·O'BRIEN LLP
LOS ANGELES

3

Case No. 2:20-CR-00452 –SJW

1  not mitigate the risk of danger to the community.

2  **IV.    <u>LEGAL STANDARD</u>**

3      The Bail Reform Act of 1984, 18 U.S.C. § 3141, et seq., determines the

4  conditions under which bail is available.  The statute was authoritatively interpreted

5  in *United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985).  In that case, the Ninth

6  Circuit described some of the historic principals related to bail in the federal system

7  that continue to apply under the Bail Reform Act, except in cases where the statute

8  establishes a presumption for detention.[1]

9      First, federal law has traditionally provided that a person arrested for a non-

10  capital offense shall be admitted to bail.  *Id.* at 1405.

11      Second, only in rare cases should release be denied.  *Id.*

12      Third, doubts regarding the propriety of release are to be resolved in favor of

13  defendants.  *Id.*

14      The Bail Reform Act authorizes the government to move for a detention

15  hearing only if one or more of seven specifically enumerated circumstances exist:

16  (1) the defendant is charged with a "crime of violence", (2) the defendant is charged

17  with an offense for which the punishment is life in prison or death, (3) the defendant

18  is charged with a serious drug offense, (4) the defendant is charged with a felony

19  and has twice been previously convicted of certain serious or violent crimes, (5) the

20  defendant is charged with a felony that involves, inter alia, possession or use of a

21  firearm; (6) there exists a "serious risk" that the defendant will flee or (7) there is a

22  "serious risk" that if released the defendant will obstruct justice or injure, intimidate

23  or harm a witness.  18 U.S.C. § 3142(f).  If one of these defined circumstances does

24  not exist, the Court is without authority to hold a detention hearing.

25      In order to seek a detention hearing based on risk of flight, the government

26  must prove by a preponderance of the evidence that the defendant poses a serious

27

28  ---------------------
[1] This case does not involve any statutory presumption of detention.

flight risk. *Motamedi*, 767 F.2d at 1407. The government's burden is even higher if it moves for a detention hearing based on one of the five designated grounds relating to dangerousness. There, the government must prove by clear and convincing evidence that the defendant poses an actual danger to the community, rather than a theoretical one. *See* 18 U.S.C. § 3142(f); *United States v. Patriarca*, 948 F.2d 789 (1st Cir. 1991). If the government meets its initial burden and a detention hearing is held, the defendant should not be ordered detained absent a finding that no condition or combination of conditions of release will reasonably assure the defendant's future appearance and the safety of the community. 18 U.S.C. § 3142(f).

In deciding whether conditions could reasonably assure the defendant's appearance and the safety of the community, courts are to evaluate: the nature and circumstances of the offense charged; the weight of the evidence against the person; the history and characteristics of the person, including family ties, length of residence, past conduct, drug or alcohol abuse, and criminal history; and the nature and seriousness of the danger to any person or the community posed by the person's release. 18 U.S.C. § 3142(g).

A defendant ordered detained by a magistrate judge may file an appeal of that decision, pursuant to 18 U.S.C. § 3145(b). Under this provision, the District Court must conduct its own de novo review of the detention order. *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990). In its review, the District Court may consider "newly developed evidence that was not presented at the prior hearing." *United States v. Freitas*, 602 F. Supp. 1283, 1293 (N.D. Cal. 1985); see also *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985) (district court should consider record plus additional evidence); *United States v. Dolby*, 928 F.3d 1199, 1208 (10th Cir. 2019) (Section 3145(b) governs de novo review by the district judge of the magistrate judge's decision, and it allows the district judge to consider new evidence).

V.      **ANALYSIS**

    A.      <u>As the Magistrate Judge Found, Mr. Hung Is Not A Flight Risk</u>

       Mr. Hung was born and raised in Southern California.  He attended and graduated from San Marino High School.  He is married to Emily Shen, also born and raised in Southern California, and they are expecting their first child next month.  Hrg. Tr. 31:20-23.  Mr. Hung is close to his parents and his siblings as well as his extended family in this district.  In other words, Mr. Hung has deep and extensive ties to and support from this community.  *See* **Exhibit 1**.  Moreover, Mr. Hung is employed, has no prior record, is fully compliant with the bond conditions in his pending related state court matter, and has no history of failing to appear in court.

       As set forth above, Mr. Hung proffered a justified bond in the amount of $3,525,000.   Hrg. Tr. 31:20-23.  Moreover, to further minimize any potential for concern, Mr. Hung has suggested GPS monitoring by PTS and other restrictive release conditions.  Accordingly, the Magistrate Judge correctly concluded that any potential risk of flight could be mitigated by the bond proposed by the defense in this case.  Order 5:8-12.

    B.      <u>Mr. Hung Is Not A Danger To The Community</u>

       The government claimed that two factors demonstrate that Mr. Hung presents a danger to the community:  First, the government asserted its investigation has revealed that Mr. Hung harbors a "violent ideology."  Second, the government asserted that Mr. Hung committed acts of violence during a protest in Pasadena on May 31, 2020.  A careful review of the facts, however, including new evidence that was not considered by the Magistrate Judge, demonstrates that both assertions are incorrect.  Mr. Hung's political views are neither radical nor violent and he has never harmed nor attempted to harm anyone, on May 31 or any other date.  Nor is he a threat to the community.  Significantly, he is not charged with a crime of violence, he has no criminal history or history of violence, and he has strong support

1  from his family and community as a law-abiding and good person.

2      **1.**    **Mr. Hung's Actions On May 31 Do Not Demonstrate That**

3          **He Is A Danger To The Community**

4      On the afternoon of May 31, 2020, Mr. Hung and his pregnant wife were

5  shopping along Colorado Boulevard in Pasadena, including at a Michael's art

6  supplies and craft store, which is approximately 2.4 miles from their home.  At 4:48

7  p.m., they completed a purchase at Michael's on Colorado Boulevard.  A copy of

8  the store receipt is attached as **Exhibit 5**.  At Michael's, the Hungs purchased

9  baking cups, crochet yarn, and other craft supplies.

10      According to the Pasadena Police report from the May 31 incident, at

11  approximately 4:58 p.m., the Hungs approached the intersection of Colorado

12  Boulevard and Fair Oaks, approximately 1.4 miles west of Michael's.  By that time,

13  protestors had taken over and blocked the intersection of Colorado Boulevard and

14  Fair Oaks.  Media coverage, photographs, and video from that protest show that

15  emotions were running high as the protestors blocked the streets at the intersection

16  of Colorado and Fair Oaks.

17      The government asserted in the detention hearing that the other cars that

18  approached the crowd of protesters "all make u-turns" and that "the protesters aren't

19  coming at any of the cars."  Hrg. Tr. at 40:18-22.  However, the Pasadena Now

20  coverage of the protest at this intersection on May 31, 2020, shows otherwise.[2]  That

21  report contains photos of the protest that show vehicles trying to drive through the

22  intersection with protestors striking and/or climbing on the vehicles:

23

24

25  [2] Images from the May 31, 2020, incident were taken from Pasadena Now's

26  coverage of the May 31, 2020, protests and is available here:
    https://www.pasadenanow.com/main/protesters-march-again-in-pasadena/.  This is

27  the same media report cited in the Affidavit in support of the Complaint.  *See*

28  Affidavit at ¶ 17 fn. 2.



A driver creates a confrontation as he tries to drive his car through the chain of protesters on Fair Oaks Avenue as demonstrators try to stop him during a protest for the murder of George Floyd in Old Pasadena, Sunday, May 31, 2020. (Photo by James Carbone)



A driver tries to drive through protesters on Fair Oaks Avenue as demonstrators try to stop him during a protest for the murder of George Floyd in Old Pasadena, Sunday, May 31, 2020. (Photo by James Carbone)

Video footage from multiple sources depict what happened as the Hungs approached and proceeded through the intersection.  Copies of these videos are being submitted separately on a USB drive as **Exhibit 6**.

Specifically, the videos demonstrate that, as Mr. Hung approached Fair Oaks, he sounded his vehicle's loud horn and slowed down, stopping at the intersection. He again sounded the horn and thereafter turned left onto Fair Oaks *after protestors moved out of the way*.  As Mr. Hung turned at the intersection, he once again braked and continued to use his horn—clearly signaling for people to move out of the roadway, which they all did.  Significantly, no one was hit by the truck.

Video shot from inside the truck reveals that, as the Hungs approached the intersection, a person threw an object that appears to be a cup at the passenger side

of the vehicle, where Mr. Hung's wife sat:



As the Hungs entered the intersection, another individual chased after and attempted to grab a flag mounted on the rear of the truck:



As the truck proceeded to make the left turn onto Fair Oaks, yet another person appeared to hit the driver side of the truck, and someone else threw an object at the passenger side of the truck:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17



A driver creates chaos as he drives through the chain of protesters on Fair Oaks Avenue as demonstrators try to stop him during a protest for the murder of George Floyd in Old Pasadena, Sunday, May 31, 2020. (Photo by James Carbone)

18    After Mr. Hung made a left onto Fair Oaks, he then turned left again onto

19  Green Street.  Pasadena Police Department ("PPD") officers received a call to stop

20  Mr. Hung.  Officers pulled him over at Euclid and Green Street, approximately half

21  a mile from the intersection of Colorado and Fair Oaks.  He was immediately

22  responsive and cooperative.  The PPD officers detained Mr. Hung and his wife, who

23  both fully complied with the officers' requests.  Soon after detaining Mr. Hung and

24  his wife, a large group of protestors approached the area.  The PPD officers then

25  placed the Hungs into the patrol car and transported them to the police station "for

26  our safety, the safety of Hung and [his wife], and for the safety of their vehicle."

27  During a search of the truck, PPD officers found a loaded handgun, a metal pipe,

28  and a machete.  Importantly, there is no evidence and the government has not

1   alleged that Mr. Hung reached for or in any way attempted to use any of these items

2   during the May 31 incident.

3        PPD officers arrested Mr. Hung for attempted assault with a deadly weapon

4   based on his act of driving his truck through the intersection.  However, after two

5   prosecutor's offices reviewed the incident, no assault charges were filed against Mr.

6   Hung.  Initially, the Los Angeles County District Attorney's Office declined to file

7   charges and referred the investigation to the Pasadena City Prosecutor's Office,

8   which charged Mr. Hung with a misdemeanor firearm possession offense.

9        The videos are objectively and strikingly contrary to the government's

10  assertions that Mr. Hung accelerated into the crowd of protestors and that he

11  intended to strike protestors.  Rather, the videos reveal Mr. Hung driving

12  defensively and carefully as he navigated through the crowd of people, who were

13  congregating and moving erratically through the middle of the street.  Mr. Hung

14  honked his horn a number of times, including as he approached the intersection in

15  order to get the crowd to move out of the road so he could pass.  If Mr. Hung

16  intended to harm anyone, he would not have honked first, nor would he have braked

17  both as he approached the intersection and as he was turning.  Moreover, as

18  reflected in a video, Mr. Hung's wife can be heard instructing Mr. Hung to "*horn*"

19  them, not to run them over or do anything violent.  Hrg. Tr. 41:6-8.  Grasping at

20  straws, the government emphasizes that Mr. Hung's *horn* was very loud: "Not just a

21  normal car horn, your honor.  It's a modified horn to sound like a train horn."  Hrg.

22  Tr. 41:10-11.  Mr. Hung's act of repeatedly sounding this loud horn as he

23  approached the protestors, however, demonstrates that Mr. Hung was trying to warn

24  them, not strike them.

25       In an attempt to bolster its argument that Mr. Hung intended to strike the

26  protestors, the government claimed that Mr. Hung sought out the protestors on May

27  31, and the Magistrate Judge agreed.  Order 3:13-15.  As discussed above, recent

28  evidence—unavailable at the initial detention hearing—establishes that Mr. Hung

1   was out shopping with his wife in Pasadena just before the incident.  In fact, the

2   receipt from Michael's and the police report taken together indicate that Mr. Hung

3   found himself detained by law enforcement within minutes of leaving Michaels.  It

4   simply strains reason to believe that Mr. Hung was searching for protestors with the

5   intent to harm them that day, but decided to make a quick detour into a crafts store

6   with his pregnant wife prior to descending upon the protest.

7          In support of its claim that Mr. Hung expressly sought out the protestors with

8   an intent to strike them on May 31, 2020, the government claimed that he was at the

9   scene of a protest in the same area on the day prior.  The government relied on a

10  statement from a witness who explained that, on May 30, 2020, after a protest had

11  broken up, the witness saw a truck matching the description of Mr. Hung's truck

12  that was driven by an Asian male.  The witness claimed that the truck made a U-turn

13  and then "coal rolled" the witness as it drove by.  Crim. Compl. 29.  As the

14  government's affidavit explains, the witnesses' description of "coal rolling" refers to

15  driving past a person such that exhaust from the vehicle blows onto them. Even if

16  the Court were to find this evidence sufficient to establish that Mr. Hung was the

17  person observed by the witness, the evidence does not show that Mr. Hung initiated

18  or engaged in any violence.  While "coal rolling" as the government described may

19  be annoying and even distasteful and rude, such conduct is not violent.

20         The government also points to the flags on his truck as proof of Mr. Hung's

21  "strong violent ideology."  Crim. Compl. 2; Hrg. Tr. 37:8.  That assertion is absurd.

22  Mr. Hung's truck bore a Betsy Ross flag, an early design of the U.S. flag

23  symbolizing American independence; a Gadsen flag, a design indicating support for

24  civil liberties; and a "Thin blue line" flag, showing support for law enforcement.

25  Countless non-violent and law-abiding citizens own and carry such flags.  Mr. Hung

26  used a variant of the "Thin blue line" flag during his participation in an annual (and

27  peaceful) Rotary Parade.  *See* **Exhibit 2**.  To claim based on these flags that Mr.

28  Hung harbored a "strong violent ideology," and thus should be detained, offends

free speech protections and represents gross prosecutorial overreach.

The events that occurred on May 31, 2020, do not support a finding that Mr. Hung is a danger, much less a finding by clear and convincing evidence that no conditions of release could reasonably assure the safety of the community.

### 2. Mr. Hung's Possession of Firearms, Weapons, And Other Equipment Does Not Demonstrate That He Is A Danger To The Community

The May 31, 2020 incident sparked a federal investigation into Mr. Hung. Search warrants were issued against Mr. Hung's San Marino residence and his family's vineyard and house in Lodi, California. The government also obtained Mr. Hung's cell phone records, text messages, Google account, PayPal, Wells Fargo, and iCloud records. The search warrants were executed on September 23, 2020. No firearms were seized from the San Marino house. The government seized two handguns and seven rifles from the Lodi house, and ten handguns, ten rifles, ammunition, and related items from his parent's vineyard in Lodi. The government has asserted that Mr. Hung's electronic communications, bank records, iCloud account, and PayPal records show that Mr. Hung has acquired firearms, scopes, and other related items through various sources, including Amazon, since approximately December 2017. Nearly all of these items were stored and ultimately seized from the Lodi vineyard and residence. The government also presented text messages and other evidence showing that Mr. Hung has used the Lodi vineyard to shoot weapons.

Possession, ownership, or even theft of firearms do not mandate pretrial detainment. In *United States v. Marquez*, 18-CR-00197-CRB-1, 2018 WL 4773152, at *3 (N.D. Cal. Oct. 3, 2018), the defendant allegedly *stole* 55 firearms, only fifteen had been recovered, two at crime scenes, and forty were still missing. The defendant had also posted photos of himself with firearms. *Id*. at *3. In reversing the detention order, the District Court pointed out that, as here, the defendant did not have a criminal record and no longer had access to the numerous stolen firearms.

1   *Id.* While the government's evidence and the extensive collection of gear

2 demonstrates Mr. Hung's deep and abiding desire to protect himself and his family,

3 and perhaps an enjoyment of using firearms in a recreational setting, it does not

4 demonstrate an intent to physically strike out in aggression against anyone in the

5 community. Mr. Hung has absolutely no history of violent conduct against anyone.

6 There is no evidence in the record that he got into fights as a student; there is no

7 evidence that he has initiated any physical altercations as an adult; and in fact, there

8 is no evidence that he has been physically assaultive towards anyone at any point in

9 his entire life. Owning weapons for self-protection or recreational use may not be

10 an option that everyone chooses, but the desire to protect oneself and one's family

11 from harm's way does not evince danger.

12           **3.**     **Mr. Hung's Communications Do Not Demonstrate That He**

13                 **Is A Danger To The Community**

14      The government also highlighted several communications, selectively pulled

15 from its review of nearly three years of data, that the government claims establish

16 Mr. Hung's "violent ideology." However, upon closer analysis of the cited text

17 messages, the government's claim that Mr. Hung harbors such "violent ideology"

18 and that no conditions of release could protect the public fails.

19      First, the government has not yet produced discovery of these

20 communications beyond what is alleged in the complaint affidavit, so the full

21 context of the messages is not clear.

22      Second, the communications that have been provided do not show that Mr.

23 Hung has ever committed an act of violence against another person.

24      Third, to the extent the messages exhibit any discussion of violence by Mr.

25 Hung, they all relate to potential defensive actions. For instance, one of the

26 messages cited by the government in the detention hearing, which the government

27 characterized as the "most troubling," was a series of text messages that Mr. Hung

28 sent to himself stating that if anybody comes to harm him, they better be ready for

1  the "seventh level of hell."  Hrg. Tr. at 54:9-11.

2         Finally, many text messages cited by the government were messages written
3  by other persons, not by Mr. Hung.

4         The text messages proffered by the government do not support detention.
5  Some are politically charged.  Others reflect a passion for firearms.  Others still
6  reflect a desire to protect himself and his loved ones from any harm.  Many are less
7  than mature, written in pop culture/video game speech.  But not a single text is a call
8  to incite physical violence.  Moreover, not a single text brags of any act of past
9  violence by Mr. Hung.  There is no such evidence of any violent behavior in any of
10  his texts because Mr. Hung has never committed any violent actions against anyone.

11         Texting feels private.  It is an intimate and informal form of constitutionally –
12  protected communication.  Had Mr. Hung been committing violent acts or inciting
13  others to do so, there would be texts to prove it.  Here, there are none.  This Court
14  should decline to detain an individual with no prior record and no history of a single
15  act of violence based on some errant texts plucked out of a sea of likely mundane
16  text communications over a three-year period.

17  **C.**     <u>**There Are Conditions of Release That Can Reasonably Assure Mr.**</u>
18          <u>**Hung's Future Appearances And The Safety of The Community**</u>

19         The government has failed to prove that Mr. Hung is a serious flight risk or a
20  danger to the community.  This Court should therefore release Mr. Hung on bond.
21  Moreover, to the extent that the Court concludes that more restrictive conditions of
22  release are necessary in order to reasonably assure his return to court and the safety
23  of the community, Mr. Hung respectfully submits that 24-hour GPS monitoring by
24  PTS would be appropriate.  Such monitoring would allow the Court through PTS to
25  track his every movement.  This real-time monitoring of his compliance with
26  restrictions on his whereabouts would provide an added measure of oversight and

27

28

1  accountability.[3]

2      Moreover, if the Court believes that a second layer of supervision is

3  necessary, Mr. Hung proposes that he be required to retain two retired FBI or law

4  enforcement agents to serve as his private custodians, charged with supervising him

5  and immediately reporting any violation of his terms of release to PTS and the

6  Court.  Risk Control Strategies—a firm founded and operated by retired FBI agents

7  and specializing in such services for nearly two decades—is willing and able to

8  provide those services here.

9      Not only will the above release restrictions mitigate any risk and concerns,

10 but pretrial release will also minimize the costs to the government,[4] relieve the

11 capacity in the detention center, and further help alleviate the spread of COVID-19.

12 Furthermore, allowing Mr. Hung to be released on a bond with restrictive conditions

13 would permit Mr. Hung to return to his family, be present at the birth of his first

14 child, and maintain gainful employment during the pendency of this case.

15 **VI.**  **CONCLUSION**

16     Detention is only warranted in cases where there are no conditions or

17 combinations of conditions that would reasonably assure future appearance and the

18 safety of others in the community.  Here, the government has failed to prove that

19 Mr. Hung is a flight risk or a danger to the community.  Moreover, the government

20 has failed to prove that there are no such combination of conditions that would

21 warrant Mr. Hung's release.

22

23

24 _____

25 [3] https://www.cacpt.uscourts.gov/supervision.

26 [4] Pretrial detention costs the government more than $73.78 per day, versus
   supervision which costs $9.17, *available at*,

27 https://www.uscourts.gov/news/2013/07/18/supervision-costs-significantly-less-
   incarceration-federal-system.

28

1          Mr. Hung respectfully requests that the Court vacate the detention order in

2    this matter and order that Mr. Hung be released on bail.

3

4    Dated:  October 21, 2020           Respectfully submitted,

5                             LARSON O'BRIEN LLP

6

7                           By:   /s/ *Stephen G. Larson*

8                                Stephen G. Larson
                            Hilary Potashner

9                                Jerry A. Behnke
                 Attorneys for Benjamin Jong Ren Hung

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28