# Exhibit 2

AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original  ☐ Duplicate Original

## UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| **LODGED**<br>CLERK, U.S. DISTRICT COURT<br>**9/21/2020**<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ jb _____ DEPUTY | **FILED**<br>CLERK, U.S. DISTRICT COURT<br>September 21, 2020<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ DEPUTY |

United States of America,

v.

BENJAMIN JONG REN HUNG,

    Defendant

Case No.   2:20MJ4508-Duty

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on or about December 26, 2017, and continuing through the present, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
*Complainant's signature*

Diamond Outlaw, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   September 21, 2020

*Paul L. Abrams*
_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Paul L. Abrams, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT

I, DIAMOND OUTLAW, being duly sworn, declare and state as follows:

### I.   PURPOSE OF THE AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against and arrest warrant for **BENJAMIN JONG REN HUNG** ("**HUNG**") for a violation of 18 U.S.C. § 371 (Conspiracy to Transport Firearms Interstate and Make a False Statement in Acquisition of Firearms).

2.   This affidavit is also made in support of an application for a warrant to search the following premise: ████ ████████████████████████████ (the "**SAN MARINO RESIDENCE**"), as described more fully in Attachment A, which is incorporated herein by reference, for evidence, fruits and instrumentalities of violations of the following statutes, as described more fully in Attachment B, which is also incorporated herein by reference: 18 U.S.C. § 231 (Civil Disorders); 18 U.S.C. § 245(b) (Federally Protected Activities); 18 U.S.C. § 249 (Hate Crime Acts); 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. § 2101 (Anti-Riot Act); and 18 U.S.C. § 922(a)(3) (Interstate Transport of Firearms); 18 U.S.C. § 922(a)(6) (False Statement in Acquisition of Firearms) (collectively, the "Subject Offenses").

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient

1

probable cause for the requested warrants and does not purport
to set forth all of my knowledge of or investigation into this
matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only with original
typographical errors and all dates and times are approximate.

## II.  BACKGROUND OF AFFIANT

4.  I am a Special Agent with the Federal Bureau of
Investigation ("FBI") and have been so employed since May 2017.
I am currently assigned to the Los Angeles Division's Civil
Rights Squad.  I attended 21 weeks of New Agent Training at the
FBI Academy in Quantico, Virginia.  During my career as an FBI
Special Agent, I have participated in multiple investigations
regarding hate crimes, misconduct under color of law, and fraud
against the government.  Through my training and experience with
the FBI, I have learned and used a variety of investigative
techniques and resources, including surveillance, undercover
operations, subpoenas, search warrants, evidence seizures, and
telephone toll analysis.  During my time at the FBI, I have
participated in the execution of multiple search warrants,
including search warrants executed at physical residences in
cases involving threats of violence.

## III.  SUMMARY OF PROBABLE CAUSE

5.  As detailed below, on May 31, 2020, **HUNG** intentionally
drove his Dodge Ram truck adorned with flags associated with
right-wing extremist groups into a crowd of individuals
peacefully protesting against racial injustice in police

practices on a street in Pasadena, California.  The victims were
forced to run out of the way to avoid being struck.  Pasadena
Police Department ("PPD") officers arrested **HUNG** at the scene of
the incident for attempted assault with a deadly weapon and
found in his truck a loaded semiautomatic handgun, multiple
loaded high-capacity magazines, an 18-inch machete, $3,200 in
cash, a long metal pipe, and a megaphone.

6.    **HUNG** acquired the handgun he possessed during the
protest from a friend, C█ █ F█████ ("F██████"), who purchased
the firearm for **HUNG** in Oregon and then transported it to Lodi,
California for **HUNG**.  When F█████ purchased the firearm, he
falsely represented that he was the actual transferee of the
gun, rather than **HUNG**.  **HUNG** then kept the firearm at the **SAN
MARINO RESIDENCE** prior to bringing it to the protest on May 31,
2020.

7.    In addition to the firearm **HUNG** obtained unlawfully
from F█████, **HUNG** purchased and then transported at least
three firearms from Oregon to Lodi, California in March 2020.
**HUNG** also amassed other firearms and tactical equipment from
suppliers throughout the United States and used his family's
vineyard in Lodi, California as a training camp to prepare to
engage in civil disorders.  As detailed below, **HUNG** communicated
frequently with associates about creating this tactical training
camp and firearms range at his family's vineyard in Lodi,
California, and his intent to use the firearms in preparation
for civil disorders.

## IV. <u>LEGAL BACKGROUND</u>

### A. Civil Disorders

8.   Title 18, United States Code, Section 231(2) (Civil Disorders) provides, in pertinent part:

> Whoever transports or manufactures for transportation in commerce any firearm, or explosive or incendiary device, knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder . . . shall be fined under this title or imprisoned not more than five years, or both.

9.   Title 18, United States Code, Section 232(1) defines a Civil Disorder as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."

### B. Civil Rights Crimes

10.   Title 18, United States Code, Section 245(b) provides, in pertinent part:

> Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with . . . any person because of his race, color, religious or national origin and because he is or has been . . . participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof; or any citizen because he is or has been, or in order to intimidate such citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion or national origin . . . participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate . . . shall be fined under this title or imprisoned not more than one year, or both; and if . . . such acts include the use, attempted use, or threatened use of a dangerous weapon . . . shall be

4

fined under this title, or imprisoned not more than
ten years, or both.

11. Title 18, United States Code, Section 249 provides, in

pertinent part:

Whoever, whether or not acting under color of law,
willfully causes bodily injury to any person or,
through the use of fire, a firearm, a dangerous weapon
. . . attempts to cause bodily injury to any person,
because of the actual or perceived race, color,
religion, or national origin of any person . . . shall
be imprisoned not more than 10 years, fined in
accordance with this title, or both.

**C.    Anti-Riot Act**

12. Title 18, United States Code, Section 2101 provides,

in pertinent part:

Whoever travels in interstate or foreign commerce or
uses any facility of interstate or foreign commerce
. . . with intent . . . to commit any act of violence
in furtherance of a riot . . . and who either during
the course of any such travel or use or thereafter
performs or attempts to perform any other overt act
for any purpose specified in subparagraph (A), (B),
(C), or (D) of this paragraph—shall be fined under
this title, or imprisoned not more than five years, or
both.

A "riot" is defined as:

A public disturbance involving (1) an act or acts of
violence by one or more persons part of an assemblage of
three or more persons, which act or acts shall constitute a
clear and present danger of, or shall result in, damage or
injury to the property of any other person or to the person
of any other individual or (2) a threat or threats of the
commission of an act or acts of violence by one or more
persons part of an assemblage of three or more persons
having, individually or collectively, the ability of
immediate execution of such threat or threats, where the
performance of the threatened act or acts of violence would
constitute a clear and present danger of, or would result
in, damage or injury to the property of any other person or
to the person of any other individual.

**D.    Interstate Transport of Firearms**

    13.    Title 18, United States Code, Section 922(a)(3)

provides, in pertinent part, that it shall be unlawful:

> for any person, other than a licensed importer,
> licensed manufacturer, licensed dealer, or licensed
> collector to transport into or receive in the State
> where he resides (or if the person is a corporation or
> other business entity, the State where it maintains a
> place of business) any firearm purchased or otherwise
> obtained by such person outside that State, except
> that this paragraph (A) shall not preclude any person
> who lawfully acquires a firearm by bequest or
> intestate succession in a State other than his State
> of residence from transporting the firearm into or
> receiving it in that State, if it is lawful for such
> person to purchase or possess such firearm in that
> State, (B) shall not apply to the transportation or
> receipt of a firearm obtained in conformity with
> subsection (b)(3) of this section, and (C) shall not
> apply to the transportation of any firearm acquired in
> any State prior to the effective date of this chapter.

**E.    False Statement in Acquisition of Firearm**

    14.    Title 18 United States Code, Section 922(a)(6)

provides, in pertinent part, that it shall be unlawful:

> for any person in connection with the acquisition or
> attempted acquisition of any firearm or ammunition
> from a licensed importer, licensed manufacturer,
> licensed dealer, or licensed collector, knowingly to
> make any false or fictitious oral or written statement
> or to furnish or exhibit any false, fictitious, or
> misrepresented identification, intended or likely to
> deceive such importer, manufacturer, dealer, or
> collector with respect to any fact material to the
> lawfulness of the sale or other disposition of such
> firearm or ammunition under the provisions of this
> chapter.

## V.   STATEMENT OF PROBABLE CAUSE

### A. HUNG Seeks Out and Attempts to Assault Black Lives Matter Protestors in Pasadena, California

1.   On May 31, 2020, Peaceful Protestors Took to the Streets of Pasadena, California, to Protest Racial Injustice

15.   After the death of George Floyd at the hands of the police in Minneapolis, Minnesota on May 26, 2020, widespread protests erupted across the nation, including in the Central District of California.  Local media stations covered the daily and nightly protests extensively, including displaying images from the protests and their general locations.

16.   On Sunday, May 30, 2020, according to news reports from Pasadena Now,[1] a local news outlet, more than 100 demonstrators gathered and marched peacefully in Old Pasadena in a protest against the police killing of George Floyd.  The protestors gathered in Old Pasadena, at the intersection of Fair Oaks Avenue and Colorado Boulevard.  Protesters could be heard chanting phrases like "I can't breathe," in reference to George Floyd's final words, and "Black Lives Matter."  The crowd marched for an hour and eventually dispersed peacefully.

---

[1] Pasadena Now's coverage of the May 30, 2020, protests is available here: https://www.pasadenanow.com/main/peaceful-demonstration-in-old-pasadena-protested-death-of-george-floyd/

17.  On Monday, May 31, 2020, according to news reports from Pasadena Now,[2] nearly 100 protestors returned to Old Pasadena again to march in peaceful protest of George Floyd's death.  The crowd began at a park and marched down Fair Oaks Avenue, forming a square at the intersection of Fair Oaks Avenue and Orange Grove.  According to news reports, the marchers "chanted, danced, and held the intersection for about 10-15 minutes" before continuing down Fair Oaks Avenue and forming another square at Colorado Avenue.  Pictures from the protest reflect a racially diverse crowd carrying signs with phrases like "Black Lives Matter," "Justice for George," and the phrase "Police Brutality" with a circle drawn around it and a line through it.  Below is a photograph from the protest as reported by Pasadena Now.  Visible in the photograph are signs that read: "Black Lives Matter" and "Let Us Breath."



[2] Pasadena Now's coverage of the May 31, 2020, protests is available here: https://www.pasadenanow.com/main/protesters-march-again-in-pasadena/

18.   In addition to local news coverage of the protests, bystander videos, witness interviews, and social media posts also indicate that the protest on May 31, 2020, in Pasadena was a peaceful assembly of individuals protesting racial injustice in response to the killing of George Floyd.   There were no reports of looting by the protestors who assembled at the corner of Fair Oaks Avenue and Colorado in Pasadena on the afternoon of May 31, 2020, or confrontations with law enforcement by that group, and the police did not arrest any of the protestors in that group for their conduct that afternoon.

2.   HUNG Intentionally Drove His Truck into the Protestors

19.   According to my review of PPD records, on May 31, 2020, PPD Sergeant Buchholz was driving an unmarked police car in the Old Town area of Pasadena, California, where the large protest described above was occurring.   At approximately 4:45 p.m., Sergeant Buchholz estimated that a crowd of approximately 150 protestors had gathered in the intersection of Colorado Boulevard and Fair Oaks Avenue.   Sergeant Buchholz then saw a large white truck driving west along Colorado Boulevard toward the protestors in the intersection.   (**HUNG** was later identified as the driver of the truck and **HUNG's** wife, E███ S███ ("S███"), was later identified as the passenger.)

20.   According to the PPD reports, witness interviews, and video of the incident taken by bystanders, **HUNG's** truck came to a stop behind three to four other cars each waiting to slowly make U-turns because it was clear that the intersection was

9

blocked by protestors.  Instead of turning around, however, **HUNG** blared a loud train-like horn, causing the cars in front of his truck to move out of the way.  Sergeant Buchholz then saw the truck accelerate rapidly as it drove toward the crowd, and he saw the protestors, including two plain clothes PPD detectives, sprint out of the truck's way to avoid being run over.

21.  According to bystander video and surveillance footage from a nearby store, **HUNG** acted without provocation.  None of the demonstrators antagonized **HUNG** or interacted with the truck before **HUNG** drove into the crowd, although several protestors appeared to chase after **HUNG's** truck as he accelerated through the intersection.  The videos also show **HUNG** accelerate toward the intersection, causing demonstrators to run out of the way to avoid being struck, reflected in the below image from a bystander video:



22.   Based on my review of video footage of the incident
and witness interviews, the subject matter of the protest would
have been readily apparent to **HUNG** as he approached the crowd.
In addition to the signs described above, and the general media
attention in the local news about the subject matter of the
protests that particular weekend, security footage from a nearby
bar shows that **HUNG** had the driver's side window down and was
waving his hand out the window as he approached the
intersection.  Although that video does not have audio, other
videos taken by bystanders reflect a loud but peaceful group
audibly shouting "black lives they matter here" in the moments
before **HUNG** drove into the crowd.

23.   After **HUNG** drove into the crowd of peaceful
protestors, PPD officers pulled **HUNG** over and detained **HUNG** and
the only passenger, S███.  According to PPD video recordings,
while being commanded to exit the truck and being placed in
handcuffs, **HUNG** spontaneously said that he felt threatened by the
protestors, who he claimed had been throwing items at his truck
while he attempted to leave the area.  (None of the video
footage or witness interviews I have seen support **HUNG's** claim
that the protestors threw items at his truck before he drove
into the intersection.)

24.   PPD arrested **HUNG** for attempted assault with a deadly
weapon and the truck was impounded and searched.[3]  In the truck,

---

[3] **HUNG** was charged with a misdemeanor violation of carrying
a loaded firearm in violation of California Penal Code
§ 25850(a) in Los Angeles County Superior Court, Case No.

11

officers found a black fanny pack that contained a loaded Glock 26 9mm semiautomatic handgun bearing serial number BBMM205 ("the Glock 26") with a 17-round magazine.[4]  The fanny pack also contained a second loaded 15-round magazine, a trigger guard, and a flashlight.  Also in the truck, officers found an 18-inch machete, a backpack containing $3,200 in cash, an 18-inch long metal pipe, and a megaphone.  The pipe was wedged between the driver's seat and the backseat, such that it was easily accessible to **HUNG** as he drove the truck.

25.  According to bystander video and witness interviews, **HUNG's** truck was very distinctive.  The truck, a white Dodge Ram 2500, bore an Oregon license plate that read, "WAR R1G."[5]  It was also modified with an elevated suspension, large tires, and an enhanced exhaust pipe, which expelled a large plume of black smoke as it accelerated into the crowd.  At the time of the incident, the truck was also flying three large flags: (1) a "Thin Blue Line" flag; (2) a Gadsden "Don't Tread on Me" yellow flag; and (3) an original 13 states "Betsy Ross" American flag.

26.  Based on my training and experience investigating civil rights violations, I am aware that:

---

0PD01751.  **HUNG** is scheduled to make his initial appearance on September 29, 2020.

[4] As described further herein, the Glock 26 was registered to F███████ .

[5] According to Oregon Department of Motor Vehicles records, the truck is registered to the Four Seasons Garden RV Resort in Bend, Oregon.  According to Oregon Secretary of State records, the registered owner of the Four Seasons Garden RV Resort is C████ H███ ("C█████"), and the manager is I███ H███ ("I█████").  According to basic Internet searches and law enforcement database records, C█████ and I█████ are **HUNG's** parents.

a.   The "thin-blue-line" flag is a modified version of the American flag that is black and white with a prominent horizontal blue line.   The flag has been used to demonstrate support for police officers, who are sometimes referred to as the "thin blue line."   The Gadsden flag is a yellow flag with an image of a snake and the words "DON'T TREAD ON ME."   The Betsy Ross flag is an early version of the American flag with thirteen alternating red-and-white stripes and a dark blue square in the upper left corner containing thirteen white stars arranged in a circle.

b.   Some far-right extremist groups have used all three flags at and in advertisements for demonstrations, including at the Unite the Right rally in Charlottesville, Virginia in August 2017.   The Unite the Right rally was organized by several white-supremacist groups, including the neo-Nazi organizations and the Ku Klux Klan.

c.   Far-right militia groups, including the "Three Percenters" organization have also used the Gadsden and Betsy Ross flags.   The Three Percenters is a far-right militia and paramilitary group with chapters nationwide whose members pledge to engage in protest and armed resistance against perceived attempts to curtail constitutional rights.   Their official flag is the Betsy Ross flag with three "I"s in the middle of the stars, and they have also been known to display the Gadsden flag.   The flag on **HUNG's** truck did not have the three "I"s in the middle; however, as detailed below, **HUNG** is depicted in a

13

photograph wearing clothing bearing the Three Percenters'
version of the Betsy Ross flag.

        3.    **HUNG** <u>Surveilled the Area before the May 31, 2020,</u>
            <u>Assault in an Apparent Effort to Locate the</u>
            <u>Protestors</u>

27. According to witness interviews and social media
reports, several individuals recalled seeing what appeared to be
the same truck as the one **HUNG** drove into the crowd of protests
earlier in the weekend.

28. After news reports showing **HUNG's** truck driving into
the protestors on May 31, 2020, an Instagram user posted a video
s/he had taken the night before while protesting in downtown
Pasadena that was then shared on Twitter. The video from May
30, 2020, depicted a white truck matching **HUNG's** with the same
distinct flags rapidly accelerating and spewing an excessive
amount of exhaust fumes onto the video-taker near a street
corner in Pasadena. The truck's passenger is visible in the
video and appears to be male, but has not been identified.

29. The FBI has identified and interviewed the user who
took the video, who confirmed that s/he was in Pasadena the
night of May 30, 2020, to protest George Floyd's death. The
witness indicated that s/he had been in the area of Fair Oaks
and Colorado with a large peaceful protest for several hours,
but that after the crowd dispersed s/he decided to stay on the
street corner holding a sign that said "it's our duty to fight
for freedom" with his/her two friends. The witness saw a large
white truck resembling **HUNG's** with the same three distinct flags
on the back drive past the corner, but then slow down and do a

14

U-turn to come back to the intersection where s/he was standing. The witness described the driver of the truck as an Asian male with short hair, and indicated that there were two other men in the car. When the traffic light turned green, **HUNG's** truck sped off and "coal rolled" him/her, as explained below. The truck then appeared to do another U-turn, and the witness and his/her friends fled to a nearby parking garage and decided to leave because they were scared. Based on my training and experience and knowledge of this investigation, "coal rolling" refers to intentionally rapidly accelerating a car or truck in order to spew an excessive amount of exhaust fumes at a targeted person or item.

30. Google records for a Google account operated by **HUNG**, obtained pursuant to a federal search warrant issued by the Honorable Rozella A. Oliver, United States Magistrate Judge on September 1, 2020, in Case No. 2:20-MJ-4157, show that **HUNG** watched a YouTube video in November 2019 called, "Rolling Coal on Protestors (BlackLivesMatter, Trump Haters, Tree Huggers)," which depicts large trucks spewing fumes on protestors. During the video, one of the drivers of a truck can be heard jokingly saying "I like when there's white people at a black lives matter protest."

31. T-Mobile cell-site records, obtained pursuant to a federal search warrant issued by the Honorable Gail Standish, United States Magistrate Judge on June 30, 2020, in Case No. 2:20-MJ-3043, show that **HUNG's** cell phone was located in the Old Town Pasadena area on the evening of May 30, 2020, and the

15

afternoon of May 31, 2020. Specifically on May 30, 2020, **HUNG's** cell phone pinged at locations in Pasadena, California, near the area of the protestors between 8 and 9 p.m. and again between approximately 10 and 11:30 p.m. In between, **HUNG's** cell phone pinged in downtown Los Angeles, another area where protests were occurring that weekend.

32. The FBI also interviewed a witness who worked security at a building near the area of the protests on May 31, 2020. This witness recalled seeing a truck resembling **HUNG's** on the nights of both May 29 and May 30, 2020, in the same area as the protests near Fair Oaks Boulevard and Colorado Avenue. On the night of May 29, 2020, the truck's passenger asked the witness where to find protests in Pasadena and how to access the crowds. The witness identified both the driver and the passenger as Caucasian males wearing dark hats. T-Mobile cell-site records do not place **HUNG's** cell-phone in Old Town Pasadena on the night of May 29, 2020.

33. **HUNG** and S█████ also communicated with their associates the weekend of the protests and bragged about their efforts to assault protestors. Specifically, I have reviewed the following Apple records obtained pursuant to a federal search warrant:[6]

---

[6] PPD officers seized an Apple iPhone from **HUNG** during his arrest. After **HUNG's** release from PPD custody, the iPhone was returned to **HUNG.** On June 30, 2020, the Honorable Gail Standish, United States Magistrate Judge, issued a search warrant for **HUNG's** Apple iCloud account, in case number 2:20-MJ-3044. According to Apple records, the Apple iCloud account associated with the email address ████████████ and the phone number ███████████ is registered to "BENJAMIN HUNG." According to T-Mobile records, the telephone number ████████

    a.   On May 28, 2020, an associate of **HUNG's**, M▆▆▆▆ G▆▆▆▆ ("G▆▆▆▆")[7] texted **HUNG**, S▆▆, and several other associates that "[t]hey got Antifa[8] lighting the windows and burning stuff," to which another associated replied 40 minutes later with "Black lives matter at it again!"  The next day, **HUNG** asked the group if they were "trying to come by nest?" which as explained below I believe is a reference to the **SAN MARINO RESIDENCE.**

    b.   Later in the day on May 29, 2020, after T-Mobile cell-site records placed his phone in downtown Los Angeles, California, in the same vicinity as where major protests were occurring, **HUNG** sent a text message to this same group of associates stating, "Antifa has been avoiding me or something. I can never seem to find them when I'm out war rigging??"  The associate replied, "they hear the war rig coming and want no fucking part mi liege."  Based on my training and experience and facts developed in this investigation, I believe "war rigging"

---

is subscribed to ICM Resources Inc. with an address of ▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ A, San Marino, California, 91108. According to the California Secretary of State, ICM Resources Inc. is a company registered to HUNG's dad, I▆▆▆ H▆▆, at the same address.

[7] The phone number that sent the text is identified in **HUNG's** contacts as "M▆▆▆▆ G▆▆▆▆," and the same number is also identified on Experian records as being in the name of "M▆▆▆▆ G▆▆▆▆."

[8] Based on my training and experience, I am aware that Antifa is a left-wing political movement in the United States that has been associated with both violent and nonviolent action in support of a wide variety of issues.  During the George Floyd protests, many news reports covered allegations that individuals and groups associated with Antifa were involved in organizing the protests.

refers to **HUNG's** attempts to use his truck, with the license plate "WAR R1G," to assault demonstrators.

c. On May 31, 2020, a few hours before **HUNG** drove through the crowd of protestors, an associate of **HUNG's** sent a photograph to **HUNG** and others, including one phone number saved in **HUNG's** account as "B███" and which law enforcement databases identify as belonging to S███, showing what appears to be protestors blocking traffic on a highway. S██ replied, "That's why you don't stop on the freeway for these people and have a gun," and then added "If they try this on my car, I'm running them over."

34. Apple records for **HUNG's** account also included a photograph of **HUNG** wearing a "Three Percenter" tank top, with the Betsy Ross flag with three "I's" surrounded by thirteen stars, and flexing his left arm in a manner like a body builder:



**B. HUNG Amassed Firearms and Other Tactical Equipment from Out of State to Circumvent California Gun Laws and Prepare to Engage in Civil Disorders**

35. As detailed below, based on my review of public databases, witness interviews, cell-site information, and PayPal, Wells Fargo, and iCloud records, I believe **HUNG** resides in two locations in California: (1) the **SAN MARINO RESIDENCE**, and (2) a residence located at ███████████████████████ ████████████████ ("Lodi Residence"). **HUNG** also frequently visits his family's vineyard located at ███████████████ ████████████████ (the "Lodi Vineyard").[9] **HUNG** also travels to Oregon periodically to visit his family's RV Resort and other properties, but does not appear to maintain a residence in Oregon.

      1. <u>**HUNG** Acquired the Firearm that He Possessed During His Assault on the Protestors Through an Associate, Who Illegally Purchased the Firearm for **HUNG** in Oregon and Transported the Firearm to California for **HUNG**</u>

36. According to ATF records, the Glock 26 found in **HUNG's** truck after he drove through the protestors was registered to F███████. Based on my review of text messages, F███████ is a friend of **HUNG's** and an employee at the Hung family RV park in Bend, Oregon. ATF records indicate that F███████ purchased the Glock 26 at Tillamook Sporting Goods in Bend, Oregon, on December 26, 2017. Tillamook Sporting Goods records indicate that F███████ acquired two firearms that day: the Glock 26, and

---

[9] The Lodi Residence and the Lodi Vineyard are located within the Eastern District of California. An application to search the Lodi Residence and the Lodi Vineyard is being filed concurrently herewith in the Eastern District of California.

a 9mm Glock 43 semiautomatic pistol bearing serial number BCFU215 (the "Glock 43").

37. I know from my training and experience and conversation with law enforcement that, when purchasing firearms, federal law requires the completion of ATF Form 4473, which documents the firearms transaction and requires the purchaser to make several representations under penalty of criminal prosecution. One of the required representations is that the person acquiring the firearm is the "actual transferee/buyer of the firearm(s) listed on this form." When purchasing the Glock 26 and the Glock 43 on December 26, 2017, F█████ checked "yes" next to this question. F█████ then signed his name under a warning that checking yes to that question if he is not the actual transferee/buyer "is a crime punishable as a felony under Federal law."

38. Based on my training and experience, my knowledge of firearms restrictions, and my conversations with other law enforcement officers, I am aware that California is often perceived as having more restrictive gun laws than other states. For example, California requires the registration of all firearm purchases within the state, whereas Oregon does not. Oregon does not maintain a statewide database recording who has purchased firearms in the state, whereas California does. California also has a 10-day waiting period before someone can purchase a firearm, which effectively means that a person cannot walk into a firearms store and purchase a gun the same day.

Oregon does not have this waiting period and permits same-day purchases of firearms.

39.  On December 26, 2017, the same day F█████ purchased the firearms in Oregon, Apple records for **HUNG's** iCloud account show that **HUNG** and F██████ communicated about F██████'s plans to go to the gun shop.  F███████ messaged **HUNG**, "I'm in gonna check out the pistols."  **HUNG** responded, "Nice. You still in guns? Or are you haircut started?"  F████████ then replied "Hair brotha."

40.  Approximately one week later, on January 2, 2018, F██████ sent **HUNG** text messages seeking out ammunition and indicating that F██████ was likely at the Lodi Vineyard. F██████ asked **HUNG** if he had "any 9mm ammunition laying around?" and **HUNG** responded that if F████ was "at the vineyard . . . there should be some 9mm in the closet of my room there where the ammo is."  **HUNG** was not sure if there was any ammunition left, but if not, he assured F████ that he "got 9mm here in Pasadena," and that he would "put more in Lodi."[10] From my training and experience and facts developed in this investigation, I believe that **HUNG** was discussing storing 9mm ammunition at the Lodi Vineyard, when **HUNG** references having "9mm" at the "vineyard."

41.  On January 3, 2018, **HUNG** wrote to F██████ to ask "where are my pistols at?"  F██████ responded, "I have your

---

[10] During this same conversation, **HUNG** also explained why he liked shooting in Lodi, California, "because you have a relatively long and flat range to shoot.  You can really practice your distance shots."

pistols and ammo with me" and that he would "leave it here in your closet." **HUNG** also asked if his "big suitcases with the glocks" were "in Lodi." **HUNG** added that if F█████ had "the Ruger" with him, which is a type of firearm, to "bring that with you. For protection." F█████ responded that he would "leave your glocks in Lodi if that is what you want," which further confirms that F█████ was in Lodi, California, at the time he informed **HUNG** he would be leaving "pistols and ammo" in **HUNG's** closet.

42. I believe that **HUNG** was located in the San Marino, California, area, within the Central District of California, at the time **HUNG** inquired about the status of his "pistols" on January 3, 2018, based on the following:

a. Text messages between **HUNG** and others indicate that he planned to go to Oregon for Christmas in 2017. In one text message to his brother, **HUNG** indicated that he would be flying out of Los Angeles International Airport on "Saturday" and returning to Los Angeles on "Friday," which would have been December 23 to December 29, 2017.

b. Wells Fargo purchase records show that **HUNG** made purchases in Pasadena, Alhambra, and Monterey Park, California, starting on December 30, 2017, and continuing through January 2018.

43. Throughout 2019 and 2020, **HUNG** texted with his associates about his ownership of a Glock 26 and the fact that he kept it at the **SAN MARINO RESIDENCE**. In October 2019, for example, **HUNG** sent G█████ a text stating, "I have a Glock 19,

22

19x and B███ [S███] has 43 . . . I also have a 26." Based on my training and experience and knowledge of this investigation, I believe **HUNG** is referencing his ownership of the Glock 26 and the fact that his wife, S███, has the Glock 43.

44. In February 2020, G███████ texted **HUNG** that "Lodi is the official bug out spot if stuff goes down," and **HUNG** responded that "I'm sure your pops has all the firepower needed, but just in case you know the spare block 26 is at the nest." Based on context and subsequent messages, I believe that "block 26" is likely a typo and is a reference to the Glock 26. G███████ replied that the "nest is much closer than Glendora." Law enforcement checks and open source research confirm that G███████ lives in the Pasadena area near the **SAN MARINO RESIDENCE**, which would be closer to his home than the town of Glendora, California. Based on my knowledge of the investigation and subsequent text messages described below, I therefore believe that the "nest" is a reference to the **SAN MARINO RESIDENCE**.[11]

45. In that same text thread from February 10, 2020, G███████ asked **HUNG** to identify the location of the Glock 26 in the "nest," and **HUNG** replied that it was located in the "[t]op drawer big wooden dresser next to bed I sleep in" with "extra mags and ammo and holster." **HUNG** added, "I think there's a box full of ammo in my room maybe 1000+ rounds."

---

[11] I have also reviewed text messages from HUNG inviting associates who live in the San Marino area to come over to the "nest house," which furthers my belief that the "nest" is a reference to the **SAN MARINO RESIDENCE**.

46.  On March 12, 2020, G          wrote to **HUNG** and others that his plan in the event of a military operation would be to "[g]rab glock 26 from Nest house or get my own ASAP."  Later that week, as described more below, G          asked **HUNG** if he could "borrow g26" if "things get worse," and **HUNG** replied that he was in Oregon, but that G          could "get the Glock without anyone knowing.  It's in the drawer next to the bed."

47.  An undated photograph from **HUNG's** iCloud account, described further below, shows a table covered in firearms, ammunition and equipment.  One of the firearms depicted appears to be a Glock 43.  For the reasons discussed below, I believe that this photograph was likely taken in Lodi, California, sometime between March and May 2020.  The absence of the Glock 26 in the photograph is consistent with text messages, described above, indicating that **HUNG** kept the Glock 26 at the **SAN MARINO RESIDENCE.**

> 2.  **HUNG** Drove to Oregon in March 2020 to Acquire Three Additional Firearms, Which He Then Brought Back to California

48.  **HUNG** and S     have no firearms registered to themselves in the state of California.  Apple records for **HUNG**'s iCloud account, however, contain numerous undated photographs of firearms and firearm accessories, including the following photograph that I believe was taken in California for the reasons set forth below:



49.   Based on my knowledge of firearms, I have identified
six firearms displayed on a table that appears to be indoors:
(1) two assault rifles; (2) three semi-automatic pistols,
including one resembling a Glock 43; and (3) one long-range
rifle.  Additionally, the table contains (4) four assault rifle
barrels; (5) at least fifteen assault rifle magazines; (6) 11
standard pistol magazines; (7) at least 15 extended pistol
magazines; (8) numerous boxes of ammunition of various calibers;
(9) a tactical vest equipped with assault rifle magazines and a
tourniquet; (10) a green tactical belt holding five assault
rifle magazines and two pistol magazines; and (11) miscellaneous

firearm accessories such as a tan pistol holster, camouflage eye protection, rifle scope, binoculars, and assorted gun parts.

50. Although the photo is undated, I believe it was taken somewhere in California and reflects firearms that **HUNG** purchased in Oregon in March 2020 and brought back to California for the following reasons:

a. According to records from Tillamook Sporting Goods in Oregon, in March 2020, **HUNG** purchased three firearms:[12] (1) on March 18, 2020, a Mossberg 464 lever action rifle with serial number LA068565; (2) on March 22, 2020, a Winchester XPR bolt action rifle with serial number 357ZR05273; and (3) on March 22, 2020, a Bergara Hunter bolt action rifle with serial number 61-06-214565-18.

b. The long-range rifle on the table appears to be the same make and model of the Bergara Hunter bolt action rifle **HUNG** bought in Oregon; therefore, the picture would have been taken after March 22, 2020.

c. Pictured next to the rifle is a Vortex Optics Crossfire II Adjustable scope, which was not purchased until March 31, 2020, after T-Mobile cell-site records show **HUNG's** cell phone arriving in Lodi, California;[13]

---

[12] The records from Tillamook identify **HUNG's** address as the same one listed on his Washington driver's license.

[13] According to Apple records, **HUNG** took a screenshot of an Amazon Prime purchase for the same make and model of scope, which stated that the item was last purchased on March 31, 2020, for $299. **HUNG's** Wells Fargo debit card history shows a purchase from Amazon for $323.67 on March 31, 2020, which appears to be the $299 scope plus applicable tax.

d.    Pictured next to the Vortex scope is a Talley

banded scope mount that was also purchased on March 31, 2020,

with a notation to "Deliver to B███ – Lodi 95242."[14]

51.    Because **HUNG** and S███ do not have any firearms

registered to them in California, I believe that the other

firearms pictured likely also came from out of state.[15]

Additionally, because the Winchester and Mossberg rifles do not

appear in this photograph, I believe they are likely being kept

at a separate location, to include the **SAN MARINO RESIDENCE.**

52.    I believe that HUNG drove to Oregon to acquire the

three firearms purchased at the end of March for the following

reasons:

───────────────

[14] According to Apple records, **HUNG** took a screenshot of a
Talley 700-721-722-725-40X Scope Mount from Amazon that stated
it was lasted purchased on March 31, 2020, and the option to
for originally $48.95, but at the time of the screen shot, only
cost $35.47.  **HUNG's** Wells Fargo debit card history shows a
purchase from Amazon for $59.05 on March 31, 2020, which appears
to be the original cost at $48.95, plus shipping and tax since
the item is not an Amazon Prime eligible purchase to receive
free shipping.

[15] In addition to firearms, **HUNG** also sought to circumvent
California's restrictions on acquiring automobile parts. For
example, on January 8, 2020, **HUNG** exchanged messages with an
associate about sending automobile parts that were illegal in
California to Oregon, and having the associate then ship the
items to **HUNG** in California to the Lodi Residence.  **HUNG** wrote
"Gratze mi Lorde!! Must be Intake piping, can't be shipped to
Cali for stupid emissions control so redirected to the land of
the free lol its metal tube that's illegal…California.  If
possible when you have a chance just put it into the garden
house or something please and thank you.  Unless it's possible
to ship it to Lodi from front office?"  The associate responded,
"Are you serious???  You can't ship that down there? What a
shame. I can send it to you in Lodi."

a.  According to T-Mobile cell-site records, seized pursuant to the federal warrant number in Case No. 2:20-MJ-3043 described above, **HUNG's** cell phone was located in California from early January 2020 to approximately March 16, 2020.  During the first half of the year, his phone was located predominantly in the Lodi, California, area, in the vicinity of both the Lodi Vineyard and the Lodi Residence.  During the last two weeks of March 2020, however, **HUNG's** cell phone pinged at multiple locations in Oregon.  After March 30, 2020, HUNG's cell phone was again located in California and did not return to Oregon through June 30, 2020, the last date of available cell-site records.[16]

b.  Wells Fargo records confirm that **HUNG** travelled from California to Oregon in March 2020 and that **HUNG** stated in Oregon for approximately two weeks.  At the end of March 2020, **HUNG** made several purchases from establishments located in Oregon.  Prior purchases and subsequent purchases were at establishments located in California.

53.  Prior to his trip to Oregon, **HUNG** and his associates communicated regularly about his plans to stockpile firearms to prepare for civil disorders.  These communications appeared to escalate in early March 2020 before **HUNG's** trip to Oregon at the onset of the COVID-19 pandemic and increased conspiracy theories

---

[16] On September 14, 2020, the Honorable Michael R. Wilner, United States Magistrate Judge, issued a search warrant for **HUNG's** additional historical cell-site records from June 30, 2020, to September 11, 2020, and prospective data, in case number 2:20-MJ-3044, but T-Mobile has not yet provided the updated historical cell-site records.

propagated by the far-right movement known as "QAnon," described more below, that the virus was a hoax.

54.  On March 12, 2020, for example, G███████ wrote to **HUNG** and others:

> Just so everyone is clear if shit really does go down
> next steps are immediately.  1. if at work go home or
> rendezvous with parents which ever is most effective
> 2. If at home grab parents, bring weapons/food Grab
> glock 26 from Nest house or get my own ASAP.  Hit gas
> station possibly full tank of coast clear Haul ass
> straight to Lodi We make bunker We never surrender ??

As discussed above, I believe that the reference to a "glock 26" at the "nest house" is a reference to the Glock 26 that **HUNG** kept at the **SAN MARINO RESIDENCE**.  I further believe that "Lodi" is a reference to the Lodi Residence and/or the Lodi Vineyard and that the proposal to bring "weapons" to "make bunker" and "never surrender" is a reference to the potential need to use violence against any intruders once in Lodi, California.

55.  The next day, on March 13, 2020, G███████ wrote to **HUNG**, S███, and others, "#QANON storm is upon us.  Deep state is in panic.  This may be the greatest military operation ever I'm starting to believe it now.  Going to be fucking bad bro. Better be ready."  Based on my training and experience, I know that "QANON" is a reference to a movement of individuals that follow an anonymous internet poster known as "Q" who advocates numerous conspiracy theories, including that government officials who are part of the "deep state" are engaged in a variety of criminal enterprises including sex trafficking of minors.  Based on my training and experience and facts developed

in this investigation, I believe the references in the above message to the "storm" and the "greatest military operation ever" are references to the individual's belief, which is commonly espoused by QANON supporters, that government responses to the COVID-19 pandemic were in fact a cover for a military operation related to a purported "deep state" criminal enterprises.

56.  In response to G███████'s message to be ready for the "greatest military operation ever," S███ replied to the same thread including **HUNG**, "about damn time."  Another associate replied, "On stand by."  S███ replied, "The sheep have no idea what's coming."

57.  A few days later, on March 16, 2020, G███████ asked **HUNG** whether he could "borrow g26" if "things get worse," or whether that would be "super illegal."  **HUNG** replied the next day that he was in Bend, Oregon,[17] but that G███████ could "get the Glock without anyone knowing.  It's in the drawer next to the bed."

3.  **HUNG** Converted the Lodi Vineyard into a Tactical Training Ground Using Weapons and Ammunition Acquired from Out of State to Prepare for Civil Disorders

58.  Throughout 2020, in advance of the protests that arose in response of the death of George Floyd, **HUNG** and his associates regularly discussed their plans for responding to civil unrest and a perceived conspiracy by government officials

---

[17] This is consistent with cell-site information placing **HUNG's** phone in multiple places in Oregon, between March 16 and March 29, 2020.

to suppress individual rights. Part of these plans appeared to include converting part of the Lodi Vineyard into a shooting range and tactical training grounds.

59. **HUNG** communicated with several associates about acquiring ammunition and firearms accessories outside of California and then having them transported into California. For example, on April 22, 2020, G███████ asked **HUNG** if he would be in Oregon anytime soon because G█████ need to "send some ammo somewhere." **HUNG** replied, "Gonna be heading up there sometime in the next few weeks" but that if G██████ was going to Vegas he could ask a friend to have the ammunition shipped there instead. **HUNG** added that he was "going to ship some mags and ammo as well to Oregon" or to another associate that, based on his name, I believe is located in either Colorado or Wyoming.

60. A week later **HUNG** wrote another associate to encourage him to "buy ammo ASAP" because "the delivery ban got lifted." The associated replied, "Mi lorde 300+ rounds shipped out this morning for Jogee apartment. Yup got like 200+ rounds of 115 grain for like under 100 bucks. We aren't messing around." **HUNG** replied, "Yes I want to pick up another 2000. Rounds."

61. During the same exchange, the associate referenced the existence of "training facility" in Lodi. The associate wrote, "once my m&p shield comes I needa come up to the Hunt Lodi Training Facility." **HUNG** replied, "Hell yee baby!! Come run the course my lorde!" Based on my training and experience and facts developed in this investigation, I believe the "Hunt Lodi Training Facility" refers to the Lodi Vineyard.

62.  On April 30, 2020, **HUNG** and G████████ exchanged several messages about buying gun parts and assembling homemade assault rifles that are not compliant with California gun laws.  **HUNG** then described the gun parts and barrel lengths he owned, and G████████ replied, referencing the inability to purchase California-compliant AR-style, "Well yeah I would do the complete lower but they don't have any California ones right now.  So should I just build then?  But than I have nothing registered?"  **HUNG** replied, "Yeah exactly.  Ghost guns.[18]  Things that don't exist lol."

63.  That same day, on April 30, 2020, **HUNG** and a different associate discussed shooting drills and the ability to practice those skills at the Lodi Vineyard.  **HUNG** described telling his dad "how legit it is for us to have our own area to shoot guns" and that people all over the world "would kill to shoot in their backyard."

64.  On May 20, 2020, **HUNG** sent a link to an associate for a shoot house.[19]  **HUNG** then wrote, "I wonder what these cost to build.  Our very own Shoot House!!!  The only way to practice

---

[18] Based on my training and experience, I know that "Ghost guns" is a term used to describe privately made firearms that lack commercial serial numbers or other identifying marks.  Individuals who make "ghost guns" typically do so to evade state or federal firearms regulations.

[19] Based on my training and experience, I know that a "shoot house" is a structure specifically designed for shooters to enter and conduct live fire, firearms training in confined spaces in order to simulate urban combat and clearing buildings and rooms.  Generally, the rooms inside a shoot house can be changed and/or rearranged in order to have different configurations to train on.

clearing buildings/rooms/staircases!!  Would love to build on
the vineyard."  I believe this is another reference by **HUNG** to
developing a larger capacity to conduct firearms related
training at the Lodi Vineyard**.**

65.  T-Mobile cell-site records indicate that after
returning from Oregon at the end of March 2020, **HUNG's** cell
phone was located in Lodi, California for most of April, split
between the Lodi Vineyard and the Lodi Residence before
returning to the **SAN MARINO RESIDENCE** in early May 2020.  This
is consistent with **HUNG's** financial records, which show that
**HUNG** purchased items from establishments located in Lodi,
California, between April 2, 2020, and May 8, 2020.  Beginning
on May 9, 2020, **HUNG** purchased items from locations in Southern
California, including a purchase at a smoke shop in Pasadena on
May 27, 2020, the weekend of the protests.

66.  In addition to communications with his associates
about his efforts to create a tactical training facility at the
Lodi Vineyard, **HUNG's** iCloud records and purchase histories
confirm that he was amassing an arsenal of weapons, ammunition,
and tactical equipment at the Lodi Vineyard.

67.  Apple records for **HUNG's** iCloud account also included
numerous additional photographs of firearms and firearm
accessories, including the following in addition to the one
described above:

a.  A photograph of two additional assault rifles on
a chair on what appears to be the back porch of an unknown
residence with straight rows of unidentified agricultural crops

in the background, which would be consistent with the topography of the Lodi Vineyard.

    b.    A photograph of two assault rifles in what appears to be a bedroom.

    c.    Multiple photographs of a black assault rifle on what appears to be a mattress.

    d.    Multiple photographs of **HUNG** wearing a green tactical vest and holding an additional black assault rifle inside a residence.

    68.    According to PayPal records,[20] **HUNG** bought various firearms-related items from online vendors in various states throughout 2020, which he had shipped to the Lodi Residence. These shipments included a holster for a Glock 19 handgun on April 30, 2020, a large but undescribed purchase from a tactical equipment company on April 27, 2020, a shooting target on April 30, 2020, and a "rubber dummy" shooting target designed to resemble the torso of an adult male on May 16, 2020.

    69.    **HUNG** continued to ship firearms components to the Lodi Residence after the May 31, 2020 incident.  For example, according to PayPal records, **HUNG** purchased another shooting target in the shape of a male torso on August 3, 2020, a component part for building a Glock 19 handgun on August 26,

---

[20] Paypal has identified approximately 23 accounts associated with **HUNG** through either the email address ███████████████████ (20 accounts) or ██████████████████████ (3 accounts).  All 23 are registered in the name of "Benjamin Hung" except for one, which is in the name of "B████ S███" but still linked to ██████████████████

34

2020, and another shooting target in the shape of a male torso on August 22, 2020.

70. During this same time period, between May 8, 2020, and May 16, 2020, PayPal records show that **HUNG** was also shipping firearms-related components to his parents' residence in ██ ████████████████████████████████████████████ (the "Old Mill Residence"), which is less than three miles away from the **SAN MARINO RESIDENCE**, including, for example, several base pads[21] for different types of Glock handguns and another "rubber dummy" shooting target.

71. Neighbors of the Lodi Vineyard have confirmed the presence of firearms activity as recently as September 9, 2020. On September 10, 2020, a neighbor to the Lodi Vineyard was interviewed by a Task Force Officer with the FBI.[22] S/he stated that s/he hears gunfire, often. S/he pointed west to the property across the river and stated the shots originated from that direction, which was in the direction of the Lodi Vineyard. When asked if the gunfire came from "the vineyard," the neighbor said yes, affirmatively. The neighbor advised that the gunfire sounded like target practice and that their domestic partner, who is familiar with firearms, positively identified the sound as gun shots. The neighbor further advised that they hear the

---

[21] A base pad is a firearm part that can be used to extend the magazine of a firearm beyond the manufacturer's capacity.

[22] Local law enforcement had previously received an anonymous complaint about gunfire in the area, and the Task Force Officer used this complaint as the basis for interviewing the neighbor.

gunfire approximately twice a month, and that sometimes it would last for approximately two hours.  When the neighbor was asked when was the last time they had heard gun shots, s/he stated September 9, 2020, the day before the interview.  S/he advised that it lasted about a half hour and that it was loud enough to scare their dogs.

72.  Aerial surveillance of the Lodi Vineyard from September 2020 depicts what appears to be a shooting range with targets and in a forested area set back from the main house.

### C.  HUNG Resides at the SAN MARINO RESIDENCE, the Lodi Residence, and the Lodi Vineyard

73.  As explained above, **HUNG** appears to spend his time in both San Marino, California, at the **SAN MARINO RESIDENCE**, and Lodi, California, at the Lodi Residence and the Lodi Vineyard.

74.  According to video recordings from **HUNG's** arrest on May 31, 2020, S███ told PPD officers during routine questioning that they lived together at the **SAN MARINO RESIDENCE**. Similarly, **HUNG** told PPD officers that he was from San Marino but that he also lived in Oregon and spent time in Washington because the company he works for operates in all three states.[23]

75.  The FBI interviewed a neighbor, who lives next door to the **SAN MARINO RESIDENCE,** who recognized a photograph of S███ and identified S███ by name, describing S███ as the daughter of his/her neighbor.  S/he also recognized a photograph of **HUNG** as the boyfriend of S███ who began showing up at the **SAN MARINO**

---

[23] **HUNG's** driver's license is a Washington State driver's license and lists an address in Seattle, Washington.

**RESIDENCE** approximately six months before. S/he was shown a photograph of **HUNG's** truck, which s/he recognized as belonging to **HUNG** because s/he had seen **HUNG** drive the truck to the **SAN MARINO RESIDENCE**. S/he recalled seeing the truck displaying various flags, including a "don't tread on me," flag, and a Confederate flag attached to the back. The neighbor mostly observed S█ and **HUNG** at the **SAN MARINO RESIDENCE** on weekends and recalled seeing **HUNG** drive the truck to and from **SAN MARINO RESIDENCE** on the weekend of the incident. The neighbor also described seeing **HUNG** on multiple occasions at the **SAN MARINO RESIDENCE** wearing military-like camouflage, military fatigues, and carrying a gray tactical vest.

76. The San Marino neighbor also saw **HUNG** at the **SAN MARINO RESIDENCE** as recently as July 8, 2020, with an unfamiliar RV parked out front that bore an out-of-state license plate. S/he observed **HUNG** and S█ loading the RV with what appeared to be lawn chairs and coolers. S/he remembered seeing the RV depart around 11:00 p.m. on July 8, 2020.

77. On July 11, 2020, FBI personnel saw a white Sunseeker RV with an Oregon license plate parked in front of the **SAN MARINO RESIDENCE** around 8:27 p.m. Agents also saw lights on in the house. According to the Oregon Department of Motor Vehicles, the Sunseeker RV is registered to C█ H█, **HUNG's** mother, at the same Four Seasons Garden RV Resort in Bend, Oregon, owned and operated by **HUNG's** parents.

78. When in Lodi, California, S█ and **HUNG** reside at the Lodi Residence and also spend time at the Lodi Vineyard.

According to Wells Fargo records, **HUNG** maintains two bank accounts that list the Lodi Residence as his mailing address and S█ maintains two bank accounts: one that lists the **SAN MARINO RESIDENCE** as her residence and a second that lists the Lodi Residence as her residence. According to Venmo records, S█ also listed the Lodi Residence as her residence. According to PayPal transaction records, further detailed below, on multiple occasions in 2019 and 2020, **HUNG** purchased items from different online vendors and listed the Lodi Residence as his shipping address. According to public databases, the Lodi Residence is owned by **HUNG's** father, I█ H█, and utility services are registered in S█'s name.

79. According to the California Secretary of State records, **HUNG's** father owns "157 California Reserve Inc.," the entity that owns the Lodi Vineyard.[24] The Lodi Vineyard is located approximately 4.5 miles north of the Lodi Residence.

80. As detailed above, **HUNG** exchanged numerous text messages with associates throughout 2020 describing his presence at the Lodi Residence, the Lodi Vineyard, and the **SAN MARINO RESIDENCE**, as well as his travel between those locations and Oregon.

---

[24] According to the San Joaquin County Sheriff's Office parcel viewer, the Lodi Vineyard is owned by 157 California Reserve Inc., with a mailing address of ███████████████ ███████████ the same address associated with ICM Resources Inc. in Oregon. 157 California Reserve Inc. was incorporated at the same address for ICM Resources Inc. in San Marino, California.

81.  On August 25, 2020, FBI personnel saw a white and gray Dodge pick-up truck with the Oregon license plate "███████"[25] parked in the driveway of the **Lodi Residence** that appears to be the same truck **HUNG** drove through the crowd on May 31, 2020. Instead of the "WAR R1G" license plate, the license plate seen on August 25, 2020 reads "██████." Several pictures saved to **HUNG's** Apple iCloud account, seized pursuant to a federal search warrant, show a similar truck with the same custom configurations and Oregon license plate "███████." I believe that this is likely the same truck, but that **HUNG** replaced the license plate to conceal the truck after receiving significant attention for the license plate "WAR R1G" on social media and in local news following his arrest in Pasadena.

82.  For the reasons set forth above, including **HUNG's** purchase of firearms from Oregon, his transport of those firearms to his multiple residences in California, his apparent intent to transport the firearms for use in connection with civil disorders, and his purchase history of firearms and firearm-related items, there is probable cause to believe that evidence of the Subject Offenses will be found at the **SAN MARINO RESIDENCE.**

### VII. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

83.  From my training, personal experience, and the collective experiences related to me by other law enforcement

---

[25] The Oregon Department of Motor Vehicles was unable to provide registration information for this license plate because of an "unable to locate" error message.

officers who conduct firearms investigations, I am aware of the following:

a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that individuals who own, deal, or transport firearms illegally will keep the contact information of the individual who is supplying firearms or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b. Many people keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices, or of firearms that they wish to sell to others. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c. Correspondence between persons buying and selling firearms, or transporting firearms, including correspondence between co-conspirators in the dealing of firearms without a license or illegally transporting them across state lines, often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of

firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that they sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms. Individuals engaged in the illegal purchase or sale of firearms often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[26]

84. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur

---

[26] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain

42

"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

85.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

86.  Digital devices capable of storing multiple gigabytes
are now commonplace.  As an example of the amount of data this
equates to, one gigabyte can store close to 19,000 average file
size (300kb) Word documents, or 614 photos with an average size
of 1.5MB.

87.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of
publicly available materials:

      a.    Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.    In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.    Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress **HUNG'S** thumb and/or fingers on the
device(s); and (2) hold the device(s) in front of **HUNG'S** face

44

with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

88.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

89.  For all of the reasons described above, there is probable cause to believe that that **HUNG** has committed a violation of 18 U.S.C. § 371 (Conspiracy to Transport Firearms Interstate and Make a False Statement in Acquisition of Firearms).  There is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the **SAN MARINO RESIDENCE** as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 21st  day of
September  , 2020

_____
THE HONORABLE PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE