TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
DAVID T. RYAN (Cal. Bar No. 295785)
Assistant United States Attorney
Terrorism and Export Crimes Section
FRANCES S. LEWIS (Cal. Bar No. 291055)
Assistant United States Attorney
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4491/4850
    Facsimile: (213) 894-2979
    E-mail:   david.ryan@usdoj.gov
              frances.lewis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 20-452(A)-SVW |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT BENJAMIN JONG REN HUNG |
| v. | |
| BENJAMIN JONG REN HUNG, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Frances S. Lewis and David T. Ryan, files its sentencing position for defendant BENJAMIN JONG REN HUNG.

    This sentencing position is based upon the attached memorandum of points and authorities, the Presentence Investigative Report dated July 12, 2021, the declaration of AUSA Frances S. Lewis and Exhibits

thereto, the files and records in this case, and such further
evidence and argument as the Court may permit.

Dated: October 11, 2021          Respectfully submitted,

                                 TRACY L. WILKISON
                                 Acting United States Attorney

                                 SCOTT M. GARRINGER
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                      */s/ Frances S. Lewis*
                                 FRANCES S. LEWIS
                                 DAVID T. RYAN
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

ii

**Contents**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION..................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND............................3

      A.    Factual Basis of the Plea Agreement.....................3

      B.    Additional Relevant Facts from the Investigation
            Related to Defendant's Firearms Offenses................6

            1.    Defendant Illegally Acquired and Illegally
                  Possessed an Arsenal of Firearms for the Purpose
                  of Engaging in Civil Disorders....................6

            2.    Defendant Brought the Loaded Glock 26 Handgun He
                  Illegally Acquired in Oregon to the Pasadena
                  Protests on May 26, 2020, to Engage in Civil
                  Disorders........................................11

            3.    After Defendant's Arrest by the Pasadena PD, He
                  Bragged about Becoming a National Icon and
                  Continued to Stockpile Tactical Assault Equipment
                  and Express a Desire to Confront and Kill His
                  Political Enemies................................17

III.  GUIDELINES CALCULATION......................................20

      A.    Plea Agreement.........................................20

      B.    PSR....................................................20

IV.   A HIGH-END SENTENCE OF 33 MONTHS IS APPROPRIATE.............21

      A.    Defendant's Mitigating Circumstances...................21

      B.    Seriousness of Defendant's Offense, Need for Just
            Punishment, Need to Deter, and Need to Protect the
            Community..............................................21

V.    CONCLUSION..................................................24

## MEMORANDUM OF POINTS AND AUTHORITIES

**I. INTRODUCTION**

Over a seven-year period, in preparation for what he described as an upcoming "civil war," defendant BENJAMIN HUNG ("defendant") illegally accumulated a massive cache of weapons.  Defendant acted in secret, intentionally taking advantage of looser gun laws in Oregon to acquire firearms through straw purchases and false statements and then bringing the guns into California where there would be no record of his ownership.  California registration records suggested that defendant owned no firearms at all, but in reality, his arsenal included 17 rifles, 12 pistols, over 70,000 rounds of ammunition, several loaded high-capacity magazines, body armor, scopes, and other tactical gear.  Three of the guns were illegal short-barreled rifles. Defendant prepared for the "revolution," as he called it, not only by secretly and illegally building this arsenal, but also by converting a portion of his parents' vineyard into a tactical training ground. Defendant's motives were clear: his messages to friends reflected increasingly violent rhetoric, including his desire not to defend himself, but to seek out and "eradicate" his perceived enemies.

On May 31, 2020, just two months after driving to Oregon to acquire five more firearms using false information, defendant brought one of his illegally acquired handguns -- a loaded Glock 26, 9mm semiautomatic handgun, bearing serial number BBMM205 (the "Glock 26") -- with him to a protest in Pasadena, California.  While unarmed individuals waved signs and peacefully chanted against racial injustice in policing after the death of George Floyd, defendant intentionally drove his modified Dodge Ram truck that he nicknamed the "War Rig" into the crowd.  As defendant has now admitted in the

plea agreement, and as surveillance video shows, several cars in front of defendant approached the same intersection, stopped, then turned around and drove away.  Defendant then chose, without provocation, to drive directly into the crowd.  The victims, including two undercover police officers, leaped out of the way while defendant gleefully blared his train horn, blasted smoke from his exhaust pipe, and yelled "fuck you" out his open window.

Pasadena Police Department ("Pasadena PD") officers arrested defendant at the scene and found in his truck the Glock 26 handgun, multiple loaded high-capacity magazines, an 18-inch machete, $3,200 in cash, a long metal pipe, and a megaphone.  He then lied to the officers multiple times, denying that it was his truck, denying that he had any weapons with him, and denying that he had come to the intersection to counterprotest -- facts he has all now admitted as part of his plea.

On May 12, 2021, defendant entered a plea of guilty to all 11 counts of the First Superseding Information pursuant to the Plea Agreement.  (Dkt. 65.)  The First Superseding Information charged defendant with conspiracy, in violation of 18 U.S.C. § 371 (count one), transporting and receiving firearms across state lines, in violation of 18 U.S.C. § 922(a)(3) (counts two and eight), false statements during purchase of firearms, in violation of 18 U.S.C. § 922(a)(6) (counts three to seven), and possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d) (counts nine to eleven).

The Presentence Investigation Report ("PSR") calculated a Sentencing Guidelines total offense level of 18 and a criminal history category of I, with a resulting sentencing range of 27 to 33

months.  For the reasons set forth below, the government concurs with the recommendation of the United States Probation & Pretrial Services Office ("USPO") that defendant receive a high-end sentence of 33 months' imprisonment with three years of supervised release to follow, as well as a fine of $10,000 and a $100 special assessment.

**II.   FACTUAL AND PROCEDURAL BACKGROUND**

   **A.   Factual Basis of the Plea Agreement**

According to the Plea Agreement's factual basis (¶ 21), defendant agreed to the following key facts:

Between at least July 23, 2014, and August 20, 2018, defendant conspired with Co-Conspirator #1 to willfully transfer into and receive in defendant's state of residence firearms purchased outside that state and to knowingly make false statements in the acquisition of firearms in violation of 18 U.S.C. §§ 922(a)(3), and (a)(6). Specifically, defendant, who resided in California, would give cash to Co-Conspirator #1, who resided in Oregon, to obtain firearms for defendant from firearms dealers in Oregon in order to evade California's firearms registration laws.  At defendant's direction, Co-Conspirator #1 would buy the firearms and falsely state on Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Form 4473 Firearms Transaction Records ("Form 4473") that Co-Conspirator #1 was the actual buyer of the firearms, rather than defendant.  Co-Conspirator #1 would then transport the firearms from Oregon to California to deliver them to defendant.

Through this conspiracy, defendant illegally obtained the following four firearms: (1) a Walther P-99 9mm semiautomatic handgun purchased on July 23, 2014; (2) the Glock 26 (described above) purchased on December 26, 2017; (3) a Glock 43, 9mm semiautomatic

handgun (the "Glock 43"), also purchased on December 26, 2017; and (4) a Glock 19X, 9mm semiautomatic handgun purchased on August 20, 2018 (the "Glock 19x").

On January 4, 2018, defendant received in the state of California, where he then resided, the Glock 26 and the Glock 43, which defendant obtained outside the state of California by directing Co-Conspirator #1 to purchase them for him in Oregon and deliver them to him in San Marino, California.  Defendant kept the Glock 26, the Glock 43, and the Glock 19X at his residences in California, but never registered the firearms in California.

Between March 18 and 29, 2020, in connection with the acquisition of four rifles and one shotgun from licensed firearms dealers, defendant knowingly made false and fictitious written statements intended and likely to deceive such dealers with respect to a fact material to the lawfulness of the sale of such firearms, specifically, falsely stating on Form 4473s that he was a resident of the state of Washington, rather than the state of California. Defendant's false statements were material because the firearms dealers were not legally permitted to sell firearms to California residents.

Defendant made these false statements to evade California's firearm registration laws and obtain the following five firearms: (1) a Mossberg Model 464 rifle (the "Mossberg 464") on March 18, 2020;  (2) a Bergara Model B-14 rifle (the "Bergara B-14") on March 22, 2020; (3) a Winchester XPR rifle (the "Winchester XPR") on March 22, 2020; (4) a Mossberg Model 500 shotgun (the "Mossberg 500") on March 29, 2020; and (5) a Browning Model BL22 rifle (the "Browning BL22") on March 29, 2020.

On March 30, 2020, defendant, not being a licensed importer, manufacturer, dealer, and collector of firearms, willfully transported the Mossberg 464, the Bergara B-14, the Winchester XPR, the Mossberg 500, and the Browning BL22 to his house in Lodi, California, where he then resided.  Defendant then kept these firearms at his residences in California, but never registered the firearms in California.

On the afternoon of May 31, 2020, a group of 50-100 individuals assembled to demonstrate at the intersection of Fair Oaks Avenue and Colorado Boulevard in Pasadena, California.  The individuals carried signs and chanted slogans protesting against inequitable treatment of minorities by police, including the death of George Floyd at the hands of a police officer in Minneapolis, Minnesota, and supporting the Black Lives Matter movement.  Shortly before 5:00 p.m., defendant drove his Dodge pick-up truck with raised suspension, modified steel front and back bumpers, custom train horn, three large flags, and vanity license plate "WAR R1G" to the location of the demonstration in order to counterprotest.  Defendant possessed several items inside the truck, including the Glock 26.  Defendant did not brandish or use the Glock 26, which remained inside a closed fanny pack beneath the middle seat throughout the incident.

As defendant neared the intersection of Fair Oaks and Colorado, he could see that the protestors were standing in the middle of the intersection blocking traffic from proceeding.  Defendant's truck was behind several other cars, which defendant could see had either stopped or were turning around to drive away from the demonstration. As defendant got closer to the intersection, instead of turning around, defendant accelerated toward the intersection where the

demonstrators were located. A protestor then threw an object at the passenger-side window of defendant's approaching truck, and defendant's passenger instructed him to "horn 'em," which defendant understood to be a reference to using the train horn. Defendant sounded his train horn and stopped short of the intersection. He then continued driving forward into the intersection and then turned left as the demonstrators moved out of the path of defendant's truck. As defendant proceeded past the demonstrators through the intersection, defendant caused the truck to emit a large amount of vehicle exhaust, also known as "coal rolling."

On September 23, 2020, at his house in Lodi, California, defendant knowingly possessed the following firearms, each of which defendant knew to be a firearm and a short-barreled rifle (i.e., a barrel less than 16 inches, as defined in 26 U.S.C. §§ 5845(a)(3) and 5845(c)), and each of which had not been registered to defendant as required by law: (1) a Colt model M4 carbine semiautomatic rifle with a 8.75 inch barrel; (2) a Colt model M4 carbine semiautomatic rifle with a 11.5 inch barrel; and (3) a Stag Arms model STAG-15 semiautomatic rifle with a 9.375 inch barrel.

### B. Additional Relevant Facts from the Investigation Related to Defendant's Firearms Offenses

#### 1. Defendant Illegally Acquired and Illegally Possessed an Arsenal of Firearms for the Purpose of Engaging in Civil Disorders

Well before his arrest by the Pasadena PD in May 2020, defendant had made clear his desire to confront and kill "Antifa scum," and to use his illegally acquired arsenal of weapons to do so. Defendant's Instagram messages throughout 2018 and 2019, while he was spending tens of thousands of dollars to amass his stockpile, reflect a man

increasingly obsessed with using violence to target and eradicate political opponents, be they "antifa," "Black Lives Matter," or other groups with whom defendant disagreed politically.  On July 3, 2018, defendant sent a group of associates the message that he was "[p]roud of my Americans in Portland who went out and slayed Antifa Scum!! I wish I could've been there with my fellow patriots . . . **civil war is on the horizon.** Ya'll can keep your strongman contests and physiques, All I know is in the chaos and rage of total battle there are no rules and no timeouts. **He who is most violent wins.**"  (Declaration of Frances S. Lewis ("Lewis Decl."), Exhibit A, Defendant's Instagram Records at USAO_045072 (emphasis added).)

One day later, on July 4, 2018, defendant wrote, "Im so jealous of these cops. I CANNOT wait to get my hands on antifa #killantifa." (Id. at USAO_045073.)  On June 12, 2019, defendant re-posted a message from someone else and added the hashtags, among others, "#FUCKANTIFA #FUCKBLM #FUCKCAIR #FUCKMUSLIMBROTHERHOOD (Id. at USAO_045071.)  On July 3, 2019, defendant posted a video of a journalist being assaulted allegedly by Antifa and stated, "**if I have to see one more video like this I'm going to start this revolution already and kill them all.**"  (Id. at USAO_045076 (emphasis added).) He then added, "I say we smash in antifa skulls as retribution." (Id. at USAO_045077.)

Defendant then wrote about his specific desire to seek out and kill people who were part of "antifa," writing in a series of messages, "Antifa are not human they are dogs and should be systematically eradicated like a cockroach infested, . . . [i]f any of you come across Antifa or know anyone who is part of, please inform me and let me know where they are based or where they live . .

. [i]f they happen to be your friend please urge them to chose a different path, or I will find them and change the path for them . . . [w]e've got plenty of acreage and plenty of dirt and equipment here in Lodi. **We can easily bury and hide a whole army of dead antifa**. So calling out to all my patriots: **hunting season is open**! **So If you see antifa, kill em, bag em, tag em, and bury em**." (Id. (emphasis added).)

As defendant has admitted, he illegally acquired five firearms (four rifles and one shotgun) himself in Oregon in March 2020 by falsely representing that he was a resident of Washington rather than a resident of California. (Plea Agmt. ¶ 21.) Both before and after his March 2020 trip to Oregon, defendant and his associates continued to communicate regularly about his plans to stockpile firearms to prepare for civil disorders. These communications appeared to escalate in early March 2020 before defendant's trip to Oregon at the onset of the COVID-19 pandemic and increased conspiracy theories propagated by the far-right movement known as "QAnon" that the virus was a hoax. (Compl. ¶ 53.) [1] For example, on March 12, 2020, an

---

[1] As described by the Anti-Defamation League, a national anti-hate organization, QAnon is a "global, wide-reaching and remarkably elaborate conspiracy theory" . . . "with marked undertones of antisemitism and xenophobia." See https://www.adl.org/qanon. The ADL also states, "While the ADL does not believe that all QAnon adherents are inherently extremists, this is a dangerous theory that has inspired violent acts."

Recent notable acts of violence that have reportedly been perpetrated or inspired by QAnon adherents include the January 6, 2021, insurrection at the U.S. Capitol and a California man's murder of his two young children in Mexico with a spearfishing gun. See, e.g., "QAnon Emerges As Recurring Theme of Criminal Cases Tied to US Capitol Siege," ABC News, available at abcnews.go.com/US/qanon-emerges-recurring-theme-criminal-cases-tied-us/story?id=75347445, and "A California Father Claims QAnon Conspiracy Led Him To Kill His 2 Children, FBI Says," NPR News, available at https://www.npr.org/2021/08/13/1027133867/children-dead-father-claims-qanon-conspiracy-led-him-to-kill.

associate ("M.G.") texted defendant and others: "Just so everyone is clear if shit really does go down next steps are immediately.  1. if at work go home or rendezvous with parents which ever is most effective 2. If at home grab parents, bring weapons/food Grab glock 26 from Nest house or get my own ASAP. . . . Haul ass straight to Lodi We make bunker We never surrender ??"  (Id. ¶ 54.)

On March 13, 2020, M.G. texted defendant, defendant's wife, and others, "#QANON storm is upon us.  Deep state is in panic.  This may be the greatest military operation ever I'm starting to believe it now.  Going to be fucking bad bro.  Better be ready."  Defendant's wife replied, "about damn time."  Another associate replied, "On stand by."  Defendant's wife replied, "The sheep have no idea what's coming."  (Id. ¶ 55-56.)  On March 16, 2020, M.G. asked defendant whether he could "borrow g26" if "things get worse," or whether that would be "super illegal."  Defendant replied the next day that he was in Bend, Oregon, but that M.G. could "get the Glock without anyone knowing.  It's in the drawer next to the bed." (Id. ¶ 57.)

Defendant did not have any weapons registered in his name in California, yet a photograph (below) from defendant's Apple iCloud account taken around April 2020 shows the extent of his weapons collection during this time frame.  (Id. ¶ 48.)  There are six firearms displayed on the table, including two assault rifles; three semi-automatic pistols, including one resembling a Glock 43; and one long-range rifle. (Id. ¶¶ 49-51.)  Additionally, the table contains four assault rifle barrels; at least fifteen assault rifle magazines; 11 standard pistol magazines; at least 15 extended pistol magazines; numerous boxes of ammunition of various calibers; a tactical vest equipped with assault rifle magazines and a tourniquet; a green

tactical belt holding five assault rifle magazines and two pistol magazines; and miscellaneous firearm accessories such as a tan pistol holster, camouflage eye protection, rifle scope, binoculars, and assorted gun parts.  (Id. ¶ 49.)  Below is the picture:



Defendant's plans for the "revolution" or "civil war," as he termed it, included converting part of the Lodi Vineyard into a shooting range and tactical training grounds and helping his associates prepare to fight.  (Id. ¶¶ 58-65.)  One of defendant's associates referred to it as the "Hunt Lodi Training Facility," and defendant encouraged him to "Come run the course my lorde!" (Id. ¶ 61.)  On April 30, 2020, defendant and M.G. exchanged several messages about assembling illegal, unserialized, homemade assault rifles.  M.G. wrote that he could not legally obtain an AR-style assault rifle under California law, and asked if he should build one then, and "have nothing registered," and defendant replied, "Yeah exactly.  Ghost guns.  Things that don't exist lol."  (Id. ¶ 62.)

On May 20, 2020, defendant sent a link to an associate for a shoot house, which is a structure specifically designed for shooters to enter and conduct live fire, firearms training in confined spaces in order to simulate urban combat and clearing buildings and rooms. Hung then wrote, "I wonder what these cost to build. Our very own Shoot House!!! The only way to practice clearing buildings/rooms/ staircases!! Would love to build on the vineyard."" (Id. ¶ 64.)

According to PayPal records, defendant also bought various firearms-related items from online vendors in various states throughout 2020, which he had shipped to the Lodi Residence.  These shipments included a holster for a Glock 19 handgun on April 30, 2020, a large but undescribed purchase from a tactical equipment company on April 27, 2020, a shooting target on April 30, 2020, and a "rubber dummy" shooting target designed to resemble the torso of an adult male on May 16, 2020.  (Id. ¶ 68.)

    2.   Defendant Brought the Loaded Glock 26 Handgun He Illegally Acquired in Oregon to the Pasadena Protests on May 26, 2020, to Engage in Civil Disorders

In May 2020, after months of expressing his passionate desire to confront and kill "antifa," defendant watched as widespread protests erupted across the nation after the death of George Floyd at the hands of the police in Minneapolis, Minnesota on May 26, 2020.  Local media stations covered the daily and nightly protests extensively, including displaying images from the protests and their general locations.  (Compl. ¶ 15.)

Defendant and his associates were monitoring the protests, which they associated with Antifa and the Black Lives Matter movement.  On May 28, 2020, M.G. texted defendant and others that "[t]hey got Antifa lighting the windows and burning stuff," to which another

associated replied 40 minutes later with "Black lives matter at it again." (Id. ¶ 33(a).)  On May 29, 2020, defendant wrote to his wife and other associates about his efforts to find and confront protestors in his War Rig, stating: "Antifa has been avoiding me or something.  **I can never seem to find them when I'm out war rigging??**" (Id. (emphasis added).)  An associate replied, "they hear the war rig coming and want no fucking part mi liege."  (Id. ¶ 33(b).)

On Sunday, May 30, 2020, a video posted online showed defendant confronting and spewing exhaust from his truck (known as "coal rolling") protestors in his War Rig truck in downtown Los Angeles. (Id. ¶ 28; Lewis Decl., Ex. D (N.E. Interview Report); Lewis Decl., Ex. E (N.E. Video dated May 30, 2020).)  These protestors recalled having to flee from defendant's pickup truck to a nearby parking garage because they were scared.  (Compl. ¶ 29.)

According to Co-Conspirator #1, who was in the War Rig truck with defendant on May 30, 2020, defendant first drove through Pasadena looking to confront protestors, but after failing to find protestors he decided to drive to downtown Los Angeles.  (Outlaw Decl., Dkt. 34-3, ¶ 2.)  Co-Conspirator #1 said that when they came upon groups of protestors downtown, defendant would scream at them, "Fuck you!" and "I will kill you!" and then coal-rolled them before driving away to confront a new group.  (Id.)  As defendant and Co-Conspirator #1 left downtown that night, Co-Conspirator #1 recalled that defendant was "amped up" by the encounter and in awe of seeing the protests in person.  (Id.)

On Monday, May 31, 2020, according to news reports from Pasadena
Now,[2] nearly 100 protestors returned to Old Pasadena to march again
in peaceful protest of George Floyd's death.  (Compl. ¶ 17.)  The
crowd began at a park and marched down Fair Oaks Avenue, forming a
square at the intersection of Fair Oaks Avenue and Orange Grove.
(Id.)  According to news reports, the marchers "chanted, danced, and
held the intersection for about 10-15 minutes" before continuing down
Fair Oaks Avenue and forming another square at Colorado Avenue.
(Id.)  Pictures from the protest reflect a racially diverse crowd
carrying signs with phrases like "Black Lives Matter," "Justice for
George," and the phrase "Police Brutality" with a circle drawn around
it and a line through it.  (Id.)  There were no reports of looting by
the protestors who assembled at the corner of Fair Oaks Avenue and
Colorado in Pasadena on the afternoon of May 31, 2020, or
confrontations with law enforcement by that group, and the police did
not arrest any of the protestors in that group for their conduct that
afternoon.  (Id. ¶ 18.)

Just a few hours before defendant drove his truck into that
crowd of peaceful protestors in Pasadena, an associate sent him and
his wife a picture of protestors blocking traffic on a highway, and
defendant's wife replied, "That's why you don't stop on the freeway
for these people and have a gun . . . If they try this on my car, I'm
running them over."  (Compl. ¶ 33.)

Defendant then took his illegally acquired Glock 26 along with
loaded high-capacity magazines, an 18-inch machete, a metal pipe, and

[2] Pasadena Now's coverage of the May 31, 2020, protests is
available here: https://www.pasadenanow.com/main/protesters-march-
again-in-pasadena/

1  a megaphone, and drove to the protest. (Compl. ¶¶ 19-34.)
2  Defendant's truck was a distinctive white Dodge Ram 2500 pickup with
3  a license plate that read, "WAR R1G," and that had been modified with
4  an elevated suspension, large tires, and an enhanced exhaust pipe,
5  which expelled a large plume of black smoke as it accelerated into
6  the crowd. (Id. ¶ 25.) At the time of the incident, the truck was
7  also flying three large flags: (1) a "Thin Blue Line" flag; (2) a
8  Gadsden "Don't Tread on Me" yellow flag; and (3) an original 13
9  states "Betsy Ross" American flag. (Id. ¶¶ 25-26.) Defendant
10 himself has been photographed flexing his biceps in a tank top
11 depicting the symbol of the Three Percenters organization[3] (id. ¶ 34)
12 and on Instagram, in June and November 2018, he used the hashtag
13 "#3percent" and "3percenter" (Lewis Decl., Ex. A at USAO_045069,
14 45075). Below are pictures of defendant's truck and himself in the
15 Three Percenters tank top as depicted in the Complaint:




---

[3] The Three Percenters is a far-right militia and paramilitary group with chapters nationwide whose members pledge to engage in protest and armed resistance against perceived attempts to curtail constitutional rights. (Compl. ¶ 26(c).) Their official flag is the Betsy Ross flag with three "I"s in the middle of the stars, and they have also been known to display the Gadsden flag. (Id.) The flag on defendant's truck did not have the three "I"s in the middle; however, the tank top defendant was photograph wearing did bear the Three Percenters' version of the Betsy Ross flag. (Id.)

1     A neighbor recalled previously seeing defendant with the same

2 truck displaying various flags, including the "Don't Tread on Me"

3 flag and a Confederate flag attached to the back.  (Id. ¶ 75.)

4     During the incident itself, as defendant later admitted in the

5 plea agreement, and as videos, witnesses, and Pasadena PD officers

6 all confirmed, a line of cars in front of defendant was slowly making

7 u-turns to avoid the protestors in the intersection.  (Id. ¶¶ 20-21;

8 Plea Agmt. ¶ 21.)  Defendant could see these cars making U-Turns or

9 coming to a stop when he chose instead to accelerate toward the

10 crowd.  (Plea Agmt. ¶ 21.)

11     After his arrest, defendant and his wife told police they were

12 just trying to flee from the "mob" of "over 50" protestors "charging"

13 their vehicle.  Video from a nearby restaurant, however, shows the

14 opposite.  Multiple cars in front of defendant easily made u-turns in

15 the wide, seven-lane street to avoid going into the intersection.

16 (Lewis Decl., Ex. F (Surveillance Video).)  Not a single pedestrian

17 or protestor was anywhere close to defendant's truck when at 4:58:30

18 p.m., he hit the acceleration and a cloud of smoke belched from his

19 truck.  He sped toward the crowd, braked briefly, then accelerated

20 again through the intersection, even as other cars continued to make

21 u-turns.

22     Even the video taken by defendant's wife from inside the truck

23 shows that no one approached the truck until after defendant

24 accelerated from a complete stop and began to drive into the

25 intersection directly towards the protestors.  Only then did a

26 protestor throw a cup at the truck, as defendant's wife yelled out,

27 "train horn his ass!" and defendant blared his horn, leaned out his

28 window, and yelled "fuck you guys!"  (Outlaw Decl., Dkt. 34-3, ¶ 3;

1   Plea Agmt. ¶ 21; Lewis Decl., Ex. G (Cellphone Video).)  Pasadena PD

2   Sergeant Buchholz, who witnessed the entire encounter from his

3   unmarked patrol car, saw the protestors, including two plain clothes

4   Pasadena PD detectives in the crowd, sprint out of the truck's way to

5   avoid being run over.  (Compl. ¶ 20; Lewis Decl., Ex. B (Pasadena PD

6   Reports).)

7        After defendant turned the corner, Pasadena PD officers pulled

8   defendant over and found inside his truck a black fanny pack that

9   contained a loaded Glock 26 9mm semiautomatic handgun with a 17-round

10  magazine, a second loaded 15-round magazine, a trigger guard, and a

11  flashlight.  (Compl. ¶ 24.)  Also in the truck, officers found an 18-

12  inch machete, a backpack containing $3,200 in cash, an 18-inch long

13  metal pipe, and a megaphone.  (Id.)  The pipe was wedged between the

14  driver's seat and the backseat, such that it was easily accessible to

15  defendant as he drove.  (Id.)  As soon as defendant exited the truck,

16  the officers asked him multiple times if there were any weapons in

17  the car, and he falsely said no.  (Lewis Decl., Ex. H (Pasadena PD

18  Body Camera).)  At the police station, officers asked defendant if

19  the truck and the items inside it belonged to him, and defendant

20  again lied, saying the vehicle was "not my truck, it's just a work

21  truck that we use for our business," and "a lot" of the items inside

22  did not belong to him.  (Outlaw Decl., Dkt. 34-3, ¶ 5.).

23       Defendant has now admitted that it was his truck, it was his

24  gun, and he was there that day to counterprotest, not simply to shop

25  and go home only to be mobbed by angry protestors.  (Plea Agmt.

26  ¶ 21.)  All of his statements to the police to the contrary were

27  lies.  This is of course consistent with the evidence that

28  (1) neighbors and associates have reported, and photographs seized

16

from defendant's phone show, that defendant routinely used the "War Rig" truck throughout 2020, including the night before May 31 to harass other peaceful protestors; (2) video seized from defendant's phone shows defendant wearing the black fanny pack on April 12, 2020, and practicing quickly pulling a firearm from it; (3) the Glock 26 found in the truck was defendant's and was unlawfully purchased for defendant in December 2017.  (Compl. ¶¶ 36, 43-47, 54; Outlaw Decl. ¶ 6; Plea Agreement ¶ 21; Lewis Decl., Ex. I (Cellphone Video).)

    3. <u>After Defendant's Arrest by the Pasadena PD, He Bragged about Becoming a National Icon and Continued to Stockpile Tactical Assault Equipment and Express a Desire to Confront and Kill His Political Enemies</u>

After defendant's arrest on May 31, 2020, by the Pasadena PD, defendant did not realize he had taken his zealous rhetoric too far. Instead, he bragged about the notoriety he had received, writing to an associate in August 2020 that the "war rig is a national icon" and that neighbors had recently approached him "like I was some kind of greek god of a patriot" and wanted to "shake my hand and pat my truck."  (Outlaw Decl. ¶ 7.)  Defendant said these neighbors were "ready to fight **the full civil war** if need be."  (<u>Id.</u> (emphasis added).)

Defendant also ramped up his efforts to buy tactical gear. During the two-year period leading up to May 2020, defendant bought at least $8,500 worth of tactical gear and ammunition, but in the three months after his arrest, between June and August 2020, he bought approximately $20,000 worth of similar equipment.  (<u>Id.</u> ¶ 14.)

Between June and September 2020, defendant and his group of associates began calling themselves the "Shooters of the Nest," and exchanged messages regarding obtaining firearms and related

17

equipment, training at defendant's family's vineyard, and confronting perceived "antifa."  (Id. ¶ 16.)  For example, on August 31, 2020, defendant sent a video of what appeared to be a protest where certain individuals are smashing car windows and wrote that it was a "target rich environment . . . what do you need an AR-15 for."  (Id.)  On September 6, 2020, an associate wrote a message to the group, which defendant "Liked," showing a hunter standing over a killed boar and the text, "gunna be replaced with Antifa soon if they keep acting up."  (Id.)  On September 10, 2020, shortly after wildfires broke out in Oregon, defendant wrote to the group, "Antifa terrorists caught setting fires," to which an associate replied, "fuckers need to be burned at stake."  (Id.)

Defendant also sent himself a message on August 22, 2020, describing in vivid and dark detail what he would do if the "mob" came through his neighborhood, writing:

> If you come to intimidate or harm me and mine, better come ready for the 7th level of hell.  You won't find me in bed, startled and frantic.  I will be death from the shadows, you will never see or know I was there.  A ghost. Disturbing the peace and safety of our babies in the middle of the night will come at the ultimate price.  I will be operating a $10,000 night vision setup and a $5000 mk18 rifle behind a pile of fully loaded 100 round drum mags. Come to our neighborhood and threaten our babies?!?  These scum will pray for a quick death and hope we don't bring em back to our subterranean 'interrogation' chamber.  Where the fun really begins and I make them tell me where their families live.  These scum are a lethal disease to the future prosperity and well being of our children.  **We will eradicate them accordingly**.

(Id. ¶ 17 (emphasis added).)

On September 11, 2020, defendant circulated approximately eight photographs to the Shooters of the Nest text group that depict himself assembling a tactical helmet, with each picture showing his

progress adding gear to the helmet, such as night vision googles.  In the final photographs, the helmet is pictured next to two AR-15 rifles, one of which is mounted with a laser that can be used to identity targets at night.  M.G. responded, "Antifa worst nightmare," and "can you imagine being Antifa rolling up in Lodi thinking its sweet and the King Bernardo hunts you down" using his night vision goggles.  Hung responded with a text stating "no fly zone where things magically disappear or become grape fertilizer."

When the FBI executed search warrants on defendant's properties in September 2020, the weapons collection they discovered was enormous.  From the Lodi Residence agents seized seven rifles, two pistols, over 10,000 rounds of ammunition, several loaded high-capacity magazines, and large quantities of tactical assault equipment including body armor, holsters, sights, and scopes. (Outlaw Decl. ¶ 10.)  From the Lodi Vineyard, agents seized ten rifles, ten pistols, over 60,000 rounds of ammunition, and similar tactical assault equipment.  Agents also seized from both locations numerous firearm parts, such as upper and lower receivers used for manufacturing and modifying firearms.  (Id.)[4]

In addition to the gun parts, agents also found evidence that some of the firearms had been illegally modified.  ATF Special Agents have determined that three of the AR-15 semi-automatic rifles seized from defendant's house had been modified into short-barrel rifles, possession of which is prohibited under federal law, and three of the rifles seized from the vineyard had been modified and qualified as

---

[4] Ghost guns are of particular concern to law enforcement because they are preferred by violent criminals who do not want their weapons traced back to them or their associates.

assault rifles, possession of which is prohibited under California law.  (Id. ¶ 12.)

## III.  GUIDELINES CALCULATION

### A.   Plea Agreement

In the plea agreement, the parties agreed to a total offense level of 18, based on a base offense level of 18 under USSG § 2K2.1, a two-level enhancement under USSG § 2K2.1(b)(1) for the number of firearms in the offense of conviction, a one-level enhancement for closely related counts under USSG §§ 3D1.2, 1.4, and a three-level downward adjustment for acceptance of responsibility under USSG § 3E.1.  (Plea Agmt. ¶ 23.)  The government further agreed not to seek a sentence above 33 months or a fine of more than $10,000.  (Id. ¶ 5(f).)  Defendant understood, however, that in seeking such a sentence, the government was permitted to present any relevant facts, including aggravating facts, that supported the imposition of the recommended sentence in this case.  (Id. ¶ 23.)

### B.   PSR

The USPO disclosed its PSR on July 16, 2021.  The USPO agreed with the parties Guidelines' calculations and calculated defendant's total offense level as 21.  (PSR ¶ 34.)  After applying a two-point downward adjustment for acceptance of responsibility under § 3E1.1(a) and a one-point downward adjustment under § 3E1.1(b), the USPO calculated defendant's total offense level to be 18.  (PSR ¶¶ 35-38.) Defendant had no prior criminal history, resulting in a criminal history category of I.  (PSR ¶ 47.)  Defendant's resulting Guidelines range is therefore 27 to 33 months.

The USPO issued its disclosed recommendation letter on July 16, 2021.  (Dkt. 76.)  In light of the aggravating factors in this case,

including the substantial length and scope of defendant's illegal firearm conspiracy and his "espousing of violence and blatant assaultive conduct," the USPO recommended a high-end sentence of 33 months imprisonment, a fine of $10,000, and three years of supervised release.  (Id. at 5.)

## IV.  A HIGH-END SENTENCE OF 33 MONTHS IS APPROPRIATE

A 33-month custodial sentence and a $10,000 fine appropriately balances the mitigating and aggravating factors under 18 U.S.C. § 3553(a) in this case.  The seriousness of the offense, the need for just punishment, the need for specific and general deterrence, and the need to protect the community all compel the requested custodial sentence of 33 months.

### A.   Defendant's Mitigating Circumstances

The government acknowledges the existence of mitigating circumstances in this case, which support the imposition of the government's recommended within-Guidelines sentence of 33 months. Defendant has no prior criminal history.  (PSR ¶ 47.)  He also appears to have the support of his family, which has deep ties to this district.  (PSR ¶¶ 11-13.)  Defendant has been able to maintain steady employment with his family's business, and recently had a young child with his wife.  (PSR ¶ 52-72.)  All of these circumstances support a within-Guidelines sentence.

### B.   Seriousness of Defendant's Offense, Need for Just Punishment, Need to Deter, and Need to Protect the Community

Through straw purchases and illegal transfers, defendant amassed an arsenal of firearms, including several assault rifles and modified short-barrel rifles that are illegal to possess under federal and state law.  Defendant also had over 70,000 rounds of ammunition, and

1   tens of thousands of dollars of tactical assault equipment.

2   Throughout 2019 and 2020, defendant and a group of associates, who

3   called themselves the "Shooters of the Nest," wrote about their

4   efforts to train for urban combat, and their desire to amass an

5   arsenal not to defend themselves, but to go out and find, confront,

6   and kill members of "antifa."  As set forth above, defendant

7   frequently used graphic language to describe his desire to commit

8   acts of violence -- indeed, to prepare for a "civil war" and a

9   "revolution" -- and his motivation behind acquiring his arsenal of

10  firearms appears primarily to engage in such battles.

11       Defendant's efforts to train to fight antifa began to turn into

12  action when, on May 31, 2020, he took one of his illegally acquired

13  firearms, the Glock 26, to a peaceful protest in Pasadena organized

14  by Black Lives Matter, a movement he associated with Antifa and

15  violence.  The Glock 26 was loaded and was in a fanny pack, just like

16  he had previously practiced on video swiftly removing a firearm.

17  Defendant also brought with him an 18-inch machete, a metal pipe, and

18  a megaphone, all while driving an additional weapon: a Dodge Ram 2500

19  pickup truck that he had nicknamed the "War Rig," with a modified

20  suspension, large tires, and an enhanced exhaust pipe that he had

21  already used the night before to harass and intimidate protestors,

22  yelling "Fuck you!" and "I will kill you!"  Contrary to the narrative

23  he told the Pasadena PD, about a scared couple just trying to leave a

24  shopping district only to be assaulted by protestors, defendant has

25  now admitted that he intentionally went to that intersection to

26  "counterprotest" and that he "accelerated" into the crowd, even upon

27  seeing others drive away.  (Plea Agmt. ¶ 21.)

28

While defendant did not injure any one on May 31, 2020, defendant easily could have.[5]  He also showed no remorse or contrition after his dangerous actions.  After his arrest on May 31, defendant lied to police officers, bragged that the War Rig had become a "national icon," accelerated his stockpiling of tactical assault equipment, and sent increasingly alarming messages about "eradicating" the "scum" who would "pray for a quick death" when he confronted them with his arsenal.  Although he has now accepted responsibility in the federal case, defendant showed no remorse for his conduct even after his arrest by Pasadena PD in May 2020.  He showed no signs of stopping his violent and aggressive behavior until he was detained in the federal case.  One of defendant's most disturbing messages on his phone was one that he sent to himself on August 22, 2020, after he was arrested driving a truck while armed with the Glock 26 through a crowd of peaceful protestors.  In this message, he promised to bring people back to his "subterranean 'interrogation' chamber" where "the fun really begins and I make them tell me where their families live."  (Outlaw Decl. ¶ 17.)  Defendant continued to describe in graphic detail how these individuals would "pray for a quick death," calling them "scum," a "lethal disease," and promising to "eradicate them accordingly."  (Id.)

The government acknowledges the existence of mitigating circumstances in this case, which support the imposition of the within-Guidelines sentence of 33 months that the USPO and the

---

[5] Just two weeks ago, a teenager trying to "coal roll" cyclists ended up injuring six of them.  See, e.g., "Sixteen-Year-Old in Pickup Truck Tried to Blow Exhaust Smoke on Cyclists, Then Struck Them, Witness Says," USA Today (Sept. 27, 2021), available online at https://www.usatoday.com/story/news/nation/2021/09/27/cyclists-ran-over-pickup-truck-texas/5885828001/

government recommend.  Defendant has no prior criminal history,
although this does not necessarily reflect a lack of criminal conduct
rather than success at avoiding getting caught, as he himself has
admitted that his conspiracy to illegally acquire firearms dated back
to 2014.  (PSR ¶ 47.)  He appears to have the support of his family,
which has deep ties to this district, as well as other supporters in
his community -- though he enjoyed this support system throughout the
several years in which he was illegally and fraudulently obtaining
firearms and sharing his desire to confront, torture, and kill
people.  (Outlaw Decl. ¶¶ 11-13.)[6]  Defendant's family support, his
employment with his family's business, and the recent birth of a
child, should provide resources to help defendant avoid future
criminal conduct.  (PSR ¶ 52-72.)  In light of these circumstances,
notwithstanding the presence of substantial aggravating factors, the
government agrees with the USPO that a within-Guidelines sentence is
appropriate.

**V.   CONCLUSION**

For the foregoing reasons, consistent with the government's
obligations in the plea agreement, a sentence of 33 months'
imprisonment to be followed by a three-year term of supervised
release, a fine of $10,000, and a $100 special assessment would be
sufficient, but not greater than necessary, to comply with the
purposes of 18 U.S.C. § 3553(a).  The government respectfully
requests that the Court sentence defendant accordingly.

---

[6] The support of his wife is also measured against her own
troubling statements and actions, including her efforts to cheer him
on while charging at the protestors and her own false statements to
law enforcement after his arrest, including that they were being
charged by over 50 people.

24